IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FILED by _____ D.C.

OCT 2 3 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

John Doe #1, John Doe #2,       *
John Doe #3, and                *
Florida Action Committee, Inc.; *
                                *
        Plaintiffs,             *     Case No:
                                *     **14-CV-23933-Huck/Otazo-Reyes**
                                *
vs.                             *
                                *
                                *
Miami-Dade County; Florida      *
Department Of Corrections;      *
Sunny Ukenye, Circuit Administrator *
for the Miami Circuit Office, Florida Department *
of Corrections, in his official capacity; *
                                *
        Defendants.             *
                                *

_____

**COMPLAINT**

1

## INTRODUCTION

1.      Defendants' enforcement of Miami-Dade County's Lauren Book Child Safety Ordinance (the "Ordinance"), which prohibits individuals convicted of certain sexual offenses from living within 2,500 feet of a "school," has repeatedly forced into homelessness hundreds of individuals in Miami-Dade County.

2.      These individuals, who frequently subsist on meager incomes after being released from prison, are unable to locate stable, affordable housing in Miami-Dade County.  This transience is primarily because the Ordinance arbitrarily renders off-limits broad swaths of housing.

3.      Another critical factor is that Defendant Miami-Dade County's imprecise definition of the term "school" has encouraged arbitrary and discriminatory enforcement of the Ordinance against those with qualifying convictions.

4.      Plaintiffs and numerous others have been directed by Defendants to an area around the intersection of NW 36th Court and NW 71st Street, in unincorporated Miami-Dade County, near the border of Hialeah.

5.      There is no housing at this location.  Instead, dozens of individuals have formed encampments near privately-owned warehouses and an active railroad track.

6.      The area is without adequate shelter.  It has no sanitation facilities, potable water, or other basic necessities, placing Plaintiffs in imminent risk of physical harm from attack, exposure, or disease.

7.      Defendants have hampered Plaintiffs' efforts to obtain and maintain affordable housing at or near the River Park Mobile Home Park (2260 NW 27th Avenue, Miami, FL 33142) ("River Park").  Defendants previously deemed River Park a valid location under the Ordinance.  However, the Miami-Dade State Attorney's Office and the Miami-Dade County

Homeless Trust lobbied Defendants to have a nearby youth emergency shelter called Miami Bridge Youth and Family Services, Inc. ("Miami Bridge"), classified as a school.  Their aim was to evict former sexual offenders in the area, though River Park and the Bridge coexisted within 2,500 feet for years without incident.

8.    This lobbying pressure led Defendant Florida Department of Corrections ("FDOC") to deem Miami Bridge a school.  It then evicted from River Park dozens of probationers covered by the Ordinance.  It did so despite the fact that Defendants had previously approved these residences and despite the fact that the Miami-Dade Police Department declined to enforce Miami Bridge as a school for those registrants not under FDOC supervision.

9.    Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate their rights under the Fourteenth Amendment to the United States Constitution against vague criminal statutes, against deprivations of liberty without due process of law, to personal security, to acquire and to maintain residential property, as well as their right under the Ex Post Facto Clauses of the state and federal constitutions to be free from Ex Post Facto laws.

10.    Plaintiffs seek a declaration from this Court affirming that their rights have been violated and a permanent injunction against future enforcement of the Ordinance.

## JURISDICTION AND VENUE

11.    Plaintiffs' claims arise under the Constitution and laws of the United States.  This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331, 1343(a)(3).

12.    This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. § 2201-2202 and Fed. R. Civ. P. 57 and 65.  The federal rights asserted by Plaintiffs are enforceable under 42 U.S.C. § 1983.

13.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(e). Defendants Miami-Dade County, and Sunny Ukenye, as well as all Plaintiffs, reside in this judicial district.  All of the events and omissions by Defendants giving rise to this action occurred in this judicial district.

## PARTIES

*Plaintiffs*

14.     Plaintiff John Doe #1 is a resident of Miami-Dade County, where he is registered as a "sex offender" under the ordinance.

15.     John Doe #1 is a mentally disabled man in his mid 50's.

16.     John Doe #1 was under supervision by the FDOC until July, 2014.

17.     In 1992, John Doe #1 was convicted of lewd and lascivious conduct with a 14 year old.

18.     When he was released from prison in 1994, John Doe #1 lived with his sister, but he was later incarcerated again.

19.     When John Doe #1 was released from prison in 2007, his sister's home was no longer an eligible location for him to live.

20.     John Doe #1's probation officer instructed him to go to a homeless encampment of former sexual offenders under the Julia Tuttle Causeway.

21.     In 2012, John Doe #1 was incarcerated for failing to register as a sex offender.

22.     John Doe #1 was released from prison in January 2014.

4

23.     John Doe #1's probation officer instructed John Doe #1 to go to the railroad tracks located near NW 36th Court and NW 71st Street after John Doe #1 could not locate housing under the Ordinance.

24.     John Doe #1 has been sleeping at the railroad tracks since January 2014.  The Miami-Dade Police Department and the FDOC approved this location as John Doe #1's residence.

25.     On several occasions, John Doe #1 has become ill while sleeping at the tracks.

26.     John Doe #1 would move back to River Park but for the Ordinance's residency restriction and Defendants' arbitrary enforcement of the restriction.

27.     John Doe #1 would move to another location in Miami-Dade County but for the Ordinance's residency restriction and Defendants' arbitrary enforcement of the restriction.

28.     Plaintiff John Doe #2 is a resident of Miami-Dade County, where he is registered as a "sex offender" under the ordinance.

29.     John Doe #2 is in his late 40's and is currently under supervision by the FDOC.

30.     In 2006, John Doe #2 was convicted of lewd and lascivious conduct on a 14 year old.

31.     John Doe #2 left prison in 2010.   Upon leaving prison, he rented a trailer at River Park.

32.     Unable to obtain employment, John Doe #2 could not afford the rent, and he moved out of the trailer.

33.     During the day, John Doe #2 would visit his Aunt's home.  Although his Aunt would have allowed him to live with her, the residency restrictions prevented John Doe #2 from living permanently with his Aunt.

34.     Instead, John Doe #2 returned to River Park each night and slept outside or in an abandoned trailer.

35.     In 2013, John Doe #2 was incarcerated again.  He was released in January 2014.

36.     Upon release, his probation officer instructed John Doe #2 to go to the corner of NW 71st Street and NW 36th Court in unincorporated Miami-Dade County.

37.     John Doe #2 expected to find housing at the location.   Instead, he found the railroad tracks and a parking lot.

38.     John Doe #2 lived at the railroad tracks from January 2014 until September 2014. Miami Dade Police Department ("MDPD") and the FDOC approved this location as his residence.

39.     John Doe #2 slept in a tent in the warehouse parking lot or along the side of the road.

40.     Recently John Doe #2's designated probation officer changed, and his new officer told John Doe #2 he could move back to River Park.

41.     In September 2014, John Doe #2 moved into a trailer at River Park.

42.     Plaintiff John Doe #3 is a resident of Miami-Dade County, where he is registered as a "sex offender" under the Ordinance.

43.     John Doe #3 is a man in his 50's, and he is currently under supervision by FDOC.

44.     In 1999, John Doe #3 was convicted of lewd and lascivious conduct with a 15 year old and unlawful sexual activity with a 16/17 year old.

45.     John Doe #3 was released from prison in 2009.

46.     In 2011, John Doe #3 moved to the Shorecrest neighborhood in Miami-Dade County to be closer to his place of employment.   In March 2014, he was evicted from his apartment.

47.     After John Doe #3 was evicted, his probation officer instructed him to go to the tracks.

48.     John Doe #3 has been sleeping in his vehicle along the tracks since March 2014. The Miami-Dade Police Department and the FDOC approved this location as John Doe #3's residence.

49.     John Doe #3 is currently employed.   Nonetheless, he has repeatedly and unsuccessfully tried to obtain affordable rental housing in compliance with the Ordinance.

50.     But for the Ordinance's residency restriction and Defendants' arbitrary enforcement of the restriction, John Doe #3 would have more available housing options, and he would not be forced to sleep in his vehicle each night.

51.     Plaintiff Florida Action Committee (FAC) is a non-profit corporation that works to reform the sex offender laws in Florida.

52.     FAC's mission is to educate the media, legislators, and the public with the facts surrounding sex offender laws.

53.     FAC has approximately 200 members across Florida, many of whom are required to register as sexual offenders.

54.     FAC members suffer harm from the Ordinance.  FAC members who are former sexual offenders desire to, but are unable to move to Miami-Dade County because they cannot find housing in compliance with the Ordinance.  A number of FAC's members are

currently living at the railroad tracks. FAC members were living in River Park during July and August 2013.

55.     FAC must divert significant time and resources working and consulting with individuals in Miami-Dade County who cannot find available housing under the Ordinance and who are forced into homelessness.

56.     FAC must also divert significant time and resources helping individuals desiring to move to Miami-Dade County find housing in compliance with the Ordinance.

*Defendants*

57.     Defendant Miami-Dade County is a political subdivision of the State of Florida organized under the laws of Florida.   It enacted, and its police department enforces, the "Lauren Book Child Safety Ordinance," Art. XVII, Ord. 21-277 through 21-285.

58.     Defendant Sunny Ukenye is the Circuit Administrator for the Miami Circuit Office of the Florida Department of Corrections.  He is charged with supervising probation officers in Miami-Dade County.  His office evicted formerly compliant probationers from River Park, and it directs probationers subject to the Ordinance to the encampment.

59.     Defendant Florida Department of Corrections is an agency of the State of Florida that oversees, through its probation officers, formerly incarcerated individuals on probation, community control, or post-release supervision.   The FDOC, through its agents and employees, has committed, and continues to commit, the constitutional violations alleged in this complaint within Miami-Dade County.  The FDOC also directs probationers subject to the Ordinance to the encampment.

## **FACTS**

60.     As of the date of filing, dozens of homeless individuals formerly convicted of certain sexual offenses have formed a makeshift encampment near the intersection of NW 36th Court and NW 71st Street.  The area is in a warehouse district in unincorporated Miami-Dade County next to an active railroad track.

61.     Inhabitants of the encampment are not there by choice or circumstance.  They were forced into homelessness by Defendants' deliberate, long-standing policy of severely restricting where individuals formerly convicted of certain sexual offenses may reside in Miami-Dade, and by Defendants' arbitrary and discriminatory enforcement of the Ordinance, which imposes these residency restrictions.

## Miami-Dade County's Lauren Book Child Safety Ordinance

62.     After the nearly five-year persistence of a notorious encampment under the Julia Tuttle Causeway numbering more than one hundred people formerly convicted of certain sexual offenses, Miami-Dade County amended its residency restriction ordinance in January 2010.  (Ord. No. 10-01, 1-21-10, amending Article XVII of Chapter 21 of the Code of Miami-Dade County "The Miami-Dade County Sexual Offender and Sexual Predator Ordinance").[1]

63.     The 2010 Ordinance repealed all municipal ordinances establishing residency restrictions for those labeled "sexual offenders" or "sexual predators."  Miami-Dade County Code, §21-279(b).

---

[1] The County renamed the ordinance the "Lauren Book Child Safety Ordinance" in October 2010.

64.     The Ordinance prohibits those formerly convicted of certain crimes[2] involving a victim under the age of 15 from residing within 2,500 feet of any school.  Miami-Dade County Code, §21-281(a).

65.     The Ordinance defines "school" as a "public or private kindergarten, elementary, middle or secondary (high) school." Miami-Dade County Code, §21-280(9).  The Ordinance does not incorporate any other definition of "school" under local, state, or federal law.

66.     There is no centralized, accurate, or reliable process under the Ordinance for regularly classifying new schools, accounting for previously omitted schools, or declassifying facilities that are no longer schools.

67.     While the Miami-Dade Police Department provides online mapping assistance for the residency restrictions, it expressly "does not assume responsibility for the accuracy or timeliness of the information displayed."[3]

68.     Covered individuals remain entirely responsible for complying with the statute, even if their noncompliance results from inaccurate or untimely information from government officials.

69.     A violation of the residency restriction is punishable by a maximum fine of $1,000 and/or imprisonment for up to 364 days. Miami-Dade County Code, §21-281(c).

**Defendants' Arbitrary Enforcement of the Ordinance**

70.     After the 2010 amendments, city, county, and state officials disbanded the Julia Tuttle Causeway encampment.

---

[2] Sections 794.011 (sexual battery), 800.04 (lewd and lascivious acts upon or in presence of persons under age 16), 827.071 (sexual performance by a child), 847.0135(5) (sexual acts transmitted over computer) or 847.0145 (selling or buying of minors for portrayal in sexually explicit conduct), Florida Statutes, or a similar law of another jurisdiction.
[3] http://www.miamidade.gov/police/2500-ft-address-compliance.asp

*Shorecrest*

71.    Many people displaced from the Julia Tuttle Causeway encampment relocated to the Shorecrest neighborhood in the City of Miami.

72.    DOC probation officers directed numerous others to Shorecrest when they could not locate compliant housing.

73.    The encampment disbanded in 2012 after Miami City Commissioner Marc Sarnoff converted a vacant piece of nearby land into a "pocket park" to exclude registrants under the state residency restriction.[4]

*River Park*

74.    Others displaced by the Defendants moved to or near River Park Mobile Home Park, located at 2260 NW 27th Avenue, Miami, FL 33142.  River Park was one the few locations thought to be eligible under the Ordinance with affordable rental housing.

75.    The Miami-Dade Police Department's Sex Crimes Bureau and the FDOC regularly approved this area under the Ordinance.

76.    On May 7, 2013, Elizabeth Regalado from the Miami-Dade County Homeless Trust notified Maria DiBernardo, Circuit Administrator for the FDOC, that individuals formerly convicted of certain sexual offenses were living near a facility called Miami Bridge Youth and Family Services Inc.

77.    Miami Bridge, located at 2810 NW South River Drive, Miami, Florida, is an emergency youth shelter.  It has existed for over 20 years.

---

[4] Fla. Stat. § 775.215.

78.     River Park is within 2,500 feet of Miami Bridge's property line as measured by the Ordinance.  The Miami River separates the two properties.

79.     Prior to Regalado's complaint, the Miami-Dade Police Department did not consider the Miami Bridge a school because it was not included in the list of schools MDPD received from the Miami-Dade County Information Technology ("IT") Department.

80.     The Miami-Dade County IT Department only provides this list to MDPD twice a year.

81.     The FDOC also did not consider the Miami Bridge a school prior to Regalado's complaint.

82.     On July 2, 2013, staff of the Miami-Dade Police Department convened a meeting with staff from Miami-Dade County Public Schools ("MDCPS"), and the Miami-Dade County Attorney's Office.

83.     MDPD called this meeting after its Legal Bureau declined to issue an official position on the Miami Bridge's status under the Ordinance.

84.     The officials at the meeting agreed that the definition of school in the Ordinance was unclear.  They subsequently decided to consider as a school any location where children receive instruction.

85.     At the same meeting, Director of School Operations Mark Zaher informed the Miami-Dade Police Department that MDCPS considers the Miami Bridge a school under state law because it is an "alternative educational program" provided at a privately owned facility through a collaborative agreement between Miami Bridge and MDCPS.

86.     The Miami Bridge and MDCPS first signed the agreement in 1990.

87.     Potentially dozens of other locations have similar collaborative agreements with MDCPS.  However, MDCPS refused to provide the Miami-Dade Police Department with the complete list of these sites.

88.     Following the meeting, the MDPD Legal Bureau determined that Miami Bridge should be considered a school.  It then requested that the County IT Department include the Bridge on the school list.

89.     Later in July, both the MDPD's Special Victims Bureau/Sexual Crimes and the FDOC decided to remove approximately 98 individuals residing within 2,500 feet of the Miami Bridge whose locations they now deemed in violation of the Ordinance.

90.     The two agencies scheduled the action for July 29, 2013.

91.     On July 28, 2013, MDPD withdrew from the action, citing ongoing negotiations with MDCPS.

92.     On or about July 29, 2013, the FDOC notified residents that their homes were now ineligible and that they had five days to relocate or face arrest. The residents were not provided any process to challenge the determination that their homes were no longer eligible under the Ordinance.

93.     By August 14, 2013, 54 individuals moved out of River Park and the nearby area. Of these, 34 became transient, 3 were incarcerated, and 3 absconded.  Only 14 were able to locate new residences.

94.     FDOC employees subsequently advised many evictees and other probationers to go to the area near NW 36th Court and NW 71st Street.

95.     Fifty-one individuals subject to the Ordinance but not under FDOC supervision remained at River Park.

96.     The Miami-Dade Police Department scheduled a second enforcement action, termed "Operation Miami Bridge," for August 22, 2013, to remove these remaining residents.

97.     The Miami-Dade Police Department cancelled the operation before its execution.

98.     Operation Miami Bridge was rescheduled and later executed on September 17, 2013.  Targeted residents received notices directing them to vacate within five days.  They were not provided any process to challenge the determination that their homes were no longer valid under the Ordinance.

99.     The next day, September 18, 2013, the Miami-Dade Police Department retrieved and rescinded these notifications, allowing recipients to remain in their residences.

100.    The MDPD Sexual Predator & Offender Office then directed the Miami-Dade County IT Department to remove Miami Bridge from the school list.

101.    At present, state and local agencies have reached irreconcilable conclusions at different times on the full scope of what constitutes a school under the Ordinance.

102.    Defendant Miami-Dade Police Department does not enforce Miami Bridge as a school.  It defers to MDCPS on what constitutes a school under the Ordinance.

103.    MDCPS refuses to issue official guidance on what qualifies as a school under the Ordinance.  MDCPS asserts it is only authorized to interpret "school" under state law, not as it is used in the Ordinance.

104.    Defendants FDOC and Sunny Ukenye are the only officials that enforce Miami Bridge as a school.  However, several probation officers in recent months have allowed supervisees at the encampment to return to the River Park area.

14

105.     Defendants have not determined whether to classify as schools under the Ordinance the potentially dozens of other alternative educational programs like Miami Bridge.

106.     As a result of Defendants' arbitrary enforcement of the Ordinance, individuals seeking to escape homelessness have no assurance that housing approved by Defendants will not later be deemed in violation of the Ordinance.

### Conditions at the Railroad Tracks Encampment

107.     Defendants' arbitrary and discriminatory enforcement of the Ordinance, along with Defendants' practice of directing individuals unable to securing housing to the encampment, have created a dangerously untenable situation.

108.     Conditions at the railroad tracks present an ongoing threat of physical danger to those forced and directed by Defendants to reside there.

109.     There are no restroom facilities at the tracks. People have no choice but to use the areas around a privately-owned warehouse or along the railroad track.

110.     There is no sanitary water source at the tracks.

111.     There is no shelter from the rain at the tracks.

112.     Prior to June 4, 2014, most of the individuals living at the tracks slept around the privately-owned warehouse; some on mats on the loading dock; some in their cars; others in tents in the parking lot; still others in sleeping bags or under discarded tarp in the grass around the warehouse.

113.     The owner of the warehouse complained on several occasions to law enforcement about the encampment on his private property.

114.    During the evening of June 4, 2014, MDPD ordered those at the warehouse, including the John Doe Plaintiffs, to vacate within 48 hours or face trespass arrest.

115.    MDPD officers instructed the evictees go to an area near NW 46th Street and NW 37th Avenue in Hialeah.

116.    The only accessible area at this intersection is a swale around a fenced-off lot.

117.    On June 5, 2014, Allen Davis, manager of the FDOC's local probation office, instructed probationers to return to an area a few hundred yards east of their previous warehouse location along NW 71st Street.

118.    This new location is also privately owned, and has an empty warehouse on the property.

119.    A few days later, the FDOC's local probation office instructed the probationers to return to NW 36th Court, but to sleep several hundred feet north of the original warehouse, on the strip of land between the street and a chain link fence.

120.    Plaintiffs were instructed to move to the new encampment location at NW 71st Street and NW 36th Avenue.

**Defendants' Enforcement of the Ordinance Does Not Advance Public Safety**

121.    The lives of those trapped by Defendants at the railroad tracks encampment have been irreparably destabilized by their inability to secure safe, stable, and affordable shelter.

122.    This destabilization directly undermines the rehabilitation and successful re-entry to society of former offenders like Plaintiffs.

123.    The involuntary transience of those at the railroad tracks encampment makes them more difficult to supervise and increases the risk that they will abscond.

124.    These factors together do not advance public safety or any other legitimate interest in Miami-Dade County, and they are likely to undermine public safety.

**COUNT I:**
**THE ORDINANCE IS VOID FOR VAGEUNESS.**

125.    The Ordinance is void for vagueness under the Fourteenth Amendment to the United States Constitution and article 1, section 9 of the Florida Constitution by failing to define the term "school" with sufficient precision and particularity as to give Plaintiffs fair notice of where former sexual offenders may lawfully reside under Miami-Dade County's 2,500-foot residency restriction.

126.    The Ordinance is also void for vagueness because Miami-Dade County's failure to define "school" with the precision required by the federal and state constitutions encourages and has resulted in arbitrary and discriminatory enforcement by Defendants against Plaintiffs.

127.    Relying on the vagueness inherent in the Ordinance's residency restriction, Defendants have expelled, threatened to expel, or excluded individuals from residing at River Park based solely upon the arbitrary determination that Miami Bridge is a "school," while allowing others to remain or return to River Park.

128.    Defendants' arbitrary and discriminatory enforcement of the unconstitutionally vague Ordinance prevents Plaintiffs from knowing whether individuals will be arrested for violating the residency restrictions should they return to, or continue to reside at River Park.

129.    Defendants' arbitrary and discriminatory enforcement of the unconstitutionally vague Ordinance prevents Plaintiffs from knowing whether former sexual offenders will be

arrested for violating Miami-Dade County's residency restrictions and the terms of their probation if they secure housing at any other location in the county.

## COUNT II:
### THE ORDINANCE VIOLATES PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS TO MEANINGFUL NOTICE AND OPPORTUNITY TO BE HEARD.

130.    Both the Fourteenth Amendment and article 1, section 9 of the Florida Constitution prohibit state actors from depriving an individual of liberty without due process of law.  Included within this protection are the rights to notice and a hearing when the state deprives an individual of fundamental liberty interests.

131.    Plaintiffs have fundamental property and liberty interests in acquiring, and remaining in, residential property.

132.    Defendants have violated Plaintiffs' federal and state due process rights by removing and excluding Plaintiffs from their homes without providing notice and an opportunity to be heard on whether the River Park area, or any location, is within 2,500 feet of a "school."

## COUNT III:
### DEFENDANTS ARE VIOLATING PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHT TO PERSONAL SECURITY.

133.    The Fourteenth Amendment to United States Constitution and article 1, section 9 of the Florida Constitution protect fundamental liberty interests against certain governmental intrusions irrespective of the fairness of the procedures utilized.  This substantive guarantee is intended to prevent state actors from employing their power in an abusive or oppressive manner.

134.    Defendants' enforcement of the Ordinance violates substantive due process by so severely restricting housing options for former offenders as to render them homeless and unable to safeguard their fundamental right to personal security.

135.    Defendants have also directed Plaintiffs and others to the encampment near NW 36th Court and NW 71st Street.

136.    The conditions at the encampment present imminent and chronic threats to the health and safety of those living there.

137.    But for the Ordinance and Defendants' arbitrary and unpredictable actions, Plaintiffs could secure affordable housing without fearing they may be forced to relocate.

138.    Defendants have an affirmative duty to protect Plaintiffs from these threats to their personal security because their enforcement of the Ordinance has directly and proximately caused these conditions.

139.    Defendants' obligation applies with special force to Plaintiff John Doe 1, who Defendants have made particularly vulnerable, given his cognitive disabilities.

140.    Forcing Plaintiffs into homelessness and depriving them of their ability to secure basic shelter is unconstitutionally arbitrary and does not serve any legitimate state interest.

**COUNT IV:**
**THE ORDINANCE VIOLATES PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHT**
**TO ACQUIRE RESIDENTIAL PROPERTY**

141.    Plaintiffs have fundamental rights under the Fourteenth Amendment to the United States Constitution and article 1, section 2 of the Florida Constitution to acquire and to maintain residential property.

19

142.    Defendants' are violating Plaintiffs' substantive due process rights by arbitrarily depriving Plaintiffs of their fundamental rights to acquire and to maintain residential property.

143.    Defendants' interference with Plaintiffs' fundamental rights is unconstitutionally arbitrary and does not serve any legitimate state interest.

## COUNT V:
## THE ORDINANCE IS AN UNCONSTITUTIONAL EX POST FACTO LAW.

144.    The Ex Post Facto Clause of Article I, Section 9 of the United States Constitution and article 1, section 10 of the Florida Constitution prohibits Florida from retroactively increasing an individual's punishment above that authorized by the law in effect at the time the offense was committed.

145.    Defendant Miami-Dade County passed the Ordinance with the intent to punish those convicted of the offenses the Ordinance designates under Florida law, irrespective of whether a former offender is actually required to register under Florida law.

146.    Regardless of legislative intent, the retroactive application of the Ordinance on Plaintiffs violates the federal and state Ex Post Facto clause because its debilitating effects are clearly punitive.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Enter a judgment declaring Miami-Dade County's Lauren Book Child Safety Ordinance void for vagueness in violation of the Fourteenth Amendment of the United States Constitution and article 1, section 9 of the Florida Constitution;

b.  Enter a judgment declaring that Defendants' failure to provide Plaintiffs with notice and an opportunity to be heard on whether a particular property is within 2,500 feet of a

"school" violates the right to due process guaranteed by the Fourteenth Amendment to the United States Constitution and article 1, section 9 of the Florida Constitution;

c. Enter a judgment declaring that Defendants' enforcement of the Ordinance violates Plaintiffs' substantive due process right to personal security under the Fourteenth Amendment to the United States Constitution and article 1, section 9 of the Florida Constitution.

d. Enter a judgment declaring that Defendants' enforcement of the Ordinance violates Plaintiffs' substantive due process rights to acquire and maintain residential property as guaranteed by the Fourteenth Amendment to the United States Constitution and article 1, section 9 of the Florida Constitution.

e. Enter a judgment declaring that the Ordinance violates the federal and state prohibitions against ex post facto laws.

f. Issue a permanent injunction prohibiting Defendants from enforcing the Ordinance;

g. Issue a permanent injunction requiring Defendants to provide notice and an opportunity to be heard on whether a location violates the residency restrictions in the Ordinance;

h. Award costs and attorney's fees pursuant to 42 U.S.C. § 1988;

i. Grant or award any other relief this Court deems just and proper.


Respectfully submitted,

**/s/ Daniel B. Tilley**
Daniel B. Tilley
Florida Bar No. 102882
Nancy Abudu*
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
T: 786-363-2714
F: 786-363-1257
dtilley@aclufl.org
nabudu@aclufl.org

*Application for admission pending

Brandon J. Buskey** (ASB2753A50B)
Ezekiel Edwards**
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY  10004
T: 212-284-7364
F: 212-549-2654
bbuskey@aclu.org
eedwards@aclu.org

**Application for admission pro hac vice
forthcoming