# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
|  | * |  |
| John Doe #1, John Doe #2, | * |  |
| John Doe #3, and | * |  |
| Florida Action Committee, Inc.; | * |  |
|  | * | Case No.: |
| Plaintiffs, | * | 14-CV-23933-Huck/Otazo-Reyes |
|  | * |  |
| vs. | * |  |
|  | * |  |
|  | * |  |
| Miami-Dade County; Florida | * |  |
| Department Of Corrections; | * |  |
| Sunny Ukenye, Circuit Administrator | * |  |
| for the Miami Circuit Office, Florida Department | * |  |
| of Corrections, in his official capacity; | * |  |
|  | * |  |
| Defendants. | * |  |
|  | * |  |

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## MIAMI-DADE COUNTY'S MOTION TO DISMISS

---

## INTRODUCTION

Plaintiffs challenge the Lauren Book Child Safety Ordinance's 2,500-foot residency restriction from schools.  The Ordinance, which has forced Plaintiffs and hundreds of others into homelessness, is an unconstitutional ex post facto law.  The Ordinance also violates Plaintiffs' fundamental rights to personal security and to acquire property.  The restriction is based on the county's alarmist and false assertions about the public safety risk these offenders pose.  Yet, not only does the restriction lack any plausible connection with improving public safety, it endangers public safety by making covered individuals more likely to recidivate.

The Ordinance is also unconstitutionally vague.  Multiple agencies at both the state and county levels have tacitly admitted that the restriction's definition of the term "school" is unclear, and Defendants have reached diametrically opposed conclusions about which facilities qualify as schools under the Ordinance.  Defendants' unpredictable enforcement of this criminal law forces covered individuals to speculate as to the Ordinance's full meaning and scope.

The Amended Complaint raises facial and as-applied challenges.  Plaintiffs' vagueness and ex post facto claims are facial challenges to the residency restriction.  Plaintiffs' substantive due process claims are as applied to individuals made homeless as a proximate result of Defendants' arbitrary enforcement of the Ordinance.  Because the Amended Complaint states claims for relief that, if true, are substantively plausible, Defendant Miami-Dade County's motion to dismiss must be denied.  *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014) (per curiam) (holding under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that "substantive plausibility" requires only that plaintiffs state "simply, concisely, and directly events that" entitle them to relief).

## I.      THE ORDINANCE IS AN UNCONSTITUTIONAL EX POST FACTO LAW.

The Book Ordinance violates the Ex Post Facto Clause of Article I, Section 9 of the United States Constitution by imposing a severe, categorical, and lifelong restriction on where covered individuals may reside.  The Ex Post Facto Clause prohibits any law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull*, 3 U.S. 386, 391 (1798); U.S. Const. art. 1, § 9, cl. 3.  The factors for determining if a law is impermissibly punitive include: (1) whether the act imposes an affirmative disability or restraint, (2) whether it has historically been regarded as a punishment, (3) whether its operation will promote the traditional aims of punishment—retribution and deterrence, (4) whether there is a rational connection to a non-punitive purpose; and (5) whether the scheme appears excessive in relation to its nonpunitive, regulatory purpose.  *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963); *see also Smith v. Doe*, 538 U.S. 84, 97 (2003).  These factors "often point in differing directions," and no single factor is dispositive.  *Hudson v. United States*, 522 U.S. 93, 101 (1997) (internal quotation marks omitted).

Whether Miami-Dade's residency restrictions are overly punitive requires a fact-intensive inquiry that cannot be decided as a matter of law.  This conclusion is supported by the principal cases Defendant Miami-Dade County cites for dismissal, both of which were decided only after development of a full factual record following trial or summary judgment.  *Smith*, 538 U.S. at 91 (summary judgment)*; Doe v. Miller*, 405 F.3d 700, 706 (8th Cir. 2005) (two-day bench trial).  Notably, no federal court has ruled on whether residency restrictions that cause the degree of homelessness and transience alleged in the Amended Complaint constitute ex post facto laws.  The Amended Complaint therefore states a viable claim for relief under the Ex Post Facto clause.  *McGuire v. City of Montgomery*, No. 2:11-CV-1027-WKW, 2013 WL 1336882, at *4-8 (M.D.

Ala. Mar. 29, 2013) (denying dismissal of ex post facto claims against Alabama's sex offender registration law (citing *Smith*, 538 U.S. 84 and *Miller*, 405 F.3d 700)).

**A.  The Ordinance Imposes an Affirmative Disability or Restraint.**

The Ordinance imposes a severe affirmative disability or restraint.  Those under its ambit are not free to reside where they wish "as other citizens, with no supervision."  *Smith*, 538 U.S. at 101.  The disability imposed by the residency restrictions is exacerbated by the fact that Miami-Dade County is predominantly urban.  *Cf. Doe v. Baker*, No. 1:05-cv-2265, 2006 WL 905368, at *4 (N.D. Ga. Apr. 5, 2006) (relying on plaintiffs' residence in suburban county to find 1,000-feet residency restriction did not impose severe restraint and acknowledging that analysis would differ for urban setting).  These restrictions in turn:

> impact where an offender's children attend school, access to public transportation for employment purposes, access to employment opportunities, access to drug and alcohol rehabilitation programs and even access to medical care and residential nursing home facilities for the aging offender.

*Commonwealth v. Baker*, 295 S.W.3d 437, 445 (Ky. 2009) (internal quotation marks omitted). Indeed, the residency restrictions in the Ordinance are so onerous that they have caused hundreds of individuals in Miami-Dade County to become homeless or transient.  (¶147.)[1]  These individuals often must cluster at unprotected areas like the railroad tracks, exposing them to numerous hazards, including physical violence by vigilantes.  *See Wallace v. State*, 905 N.E.2d 371, 380 (Ind. 2009) (noting problem that offenders may be subject to "vigilante justice").

Defendant Miami-Dade County counters that the restrictions are not as severe as the civil commitment system approved in *Kansas v. Hendricks*, 521 U.S. 346, 363 (1997).  Miami-Dade Br. at 16.  Defendant overlooks two critical distinctions between the disabilities imposed by the

---

[1] Citations in this form are references to the Amended Complaint (Doc. 25).

Miami-Dade and Kansas systems.  First, Kansas only allowed civil commitment for individuals who, after a full judicial hearing, were found beyond a reasonable doubt to suffer from a "mental abnormality or a personality disorder" and were also "likely to engage in predatory acts of sexual violence."  *Hendricks*, 521 U.S. at 350 (internal quotation marks omitted).  Second, a single commitment in Kansas lasted just one year; further confinement had to be reauthorized yearly through the same rigorous process.  These requirements persuaded the Supreme Court that the statute would not impose the affirmative restraint of civil commitment longer than necessary to address an individual's dangerousness.  *Id.* at 364.

The Ordinance contains no such limitations.  It applies for life, without any hearing and regardless of an individual's risk to society over time.  (¶73.)  These facts weigh strongly in favor of the law's punitive effect.  *McGuire*, 2013 WL 1336882, at *7 ("[T]he categorical treatment of registrants—failing to differentiate among registrants based on their offense, requiring lifetime registration for all registrants—is one factor to consider when assessing [a sex offender ordinance's] reasonableness.").

## B.  The Ordinance is Excessive in Relation its Public Safety Goal.

While the Ordinance purports to serve public safety, its residency restrictions are vastly excessive in relation to that goal.  To start, the Ordinance is objectively wrong in claiming former sexual offenders pose an "extreme" public risk.  (¶133-139.)  Defendant Miami-Dade County claims the Supreme Court has previously found that the risk of recidivism for former sexual offenders is "frightening and high."  *McKune v. Lile*, 536 U.S. 24, 34 (2002).  However, the Supreme Court was referring to the risk of recidivism for individuals who have not received sexual offender treatment.  *Id.* at 33.  The Supreme Court expressly recognized that the risk of recidivism is drastically reduced in those who receive treatment.  *Id.*  This clarification is

particularly relevant here, since individuals covered by the Ordinance must complete sexual abuse treatment as a mandatory condition of Florida probation.   Fla. Stat. § 948.30(1)(c). Nevertheless, the Ordinance does not account for this reduced recidivism.

Along with the Ordinance's misapprehension of the public safety risk from covered individuals, there is absolutely no evidence that residency restrictions reduce whatever risk does exist.  (¶140-142.)  The Ordinance fails to address public safety largely because it is not based on a particularized risk assessment.  *See Doe v. Dept. of Pub. Safety and Corr. Servs.*, 62 A.3d 123, 146 (Md. 2013) (Harrell, J., concurring) (citing research establishing that blanket offender restrictions "do not reduce recidivism by sex offenders").   The Ordinance applies for life based on the crime committed, without exception, even if an individual earns an exemption from Florida's registration requirement and residency restrictions.  (¶72.)  The Ordinance's utter lack of individualization heavily favors a finding of excessiveness.  *See Doe v. State*, 189 P.3d 999, 1017 (Alaska 2008) (finding restriction excessive in part because it applied for life without regard to completion of treatment or risk of re-offense); *Baker*, 295 S.W.3d at 446 (citing residency restriction's lack of individualized assessment to support excessiveness); *Wallace*, 905 N.E.2d at 384 (finding restriction excessive in part because covered individual could not seek exemption from statute "even on the clearest proof of rehabilitation"); *State v. Letalien*, 985 A.2d 4, 26 (Me. 2009) (finding ex post facto violation where offender registration applied for life); *State v. Williams*, 952 N.E.2d 1108, 1113 (Ohio 2011) (finding ex post facto violation where requirements applied based solely on crime "without regard to . . . future dangerousness").

The Ordinance is also ineffective because it does not actually limit an individual's access to children.  Miami-Dade impliedly recognizes this failing, as other provisions in the Ordinance address covered individuals' access to parks, child care facilities, and child safety zones.  Miami-

Dade County Code § 21-284, 285.  Moreover, the research consensus cited in the Amended Complaint shows that the overwhelming majority of sexually abused children are victimized by someone familiar to them; the perpetrators' proximity to a school at night is irrelevant. (¶142.)

The most significant factor in favor of excessiveness is that the residency restrictions undermine public safety, the very goal the Ordinance purports to serve.  They do so by forcing individuals into homelessness and transience, which in turn destabilizes their rehabilitation and makes them more likely to reoffend.  (¶143-151); *see also Ryals v. City of Englewood*, 962 F. Supp. 2d 1236, 1243-44, 1250-51 (D. Colo. 2013) (concluding that residency restrictions "pose a potentially substantial obstruction to the realization of the reintegration goals" (citing *Fross v. Cnty. of Allegheny*, 20 A.3d 1193, 1206-07 (Pa. 2011) (concluding that county's residency restriction "interferes with the goal of Megan's Law to reduce recidivism among sex offenders and improve public safety"))).

Miami-Dade County makes no attempt to assert that the homelessness and transience caused by the Ordinance advance public safety.  It instead argues that the residency restrictions are not excessive because Miami-Dade intended the 2010 amendments to leave former offenders with available housing.  Miami-Dade Br. at 18.  The County's intent is relevant in assessing whether the effects of the Ordinance are punitive.  Nonetheless, the fact that the residency restrictions have continuously made hundreds of individuals homeless since 2010 suggests Miami-Dade has utterly failed its intentions.  (¶¶ 68, 74.)

Based on these allegations, Plaintiffs are "entitled to develop facts on which the court may determine the reasonableness of the restrictions and then weigh reasonableness" against the other ex post facto guideposts.  *McGuire*, 2013 WL 1336882, at *8.

### C.  The Ordinance Promotes the Traditional Aims of Punishment.

7

As Defendant Miami-Dade County concedes, residency restrictions serve the traditional aim of punishment to deter future crime.  Miami-Dade Br. at 17.  Though not dispositive, this fact weighs in Plaintiffs' favor.

The residency restrictions are also retributive.  That the County's goal is retribution, rather than regulation, is evident in the fact that the restrictions apply based solely on the crime committed, without regard to an individual's risk of recidivism over time.  *Doe v. State*, 189 P.3d at 1013-14 (restrictions for ex-sexual offenders "based not on a particularized determination of the risk the person poses to society but rather on the criminal statute the person was convicted of violating . . . provide a deterrent and retributive effect that goes beyond any non-punitive purpose and that essentially serves the traditional goals of punishment"); *Baker*, 295 S.W.3d at 444 ("When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones."); *see also Smith*, 538 U.S. at 102 (approving requirements "reasonably related to the danger of recidivism").  An individual's completion of offender treatment is irrelevant under the Ordinance, even though covered individuals are required to receive such treatment, and even though treatment significantly reduces the risk of recidivism.  *McKune*, 536 U.S. at 33.  The Ordinance also makes no exceptions for individuals unable to find stable housing due to the residency restrictions, despite the devastating effects housing instability has on rehabilitation.  (¶143.)  These retributive features weigh in Plaintiffs' favor.

### D.  The Ordinance Strongly Resembles Historical Forms of Punishment.

Residency restrictions as expansive as Miami-Dade's mimic the historical punishment of banishment.  *Baker*, 295 S.W.3d at 444 (finding residency restriction that covered large portions

8

of community was "decidedly similar to banishment").  The Amended Complaint details how the Ordinance has repeatedly created homeless encampments around the County, along with forcing numerous others into isolated homelessness and transience.  (¶67-69, 82-85.)  Discovery will show the extent to which the residency restrictions have the practical effect of banishment in Miami-Dade.  *McGuire*, 2013 WL 1336882, at *6.

The Ordinance also approximates probation or parole.  *See Doe v. Dep't. of Pub. Safety and Corr. Servs.*, 62 A.3d at 139-40 (concluding that sex offender restrictions "have the same practical effect" as probation or parole) (citing *Doe v. State*, 189 P.3d at 1012  and *Wallace*, 905 N.E.2d at 380-81).   Indeed, residency restrictions are a mandatory condition of probation in Florida.  Fla. Stat. § 948.30(1)(b).  Because the Ordinance also prohibits where an individual may travel within Miami-Dade County, Miami-Dade County Code § 21-284, it requires constant, probation-like supervision of covered individuals by law enforcement officials.  Violating the Ordinance exposes individuals to additional penal sanctions, as would a probation violation.

Defendant asserts that the Ordinance's "grandfather clause", Miami-Dade County Code § 21-282, disqualifies it as a form of historical punishment.  This Court cannot determine on a motion to dismiss how many people the grandfather clause affects so as to weigh this contention properly.  Further, as the Miami-Bridge incident reveals, Defendants' ignore the fact that an individual remains liable if he establishes a residence near a facility that officials later reclassify as a school.  (¶80.)

**E.  The Ordinance Lacks Any Rational Connection to Reducing Public Safety.**

The Ordinance's residency restriction bears no rational connection to public safety. Defendant Miami-Dade County makes no effort to articulate such a connection, nor does the case law it cites.  Miami-Dade Br. at 17 (quoting *Miller*, 405 F.3d at 721); *see also id.* at 14

9

(quoting *Baker*, 2006 WL 905368, at *5).  Defendant merely invokes the casuistry that the Ordinance is reasonable given the public safety risk the county believes former offenders pose.

There is absolutely no evidence that such a connection exists.  (*See, e.g.*, ¶142.)  The residency restriction does nothing to limit an individual's access to children.  As the Kentucky Supreme Court explained in rejecting any rational connection between public safety and that state's residency restriction:

> [The statute] prohibits registrants from residing (i.e. sleeping at night, when children are not present) within 1,000 feet of areas where children congregate, but it does not prohibit registrants from spending all day at a school, daycare center, or playground (when children are present). It allows registered sex offenders to sit across the street and watch children, and even to work near children. [The statute] does not even restrict an offender from living with the victim, so long as they live and sleep outside of the prohibited area. All [the statute] prohibits is residing in a home within the prohibited zone. It does not regulate contact with children. It is difficult to see how public safety is enhanced by a registrant not being allowed to sleep near a school at night, when children are not present, but being allowed to stay there during the day, when children are present.

*Baker*, 295 S.W.3d at 445.  The very same could be said of Miami-Dade's residency restriction. Combined with the undeniable tendency of Miami-Dade's restrictions to make covered individuals more difficult to supervise and more at risk of re-offending (¶148-49), it is difficult to discern how the restriction makes anyone safer.

This factor alone is not dispositive. Thus, even if this Court concluded that the Ordinance is rationally connected to public safety, Plaintiffs would still be entitled to submit proof that the *Smith* guidelines, weighed in totality, establish that the Ordinance is punitive.  *McGuire*, 2013 WL 1336882, at *4-8.

## II.  AS APPLIED, THE ORDINANCE VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHTS UNDER SUBSTANTIVE DUE PROCESS.

Defendants' enforcement of the Ordinance's residency restriction so severely restricts housing in Miami-Dade County as to prevent Plaintiffs and hundreds of covered individuals from locating stable shelter. (¶147.) Defendants have unduly infringed on Plaintiffs' fundamental rights to personal security and to acquire residential property. These rights are "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [they] were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted). The Ordinance is thus subject to heightened scrutiny and must be "narrowly tailored" to achieve the state's compelling interest in public safety. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 302 (1993).

### A. The Ordinance Violates Plaintiffs' Right to Personal Security.

The Supreme Court has long recognized the right to personal security as a fundamental liberty interest. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). The right to personal security is among those descended from the Magna Carta that the Founders intended to codify in drafting the Fifth Amendment. *Ingraham*, 430 U.S. at 672-73; *see also id.* at 673, n.41 (citing Shattuck, *The True Meaning of the Term "Liberty,"* 4. Harv. L. Rev. 365, 372-73 (1890)). The right includes "life, limb, health, and reputation," rights "which may fairly be included under the term 'life' in our constitutions." Shattuck, 4 Harv. L. Rev at 377.

Defendant Miami-Dade County denies that the Ordinance infringes the right to personal security because the Constitution "does not impose an affirmative duty on the government to guarantee 'certain minimal levels of safety and security.'" Miami-Dade Br. at 11 (quoting *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). Plaintiffs, however, do not allege that Miami-Dade County has a general obligation to provide for their

11

safety and security.   Rather, Plaintiffs assert that Miami-Dade County has affirmatively *endangered* their safety and security by forcing them into homelessness.   Because Plaintiffs allege that Miami-Dade's affirmative act of unduly restraining Plaintiffs' liberty to secure housing has caused Plaintiffs' homelessness, Plaintiffs properly invoke the substantive protections of due process.  *Spivey v. Elliot*, 29 F.3d 1522, 1526 (11th Cir. 1994) (state's affirmative restraints on individual liberty trigger due-process protection) (citing *DeShaney*, 489 U.S. at 200).

Miami-Dade County also asserts that those residing at the railroad encampment are there by choice and that the Constitution does not obligate governments to prevent homelessness. Miami-Dade Br. at 11.  This characterization grossly distorts Plaintiffs' claims.  The Amended Complaint unambiguously alleges that Plaintiffs are not homeless by choice or mere bad luck. (¶68.)  They are homeless because Defendants have made them homeless.  *Id.*  Plaintiffs are entitled to submit proof demonstrating the extent to which the Ordinance causes homelessness before the Court may resolve this substantive due process claim.

### B.  The Ordinance Violates Plaintiffs' Right to Acquire Residential Property.

Defendant Miami-Dade County's arbitrary enforcement of the Ordinance violates Plaintiffs' fundamental right to acquire residential property by unduly burdening Plaintiffs' liberty to secure housing in Miami-Dade and forcing Plaintiffs into homelessness and transience. The right to acquire basic shelter is squarely within the scope of "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (enumerating the broad list of potential liberty interests under the Due Process Clause, which "denotes not merely freedom from bodily restraint" but includes also "the right of the individual to contract" and to "establish a home").

The Supreme Court has long upheld the sanctity of an individual's liberty interest in acquiring property.  A century ago, the Court held that the right to "make contracts for the acquisition of property" is implicit in the right of "personal liberty and the right of private property," *Coppage v. Kansas*, 236 U.S. 1, 14 (1915), and is "as much entitled to protection as the right to guard property already acquired." *Int'l News Serv. v. AP*, 248 U.S. 215, 236 (1918); *see also Holden v. Hardy*, 169 U.S. 366, 391 (1898) ("As the possession of property, of which a person cannot be deprived, doubtless implies that such property may be acquired, it is safe to say that a state law which undertakes to deprive any class of persons of the general power to acquire property would also be obnoxious to the [Due Process Clause]."); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 61 (1993) ("[T]he case before us well illustrates an essential principle: Individual freedom finds tangible expression in property rights.").  In *Jones v. Alfred H. Mayer Co.*, the Supreme Court cited Congress' acknowledgment of "the right to acquire" property as among the "great fundamental rights" to support an expansive reading of the Civil Rights Act of 1866.  392 U.S. 409, 432 (1968) (internal quotations omitted).

Miami-Dade County argues that the Ordinance does not violate Plaintiffs' fundamental right to acquire residential property because Plaintiffs are not restricted from all housing options within the city. Miami-Dade Br. at 12.  Contrary to Defendants' contention, substantive due process does not require the complete destruction of fundamental rights; it protects fundamental rights directly or unduly burdened by state action.  *See Maher v. Roe*, 432 U.S. 464, 473-74 (1977).  It is undeniable that Defendants' enforcement of the Ordinance directly and unduly burdens Plaintiffs' right to acquire residential property.  Plaintiffs are restricted from a great proportion of housing that would otherwise be available to them.  Plaintiffs intend to submit

factual proof revealing the extent to which the Ordinance eliminates Plaintiffs' housing options, and thus the extent to which the restrictions implicate Plaintiffs' right to acquire basic shelter.

Miami-Dade County also asserts that there is no fundamental right to affordable housing. Miami-Dade Br. at 12 (citing *Sierotowicz v. N.Y.C. Hous. Auth.*, Nos. 04-cv-3148, 04-cv-3886, 04-cv-3887, 04-cv-3888, 2009 WL 2382314, at *2 (E.D. N.Y. July 31, 2009)). But Plaintiffs do not claim a right to affordable housing. Plaintiffs also do not claim that Miami-Dade County must provide them with housing or allow them to live in any particular residence. The fundamental right at stake here is Plaintiffs' threshold liberty to acquire residential property *at all*, free of the severe burdens the residency restriction places directly on this right.

Miami-Dade next posits the parade of horribles that if the right to acquire basic shelter were acknowledged as fundamental, a number of zoning and other land use regulations would be subject to strict scrutiny. Miami-Dade Br. at 12. This reasoning is fatally flawed. Zoning laws do not generally cause mass homelessness. Nor do they target specific groups of individuals, as opposed to particular land uses. Recognizing the fundamental right to acquire property would only impact ordinances that directly and unduly restrict an individual's ability to obtain housing, thereby rendering that individual homeless or transient.

### C. The Ordinance Lacks a Rational Basis Under the Federal Constitution.

Defendants have not asserted that the Ordinance would survive heightened scrutiny. Should the Court conclude that heightened scrutiny is unwarranted, there is no rational basis for the Ordinance's residence restrictions under the federal constitution, as discussed above. *See supra*, Sect. I, Part E, at 9-10.

### D. The Ordinance Lacks a Rational Basis Under the Florida Constitution.

If this Court determines the Ordinance satisfies the rational-basis test under the federal constitution, this conclusion would not resolve Plaintiffs' claims under the Florida Constitution. Defendant Miami-Dade County has not challenged Plaintiffs' state law claims on the merits.[2]

Under Florida's rational-basis test, this Court must independently evaluate Miami-Dade County's factual conclusions about the risks former sexual offenders pose and the efficacy of residency restrictions in reducing that risk. *Estate of McCall v. United States*, 134 So. 3d 894, 906 (Fla. 2014) ("'While courts may defer to legislative statements of policy and fact, courts may do so only when those statements are based on actual findings of fact, and *even then courts must conduct their own inquiry*.'" (quoting with emphasis *N. Fla. Women's Health and Counseling Serv., Inc. v. State*, 866 So. 2d 612, 627 (Fla. 2003))). Florida's test recognizes that legislative findings, even if valid in the past, may not be in the future. Courts must evaluate post-enactment data to assess whether "the factual premise upon which the statute was based has changed." *Id.* at 913 (citing *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547-48 (1924)).

Plaintiffs have stated plausible claims for relief under the Florida Constitution. A robust body of research rejects Miami-Dade's conclusions about the "extreme" risks former offenders pose and establishes that residency restrictions most likely damage public safety. (¶133-51.) Miami-Dade repeatedly states that it was entitled to assess the public-safety risk that former offenders pose by relying on decades-old research cited in appellate cases. Miami-Dade Br. at

---

[2] This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a). In a footnote, Defendant Miami-Dade County asserts that Plaintiffs may not advance their state-law claims in this action, citing the Eleventh Circuit decision in *Knight v. Jacobson*, 300 F.3d 1272. 1276 (11th Cir. 2002). Miami-Dade Br. at 6, n.4. *Knight*, however, does not concern this Court's supplemental jurisdiction. *Knight* merely stands for the proposition that an arrest based on probable cause does not violate the Fourth Amendment, even when state law does not authorize arrest for the suspected offense. *Knight*, 300 F.3d at 1276. Nothing in 28 U.S.C. § 1983 limits this Court's supplemental jurisdiction. Defendant Miami-Dade County has failed to cite any authority preventing this Court from deciding Plaintiffs' state-law claims.

13-14, 17-18.   Plaintiffs' Amended Complaint establishes that these factual premises were invalid by the 2010 amendments to the Book Ordinance.  Regardless, it is for this Court to assess the continued validity of Miami-Dade's factual premises under the Florida constitution.  *Estate of McCall*, 134 So. 3d at 913.

### III.     THE ORDINANCE IS VOID FOR VAGUENESS.[3]

The allegations in the Amended Complaint establish that the Book Ordinance is void for vagueness.  A criminal statute such as the Ordinance is unconstitutionally vague if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).   The doctrine's first component is fair notice, which protects against imprecisely drawn statutes that "trap the innocent" by providing inadequate notice of prohibited conduct.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A statute need not account for every factual contingency, but it must set forth its terms with sufficient definiteness so that individuals facing potential criminal sanctions are not forced to speculate as to its meaning.  *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999) (plurality opinion) (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)).

The doctrine's second component mandates that legislative bodies "establish minimal guidelines to govern law enforcement" to prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."  *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574-75 (1974)) (internal quotation marks omitted). Statutes must effectively cabin law enforcement's discretion to interpret key terms in order to

---

[3] The Court has stayed consideration of this claim. Doc. 38.

prevent the oppression of unpopular groups. *Gray v. Kohl*, 568 F. Supp. 2d 1378, 1391-92 (S.D. Fla. 2008) (citing, *inter alia*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972)).

The Book Ordinance, which criminalizes the otherwise innocent behavior of living in a home, is void under either vagueness component.  The Ordinance leaves covered individuals with no choice but to speculate as to its full scope, and it encourages arbitrary enforcement.

### A. The Term "School" in the Ordinance is not Defined with Sufficient Definiteness.

The Ordinance defines a "school" as a "public or private kindergarten, elementary, middle or secondary (high) school." Miami-Dade County Code § 21-280.  In relying on the word "school" to define the term "school," the Ordinance is inherently circular.  The Ordinance does not incorporate the definition of "school" from any external source, whether local, state, or federal, to clarify its scope.  These failings are not problematic for "schools" that fall within that term's ordinary, common usage.  *State v. Buckner*, 472 So. 2d 1228, 1229-30 (Fla. 2nd DCA 1985).  The vagueness in the Ordinance results instead from its lack of clarity regarding which facilities qualify as schools and which do not.  *See Morales*, 527 U.S. at 57 (vagueness of "loitering" in statute resulted not from confusion over ordinary meaning of term but confusion over what loitering was covered under statute).

The Miami-Dade County School Board alternately describes Miami Bridge as a "social service agency"[4] and as a "temporary residential shelter."[5]  On its own website, Miami Bridge describes itself as a youth emergency center.[6]  In aid of that primary function, the Bridge also has an "education program" to help youth maintain their studies and transition back into regular

---

[4] Truancy Intervention Program Handbook, http://ehandbooks.dadeschools.net/policies/101.pdf (last accessed Feb. 13, 2015).
[5] Miami-Dade County Public Schools Educational Alternative Outreach Program, List of Centers, http://outreach.dadeschools.net/html/centers.html (last accessed Feb. 13, 2015).
[6] Miami Bridge Home Page, http://www.miamibridge.org (last accessed Feb. 13, 2015).

school placements.  Consequently, the Florida Department of Education designates Miami Bridge as an "alternative education program."  (¶97.)  Potentially dozens of other facilities in Miami-Dade County share this distinction, including other youth emergency shelters, hospitals, juvenile detention centers, and prisons.  (¶¶77, 99.)

None of these terms—"social service agency," "temporary residential shelter," or "alternative education outreach center"—comports with the public's common sense notion of a "school."  The Ordinance's definition of school leaves open too many questions to notify citizens properly of its scope, especially when an undetermined number of similar facilities may also qualify as schools.  *See Roemhild v. State*, 308 S.E.2d 154, 158 (1983) ("Although we agree that the word 'school' clearly puts one on notice that an organized education must be provided to the child, there are many questions concerning the scope, nature, and place of the education which are left unanswered by the statute or applicable authorities.").

While Miami Bridge has operated for more than twenty years and the Miami-Dade residency restrictions have applied to schools for nearly a decade, neither the Miami-Dade Police Department nor the Florida Department of Corrections considered Miami Bridge a "school" until 2013.  Defendant Miami-Dade County changed its position several times as to whether Miami Bridge is a school, and three times it abandoned eviction actions for the surrounding area. (¶¶101-03, 108-09, 110-11.)  Meanwhile, the Department of Corrections generally enforces Miami Bridge as a school.  It evicted 54 individuals from the River Park trailer park, all of whom had previously been approved to live at that location.  (¶¶104-05.)  State probation officers have subsequently allowed supervisees, including John Doe #2, to move back to River Park.  (¶116.)

If the officials charged with enforcing this criminal ordinance cannot reliably determine its reach, ordinary citizens cannot be held to a higher standard.  *See State v. Popanz*, 332 N.W.2d

750, 756 (Wis. 1983) ("The persons who must obey the law should not have to guess at what the phrase [school] means. They should have some objective standards to guide them in their attempts to 'steer between lawful and unlawful conduct.'") (quoting *Grayned*, 408 U.S. at 108). The inevitable effect of the county's imprecise definition of school is to cause registrants to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (quotations and citations omitted).   In view of the tremendous burdens the Ordinance places on an individual's ability to secure shelter under threat of criminal sanctions, public safety cannot justify this imprecision.  *Kolender*, 461 U.S. at 361 ("As weighty as this concern [with public safety] is, however, it cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity.").

### B.  The Ordinance's Encourages Arbitrary and Discriminatory Enforcement.

The Ordinance is also unconstitutionally vague because its lack of minimal guidelines encourages arbitrary and discriminatory enforcement by public officials.  The allegations in the Amended Complaint reveal how the Ordinance facilitated Defendants' "standardless sweep" against Plaintiffs and others.  (¶¶77-80.)  Defendants reclassified Miami Bridge as a school due directly to a lobbying effort by the Homeless Trust to evict individuals covered by the Ordinance from the area around Miami Bridge.   (¶88.)   Given that there are dozens of alternative educational facilities like Miami Bridge, the River Park evictions could be easily replicated whenever a motivated group wishes to remove covered individuals.  The vagueness doctrine does not tolerate such enabling of discriminatory criminal enforcement against disfavored groups.  *Papachristou*, 405 U.S. at 170 (vague law "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940))).

**C.  Defendant Miami Dade County's Arguments for Dismissal Are without Merit.**

In moving to dismiss Plaintiffs' vagueness claim, Defendant Miami-Dade County asserts that Plaintiffs "'must demonstrate that the law is impermissibly vague in all of its applications.'" Miami-Dade  Br. at 6-7 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)).  The Supreme Court, however, articulated this standard in the context of a vagueness challenge to a *civil* statute that "simply regulate[d] business behavior and contain[ed] a scienter requirement."  *Vill. of Hoffman Estates*, 455 U.S. at 499.  *Village of Hoffman Estates* expressly acknowledges that criminal statutes must receive stricter vagueness scrutiny in part because the consequences for imprecision are so much more severe.  *Id.* at 498-99.  Stricter scrutiny is especially necessary for laws like the Ordinance, which impose criminal liability without a *mens rea* requirement.  *See Morales*, 527 U.S. at 55.

Defendant Miami-Dade County next invokes *Stanberry v. Holmes*, 613 F.2d 1285 (5th Cir. 1980) to assert that the term "school" is not impermissibly vague.  Miami-Dade Br. at 7-8. *Stanberry* is inapposite.  That case addressed a civil zoning ordinance applicable only to businesses.  *Stanberry*, 613 F.2d at 1286.  The Fifth Circuit therefore did not examine the ordinance under *Kolender*'s more demanding standard for criminal statutes.  Also critical in *Stanberry* was the fact that the ordinance's references to "playgrounds, dormitories, stadiums and other structures or grounds used in conjunction therewith" sufficiently narrowed the definition of school to exclude "such enterprises as bartending or Karate schools."  *Id.* at 1287, 1290.  In contrast to *Stanberry*, the Ordinance lacks any qualifying language to exclude educational programs that may occur in jails, prisons, juvenile detention centers, hospitals, and other youth emergency shelters.  (¶77.)

Defendant Miami-Dade County further claims that the disagreement between state and county officials over how to interpret the term school does not support a vagueness claim. Miami-Dade Br. at 8-9.   The County relies on 11th Circuit precedent stating that misinterpretations by or disagreements among "a few police officers" does not render a statute void for vagueness.  *First Vagabonds Church of God v. City of Orlando*, 610 F.3d 1274, 1288 (11th Cir. 2010).  This assertion strains credulity.  Plaintiffs do not allege that a "few police officers" disagree over how to interpret the Ordinance.  Plaintiffs allege that multiple agencies at both the state and county levels have failed to reach a consensus on how to interpret the Ordinance.  The County has itself vacillated on several occasions.  (¶86-117.)  The Ordinance's imprecision, not the predilections of individual officers, is at fault for this confusion.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Miami-Dade County's motion to dismiss.

## REQUEST FOR HEARING

Due to the complex nature of the issues presented by the Amended Complaint and Defendant Miami-Dade County's motion to dismiss, Plaintiffs request oral argument.  Oral argument will assist the Court in efficiently resolving this motion.  Plaintiffs estimate that thirty minutes of argument per side will be sufficient.

Date: February 13, 2015

Certificate of Service: Today, I filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all persons registered for this case, including any opposing counsel that have appeared.

Respectfully submitted,

**/s/ Daniel B. Tilley**
Daniel B. Tilley
Florida Bar No. 102882
Nancy Abudu
Florida Bar No. 111881
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
T: 786-363-2714
F: 786-363-1257
dtilley@aclufl.org
nabudu@aclufl.org

Brandon J. Buskey** (ASB2753A50B)
Ezekiel Edwards**
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY  10004
T: 212-284-7364
F: 212-549-2654
bbuskey@aclu.org
eedwards@aclu.org

** Pro hac vice