# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
|  | * |  |
| John Doe #3, John Doe #4, John Doe #5, and | * |  |
| John Doe #6; John Doe #7 | * |  |
|  | * | Case No.: |
| Plaintiffs, | * | 14-CV-23933-Huck/ McAliley |
|  | * |  |
| vs. | * |  |
|  | * |  |
|  | * |  |
| Miami-Dade County; Florida; | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

---

# SECOND AMENDED COMPLAINT

## INTRODUCTION

1.      Defendant Miami-Dade County's enforcement of the Lauren Book Child Safety Ordinance (the "Ordinance"), which prohibits individuals convicted of certain sexual offenses from living within 2500 feet of a "school," has repeatedly forced into homelessness hundreds of individuals in Miami-Dade County.

2.      These individuals are unable to obtain stable housing in Miami-Dade County. This transience is primarily because the Ordinance arbitrarily renders off-limits broad swaths of available housing.

3.      Because they cannot obtain housing under the Ordinance, Plaintiffs and numerous other people covered by the Ordinance have been directed by their probation officers to an area around the intersection of NW 36th Court and NW 71st Street, in unincorporated Miami-Dade County, near the border of Hialeah.

4.      There is no housing at this location.  Instead, hundreds of individuals have formed encampments near privately-owned warehouses and an active railroad track.[1]

5.      The area is without adequate shelter.  It has no sanitation facilities, potable water, electricity, or other basic necessities, placing Plaintiffs at imminent risk of physical harm from attack, exposure to the elements, and disease.  These conditions also threaten public safety and health, particularly the risk of disease from the lack of sanitation facilities.

6.      The Ordinance's residency restriction, which is punitive in nature, applies to anyone convicted of certain crimes, even if the crimes occurred before Miami Dade County enacted the Ordinance.

---

[1] The Second Amended Complaint will refer to this area alternatively as the "encampment," "tracks," or "railroad tracks."

7.     Plaintiffs, all of whom committed their offenses before the County enacted the Ordinance, bring this action under 42 U.S.C. § 1983 to vindicate their rights under the Ex Post Facto Clauses of the state and federal constitutions.

8.     Plaintiffs seek a declaration from this Court affirming that their rights have been violated, a permanent injunction against future enforcement of the Ordinance.

## JURISDICTION AND VENUE

9.     Plaintiffs' federal claim arises under the Constitution of the United States.  This Court has jurisdiction over this claims under 28 U.S.C. §§ 1331, 1343(a)(3).

10.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65.  The federal rights asserted by Plaintiffs are enforceable under 42 U.S.C. § 1983.

11.     The Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367, because the federal and state law claims arise from the same case and controversy.

12.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(e). Defendant Miami-Dade County and all Plaintiffs reside in this judicial district.  All of the acts and omissions by Defendant giving rise to this action occurred in this judicial district.

## PARTIES

*Plaintiffs*

13.     Plaintiff John Doe #3 is a resident of Miami-Dade County, where he meets the definition of a "sexual offender" under the Ordinance.

14.     John Doe #3 is in his late 50's and is currently under supervision by the Florida Department of Corrections ("FDOC").

15.     John Doe #3 remains under extensive probation conditions, including a daily curfew from 10 p.m. to 6 a.m., but has a court order allowing him to work during curfew.

16.     In 1999, John Doe #3 was convicted of lewd and lascivious conduct with a 15 year old and unlawful sexual activity with a 16/17 year old.

17.     John Doe #3 was released from prison in 2009.

18.     In 2011, John Doe #3 moved to the Shorecrest neighborhood in Miami-Dade County to be closer to his place of employment.  In March 2014, he was evicted from his apartment.

19.     After John Doe #3 moved out of his apartment, his probation officer instructed him to go to the tracks because John Doe #3 could not locate new housing compliant with the Ordinance.

20.     John Doe #3 has been sleeping in his vehicle along the tracks since March 2014. The Miami-Dade Police Department and FDOC approved this location as John Doe #3's residence.

21.     John Doe #3 is currently employed and can afford rental housing.  Nonetheless, despite repeated attempts, he has been unable to obtain rental housing in compliance with the Ordinance.

22.     The Ordinance has directly caused John Doe #3's homelessness by severely restricting available housing options.  But for the Ordinance's residency restriction, John Doe #3 could obtain housing and would not be forced to sleep in his vehicle each night.

23.     The residency restriction punishes John Doe #3 by forcing him into homelessness, preventing him from securing housing, and negatively affecting his physical and mental health.

24.     Defendant John Doe #4 is a resident of Miami-Dade County, where he meets the definition of a "sexual offender" under the Ordinance.

25.     John Doe #4 is a mentally disabled man in his mid-60's. He receives treatment for schizophrenia.

26.     In 1993, John Doe #4 was charged with lewd and lascivious conduct with a minor. He pleaded guilty and was sentenced to probation in 1994.

27.     Later in 1994, John Doe #4 violated probation and was sentenced to 3 years in prison; he was released in 1997.

28.     In 2008, John Doe #4's wife left him, and he had to move out of their home. Because of the Ordinance, he could not find a place to live, became homeless, and slept at Camillus House, a homeless shelter.

29.     After he obtained disability benefits in 2009, John Doe #4 rented an apartment in Hialeah, but he could not live there because it was ineligible under the Ordinance.

30.     Because of the Ordinance, John Doe #4 began residing under the Julia Tuttle Causeway.

31.     With relocation assistance from the Homeless Trust provided in 2010, John Doe #4 moved into an apartment in Homestead, Florida, where he lived with another registrant. (This location would no longer be eligible location a school opened within 2,500 feet.)

32.     In July 2015, John Doe #4 was evicted from the Homestead apartment.   He relocated to the railroad tracks.

33.     John Doe #4 has been staying near the tracks since July 2015.

34.     John Doe #4 pays an acquaintance $650 per month to store his personal property and medication and to have somewhere to go during the day and rest, since does not sleep at the railroad tracks out of fear for his safety.

35.     Despite repeated attempts, John Doe #4 has been unable to obtain rental housing in compliance with the Ordinance.  His mental disabilities make locating housing under the Ordinance especially difficult.

36.     The Ordinance has directly caused John Doe #4's homelessness by severely restricting his housing options.  But for the Ordinance's residency restriction, John Doe #4 would not be forced to stay outside each night.

37.     The residency restriction punishes John Doe #4 by forcing him into homelessness, preventing him from securing housing, and negatively affecting his physical and mental health.

38.     Defendant John Doe #5 is a resident of Miami-Dade County, where he meets the definition of a "sexual predator" under the Ordinance.

39.     John Doe #5 is in his late 50's and is currently under supervision by FDOC.

40.     John Doe #5 suffers from Parkinson's disease and has significant tremors.  He receives Supplemental Security Income (SSI).

41.     John Doe #5 was convicted in 1994 of lewd and lascivious assault on a child and sexual battery on a minor.

42.     John Doe #5 was incarcerated several times for probation violations. John Doe #5 was most recently released from prison in 2014.

43.   John Doe #5's probation officer instructed him to go to the railroad tracks because he could not obtain housing compliant with the Ordinance.  He has been living there since he was released in 2014.

44.   John Doe #5 would be able to live with his niece in Miami Gardens, but he cannot reside there because his niece's home is within 2,500 feet of several schools.

45.   Each night at the railroad tracks, John Doe #5 either borrows a family member's car to sleep in or sleeps on a mat along a nearby warehouse.

46.   Despite repeated attempts, he has been unable to obtain rental housing in compliance with the Ordinance.  The effects of Parkinson's disease make it especially difficult for him to locate housing under the Ordinance.

47.   The Ordinance has directly caused John Doe #5's homelessness by severely restricting housing options and by preventing him from living with his niece, who could help provide the care he needs to manage his Parkinson's disease.  But for the Ordinance's residency restriction, John Doe #5 would not be forced to sleep outside each night.

48.   The residency restriction punishes John Doe #5 by forcing him into homelessness, preventing him from securing housing, and negatively affecting his physical and mental health.

49.   Defendant John Doe #6 is a resident of Miami-Dade County, where he meets the definition of a "sexual offender" under the Ordinance.

50.   John Doe #6 is in his mid-40's and is employed.

51.   John Doe #6 was convicted of lewd and lascivious molestation of a child under 12 in 2004.

52.     John Doe #6 was released in 2005 and lived for eight years in the City of Surfside which is located in Miami-Dade County.

53.     After a disagreement with his landlord, John Doe #6 left this residence and found temporary housing at several locations.  However, he could not remain in any of these locations because they were all ineligible under the Ordinance.

54.     John Doe #6 has been living at the railroad tracks since 2015.  His probation officer directed him to the location because he could not locate housing compliant with the Ordinance.

55.     John Doe #6 is employed and can afford housing. Nonetheless, despite repeated attempts, he has been unable to obtain housing in compliance with the Ordinance.

56.     The Ordinance has directly caused John Doe #6's homelessness by severely restricting his housing options.  But for the Ordinance's residency restriction, John Doe #6 could obtain other housing, and he would not be forced to sleep outside each night.

57.     The residency restriction punishes John Doe #6 by forcing him into homelessness, preventing him from securing housing, and negatively affecting his physical and mental health.

58.     Defendant John Doe #7 is a resident of Miami-Dade County, where he meets the definition of a "sexual predator" under the Ordinance.

59.     John Doe #7 is a physically disabled man in his 70's.

60.     John Doe #7 uses a wheelchair for mobility because he broke his hip in prison and he has heart problems.

61.     In May 2009, John Doe #7 was convicted of sexual battery and two counts of lewd and lascivious conduct with a person 12 to 15 years old.

62.     When John Doe #7 was released from prison in December 2014, he lived briefly in motels, but then ended up homeless living near downtown Miami for several months.

63.     In September 2015, John Doe #7's probation officer instructed him to go to the railroad tracks where he currently lives because Doe #7 could not obtain housing under the Ordinance.

64.     John Doe #7 sleeps in a tent each night at the tracks.

65.     Because he is in a wheelchair, he relies on other registrants to take him to a near-by Wal-Mart to use a bathroom that is accessible for the disabled.

66.     Despite repeated attempts, he has been unable to obtain rental housing in compliance with the Ordinance.  His physical disability makes it especially difficult to locate housing under the Ordinance.

67.     The Ordinance has directly caused John Doe #7's homelessness by severely restricting housing options.  But for the Ordinance's residency restriction, John Doe #7 would have more available housing options, and he would not be forced to sleep outside each night.

68.     The residency restriction punishes John Doe #7 by forcing him into homelessness, preventing him from securing housing, and negatively affecting his physical and mental health.

69.     All Plaintiffs committed their qualifying offenses before the enactment of the Ordinance.  None of the Plaintiffs have committed another sexual offense.

*Defendant*

70.     Defendant Miami-Dade County is a political subdivision of the State of Florida organized under the laws of Florida.  It enacted, and its police department enforces, the

"Lauren Book Child Safety Ordinance," Miami-Dade County, Fla., Code of Ordinances ch. 23, art. XVII, sec. 21-277 through 21-285.

## FACTS

71.     For the past several years, hundreds of homeless individuals formerly convicted of certain sexual offenses have formed a makeshift encampment near the intersection of NW 36th Court and NW 71st Street.  The area is in a warehouse district in unincorporated Miami-Dade County next to an active railroad track.

72.     Inhabitants of the encampment are not there by choice or circumstance.  They were forced into homelessness by Defendant's deliberate, long-standing policy of severely restricting where individuals formerly convicted of certain sexual offenses may reside in Miami-Dade County.

### I.     Miami-Dade County's Lauren Book Child Safety Ordinance

73.     After the nearly five-year persistence of a notorious encampment under the Julia Tuttle Causeway, which at its peak numbered more than one hundred people formerly convicted of certain sexual offenses, Miami-Dade County amended its residency restriction ordinance in January 2010. (Ord. No. 10-01, § 2, 1-21-10, amending Article XVII of Chapter 21 of the Miami-Dade County Code of Ordinances ("The Miami-Dade County Sexual Offender and Sexual Predator Ordinance")).[2]

74.     The County's original Ordinance was enacted in November 2005.

---

[2]   The County renamed the Ordinance the "Lauren Book Child Safety Ordinance" in October 2010.

75.    The 2010 Ordinance preempted and repealed all municipal ordinances establishing residency restrictions for those labeled "sexual offenders" or "sexual predators." Miami-Dade County, Fla., Code of Ordinances ch. 23, art. XVII, sec. 21-279(b).

76.    The Ordinance prohibits those formerly convicted of certain crimes[3] involving a victim under the age of 16 from residing within 2,500 feet of any school.  Ch. 23, art. XVII, sec. 21-281(a).

77.    The Ordinance's residency restriction is retroactive and applies even if an individual committed the relevant crime before the County enacted the Ordinance.  By contrast, the State of Florida's residency restriction – 1,000 feet from a school, child care facility, park, or playground – does not apply to individuals whose offenses occurred prior to the statute's effective date (October 1, 2004).

78.    The Ordinance's residency restriction applies even if an individual no longer has to register as a "sex offender" under Fla. Stat. § 943.04354.  By contrast, the State of Florida's residency restriction does not apply to individuals who have been removed from the registry.

79.    The Ordinance's residency restriction applies for life, without regard to an individual's risk of recidivism over time, whether the individual has successfully completed sexual offender treatment, whether the individual is currently under FDOC supervision, or any other individual circumstance, such as significant mental or physical conditions.

80.    Despite the Ordinance's preemption of municipal ordinances, the Ordinance still severely and unduly restricts available housing options in Miami-Dade County.

---

[3] Sections 794.011 (sexual battery), 800.04 (lewd and lascivious acts on/in presence of persons under age 16), 827.071 (sexual performance by a child), 847.0135(5) (sexual acts transmitted over computer), or 847.0145 (selling or buying of minors for portrayal in sexually explicit conduct), Fla. Stat., or similar laws of another jurisdiction.

81.     The Ordinance's residency restriction excludes far more housing in Miami-Dade County than the State of Florida's residency restriction.  This is in part due to its breadth, Miami-Dade County's population-density, and the county's large number of schools.  The excessive reach of the county's residency restriction has drastically exacerbated and continues to drastically exacerbate transience and homelessness in Miami-Dade County.

82.     While the Miami-Dade Police Department provides online mapping assistance for the residency restriction, it expressly "does not assume responsibility for the accuracy or timeliness of the information displayed."[4]   The county also does not assist covered individuals in locating available housing under the Ordinance.

83.     Violating the residency restriction is a crime punishable by a maximum fine of $1000 and/or imprisonment for up to 364 days.  Ch. 23, art. XVII, sec. 21-281(c).

**II.     *The Ordinance Has Forced Hundreds Into Homelessness and Transience.***

84.     After the 2010 amendments, city, county, and state officials disbanded the Julia Tuttle Causeway encampment.  However, homeless encampments persisted.

85.     Many people displaced from the Julia Tuttle Causeway encampment relocated to rental housing in the Shorecrest neighborhood of Miami because it was one of the few areas compliant with the Ordinance that also had available housing.

86.     FDOC probation officers directed numerous others to Shorecrest when those individuals could not locate compliant housing.  When available housing in the area became scarce, many of these people began living in tents along a sidewalk.

---

[4] Miami-Dade County Portal, http://www.miamidade.gov/police/2500-ft-address-compliance.asp (last visited Sept. 28, 2017).

87.     The Shorecrest encampment disbanded in 2012 after a Miami City Commissioner converted a vacant piece of nearby land into a "pocket park" to exclude registrants under the state residency restriction.[5]

88.     Others displaced from the Tuttle encampment moved to or near River Park Mobile Home Park, located at 2260 NW 27th Avenue, Miami, FL 33142.  River Park was another of the few locations thought to be eligible under the Ordinance with available housing.

89.     In 2013, at the urging of the Miami-Dade County Homeless Trust, the County determined that River Park was ineligible under the Ordinance because it was within 2,500 feet of the Miami Bridge Youth and Family Services, Inc. ("Miami Bridge") facility. Though Miami Bridge had never been considered a school since its founding in 1975, the County unilaterally decided that the facility should be re-designated as a school.

90.     In July 2013, both the MDPD's Special Victims Bureau/Sexual Crimes and the FDOC notified nearly 100 individuals residing within 2,500 feet of the Miami Bridge that their homes were now deemed in violation of the Ordinance.  Many were told that they had five days to relocate or face arrest.

91.     By 2013, 54 individuals moved out of River Park and the nearby area.  Of these, 34 became transient, 3 were incarcerated, and 3 absconded.  Only 14 were able to locate new residences.

92.     At the instruction of FDOC employees, many evictees and other probationers who were unable to locate new residences went to the area near NW 36th Court and NW 71st Street, thus forming yet another encampment.

---

[5] Fla. Stat. § 775.215 ("Residency restriction for persons convicted of certain sex offenses").

93.     Conditions at the encampment present an ongoing threat of physical danger to those forced to reside there.  The conditions also create severe public health risks at the encampment and the surrounding areas.

94.     There are no restroom facilities at the encampment, nor is there any source for sanitary water.  People have no choice but to relieve themselves in the areas around privately-owned warehouses or along the railroad track, creating a significant and ongoing risk of an outbreak of infectious diseases such as cholera.

95.     There is no shelter from extreme weather the rain at the encampment, nor does the Ordinance provide any exemption from the residency restriction for people to obtain shelter during extreme weather events.

96.     For example, Hurricane Irma resulted in a mandatory evacuation involving millions of Floridians.  Those at the encampment under FDOC supervision, such as Does ## 3, 5, and 7, were forced to report to a local jail.  The Ordinance left those not under FDOC supervision without any shelter from the hurricane.

97.     Originally, most of the individuals at the encampment slept around a privately-owned warehouse; some on mats on the loading dock; some in their cars; others in tents in the parking lot; still others in sleeping bags or under discarded tarps in the grass around the warehouse.

98.     Since then, many of the warehouses have built fences to keep people from sleeping on their private property, and the Miami-Dade Police Department has threatened to arrest people sleeping on private property.

99.     The encampment covers over several blocks, and people have set up tents along the roads, while others sleep in their cars, in chairs, or on mats.

13

100.     According to the Florida Department of Law Enforcement's online registry, as of the date of this Complaint, 261 people have registered to live at or near the encampment. The number of people registered at the encampment is now nearly twice as large as the number of people who lived at the Tuttle Bridge encampment.

### III.     The Ordinance's Residency Restriction Has No Factual Basis and Undermines Public Safety.

101.     The Ordinance purports to promote public safety by restricting certain former sexual offenders from living within 2,500 feet of schools.

102.     However, the Ordinance is based on demonstrably false assumptions about former sexual offenders and the efficacy of residency restrictions.

103.     Specifically, the Ordinance is premised on Miami-Dade County's "findings" that those covered by the Ordinance "present an extreme threat to the public safety," and that they "are extremely likely to use physical violence and to repeat their offenses."   Miami-Dade County, Fla., Code of Ordinances, ch. 21, art. XVII, sec. 21-278(a).   These findings are factually incorrect and have no factual basis.

104.     Research has consistently shown that sexual offender recidivism rates are among the lowest for any category of offenses, and that this lower risk of sexual offense recidivism steadily declines over time.[6]

105.     Research has also consistently shown that individual risk assessments are a more reliable method for determining the risk of recidivism for former offenders than categorical assumptions based on the nature of the conviction.[7]

---

[6] *See, e.g.,* R. Karl Hanson & Kelly Morton-Bourgon, *Predictors of Sexual Recidivism: An Updated Meta-Analysis* 8 (2004), http://www.static99.org/pdfdocs/hansonandmortonbourgon2004.pdf (last visited Sept. 28, 2017).

106.    The Ordinance goes on to assert that "[m]ost sexual offenders commit many offenses, have many more victims than are ever reported, and are prosecuted for only a fraction of their crimes."  Ch. 21, art. XVII, sec. 21-287(a).

107.    There is no basis in fact for these assertions, or for the implication that the rate of undetected sexual offending is any different than the rate of undetected offending for any other category of crime.

108.    Aside from the Ordinance's incorrect factual assertions and false assumptions about former sexual offenders, there is no evidence demonstrating that residency restrictions have any impact on recidivism or public safety, or that an individual's proximity to a school at night—when no students are present—is a salient risk factor in sexual offending.[8]

109.    The efficacy of the Ordinance's residency restriction is particularly suspect.  The 2,500 feet distance "may not be measured by a pedestrian route or automobile route, but instead as the shortest straight line" from the school's property line.  Ch. 21, art. XVII, sec. 21-281(b).  Thus, an individual may be barred from a residence based on the location's proximity to a school, even if there is no viable route to reach the school within 2,500 feet.

110.    More broadly, residency restrictions as severe as Defendant's do not advance public safety.  Nearly 95% of sexual crimes are committed by offenders familiar with the

---

[7] Association for the Treatment of Sexual Abusers, *Sexual Offender Residence Restrictions* (2014), http://www.atsa.com/pdfs/Policy/2014SOResidenceRestrictions.pdf (last visited Sept. 28, 2017).

[8] *E.g.*, Kelly M. Socia, *Residence Restrictions Are Ineffective, Inefficient, and Inadequate: So Now What?*, 13 Criminology & Public Pol'y 1, 3 (2014) (consolidating the results of six studies examining the effects of residency restrictions; finding as of 2014 that "[n]o study has found that residency restrictions resulted (or would result) in a significant decrease in child victims of sex crimes").

victim, and most child victims are abused by someone they know.[9]  How close an individual lives to a school is almost categorically irrelevant.

111.    Defendant's residency restriction is worse than ineffective; it actively undermines public safety.

112.    The only demonstrated means of effectively managing reentry and recidivism are targeted treatment, along with maintaining supportive, stable environments that provide access to housing, employment, and transportation.[10]

113.    Starkly contrasting this research on effective recidivism management, the lives of those forced into homelessness and transience by Defendant at places like the encampment have been irreparably destabilized by their inability to secure safe and stable shelter.

114.    This destabilization directly undermines the rehabilitation and successful re-entry to society of former offenders like Plaintiffs whose crimes all occurred more than a decade ago.

115.    The residency restriction on housing makes it more difficult for Plaintiffs and others to secure residences, receive treatment, and obtain and maintain employment.  These factors increase the risk of recidivism, especially for crimes more closely associated with poverty and social instability.

116.    While there are hundreds of individuals living at the railroad encampment, there are many other individuals subject to the Ordinance who are transient or homeless due directly to the residency restriction.

---

[9] *See, e.g.*, Howard N. Snyder, U.S. Dep't of Just. Bureau of Just. Stat., *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics* 10 (2000), *available at* http://www.bjs.gov/content/pub/pdf/saycrle.pdf (last visited December 15, 2014).

[10] Association for the Treatment of Sexual Abusers, *supra*.

117.    The involuntary homelessness and transience caused by the Ordinance makes former sexual offenders more difficult to supervise.  It also significantly increases the risk these individuals will abscond or otherwise violate their registration requirements.

118.    Consequently, the Ordinance increases the risk of recidivism because of its damaging effects on an individual's ability to achieve residential, economic, and social stability.

119.    These factors together do not advance public safety or any other legitimate public interest in Miami-Dade County.

120.    Based on the robust body of research on residency restrictions and offender treatment and management, including Florida-specific research,[11] the Ordinance undermines public safety, the very goal it purports to serve.

## COUNT I:
## FEDERAL EX POST FACTO VIOLATION

121.    The Ex Post Facto Clause of Article I, Section 9 of the United States Constitution prohibits Defendant from retroactively increasing an individual's punishment above that authorized by the law in effect at the time the offense was committed.

122.    The Ordinance retroactively applies to individuals who committed certain offenses before its passage.

---

[11] *See, e.g.*, Paul A. Zandbergen & Timothy C. Hart, *Reducing Housing Options for Convicted Sex Offenders: Investigating the Impact of Residency Restriction Laws using GIS*, 8 Just. Research & Pol'y, 1, 4 (2006) (Orange County, Florida residency restrictions demonstrably increased transience and may unintentionally "increase rather than decrease the likelihood of reoffending"); *see also generally* Jill S. Levenson, *Collateral Consequences of Sex Offender Residence Restrictions*, 21 Crim. Just. Stud. 153 (2008).

123.   All of the Plaintiffs' qualifying criminal offenses occurred prior to the enactment of the Ordinance.

124.   Defendant Miami-Dade County passed the Ordinance with the intent to punish those convicted of certain sexual offenses, irrespective of whether a former offender is actually required to register under Florida law, when the offense occurred, or whether the former offender poses a risk to the public.

125.   Regardless of legislative intent, the retroactive application of the Ordinance on Plaintiffs violates the federal Ex Post Facto Clauses because its debilitating effects are clearly punitive.

## COUNT II:

## FLORIDA EX POST FACTO VIOLATION

126.   The Ex Post Facto Clause of article I, section 10 of the Florida Constitution prohibits Defendant from retroactively increasing an individual's punishment above that authorized by the law in effect at the time the offense was committed.

127.   The Ordinance is retroactive and applies to individuals who committed certain offenses before its passage.

128.   All of the Plaintiffs' qualifying criminal offenses occurred prior to the enactment of the Ordinance.

129.   Defendant Miami-Dade County passed the Ordinance with the intent to punish those convicted of certain sexual offenses, irrespective of whether a former offender is actually required to register under Florida law, when the offense occurred, or whether the former offender poses a risk to the public.

130.    Regardless of legislative intent, the retroactive application of the Ordinance on Plaintiffs violates the federal and state Ex Post Facto Clauses because its debilitating effects are clearly punitive.


## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Enter a judgment declaring that the Ordinance violates the federal and state prohibitions against ex post facto laws.

b.  Issue a permanent injunction prohibiting Defendants from enforcing the Ordinance against anyone whose qualifying offense occurred before the enactment of the Ordinance;

c.  Award costs and attorney's fees pursuant to 42 U.S.C. § 1988[12];

d.  Grant or award any other relief this Court deems just and proper.

Date: October 2, 2017.

Respectfully submitted,

*/s/ Nancy G. Abudu*
Nancy G. Abudu
Florida Bar No. 111881
Daniel B. Tilley
Florida Bar No. 102882
ACLU Foundation of Florida
4343 W. Flagler St., Ste. 400
Miami, FL 33134
T: 786-363-2707
F: 786-363-1108
dtilley@aclufl.org
nabudu@aclufl.org

Brandon J. Buskey* (ASB2753A50B)
Ezekiel Edwards*
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-284-7364
F: 212-549-2654
bbuskey@aclu.org
eedwards@aclu.org

*Admitted pro hac vice*

---

[12] Legal Services of Greater Miami, Inc. does not seek to recover attorney's fees or costs from Defendant.

Jeffrey M. Hearne
Florida Bar No. 512060
Daniel Rowinsky Quintian
Florida Bar No. 105525
Legal Services of Greater Miami, Inc.
4343 W. Flagler, Ste. 100
Miami, Florida 33134
T: 305-576-0080
F: 305-573-5800
jhearne@legalservicesmiami.org
drowinsky@legalservicesmiami.org
*Legal Services only represents John Doe #3, John Doe #4, and John Doe #5*