**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| | * | |
| John Doe #4, et al. | * | |
| | * | Case No.: |
| Plaintiffs, | * | 14-cv-23933-Huck/McAliley |
| | * | |
| v. | * | |
| | * | |
| | * | |
| Miami-Dade County, Florida | * | |
| | * | |
| Defendant. | * | |
| | * | |

---

## Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Memorandum of Law

Plaintiffs, by and through undersigned counsel, file this response in opposition to the County's Motion for Summary Judgment, ECF 122.

### I.      Introduction

Plaintiffs' evidence establishes that the Lauren Book Child Safety Ordinance's (the "Ordinance") prohibition on certain former sexual offenders residing within 2500 feet of any school in Miami-Dade County constitutes an ex post facto law. The Ordinance eliminates 90% of residential properties and 99.9% of available, affordable properties for covered individuals, which has significantly increased homelessness among this population. But the residence restriction does nothing to advance the County's purported goal of public safety. Instead, the Ordinance increases the likelihood that these individuals will re-offend by making it unreasonably difficult for them to locate housing and successfully re-enter society.

1

Summary judgment is entirely inappropriate. The County's statute of limitations and standing objections are without merit; Plaintiffs suffer concrete, ongoing injuries every day from the Ordinance's punitive effects. Also, there are critical factual disputes about the amount of housing that is available to covered individuals, as well as the degree to which the Ordinance advances or undermines public safety. These disputes must be resolved at trial.

## II. Summary-Judgment Standard

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A fact is "material" if it might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## III. Analysis

### A. Plaintiffs' claims are timely.

Defendant asserts that Plaintiffs' claims accrued by 2010, the year the ordinance was amended, and are thus outside Florida's four-year limitations period for § 1983 claims. ECF 122 at 3-4. That is incorrect. The County cites precisely one case—*Hillcrest Property, LLC v. Pasco County*, 754 F.3d 1279 (11th Cir. 2014)—for the proposition that the limitations period began to

run with the statute's enactment.  But *Hillcrest*'s holding is inapposite.  That case decided the accrual date of a facial substantive due process claim alleging a property deprivation.  The *Hillcrest* court applied the accrual date for facial takings claims, reasoning that "the value of the property at issue depreciated when it became subject to" the challenged ordinance.  *Hillcrest*, 754 F.3d at 1283; *see also id.* at 1282 ("In the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest.").

However, while *Hillcrest* recognized that a statute's enactment is the appropriate accrual date in the unique context of takings, it also acknowledged that "[i]n other contexts, the harm inflicted by the statute is continuing" and occurs whenever the statute is enforced.  *Id.* at 1282. Plaintiffs' ex post facto claims plainly challenge the continuing harm from the Book Ordinance's enforcement; they do not challenge a discrete devaluation of a property interest.  Specifically, they contest the Book Ordinance's ongoing imposition of retroactive punishment, inflicted by permanently and dramatically limiting their liberty to secure housing in Miami Dade County.  As the Sixth Circuit explained in *Kuhnle Bros., Inc. v. County of Geauga*—a decision upon which the *Hillcrest* court relied heavily—where the enforcement of a statute deprives a plaintiff of such essential liberty interests, "each day that the invalid resolution remain[s] in effect, it inflict[s] 'continuing and accumulating harm.'"  103 F.3d 516, 522 (quoting *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968); *see also Perez v. Laredo Junior College*, 706 F.2d 731, 733-34 (5th Cir. 1983) ("If the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute [of limitations] does not foreclose an action aimed at [ ] enforcement of the policy during the limitations period.").

Plaintiffs therefore suffer anew their alleged punishment from the Ordinance every day the Ordinance is in effect; every time they search for an address compliant with the Ordinance;[1] and every thirty days when, because they are homeless, they must verify that their current location complies with the Ordinance, Fla Stat. Ann. § 943.0435(4)(b)(2). Each of these harms begins a new limitations period in which Plaintiffs may seek to halt the County from enforcing the Ordinance against them. *Kuhnle Bros.*, 103 F.3d at 522. ("[T]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations.'") (quoting *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989), *aff'd in part on other grounds sub nom Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990)). Their lawsuit is therefore timely.

### B. John Doe #7 has standing.

The County also argues that Plaintiff John Doe #7 does not have standing. ECF 122 at 4-5. In support of its argument, the County represents that Doe #7 "remains on probation for his qualifying offense until 2026" and that "as one of the conditions of his plea agreement, which remains in effect while he is on probation, John Doe #7 agreed that he would be prohibited from living within 2,500 feet of any school," unless he came under the ordinance's grandfather clause. *Id.* at 5. The County contends that the fact that Doe #7 is on probation until 2026 means "he cannot demonstrate today" that his injury will be redressed by a favorable decision. *Id.* (emphasis added). This argument lacks merit for multiple reasons.

First, the County's selective reading of the plea agreement omits a critical, dispositive fact: the plea agreement explicitly states that "[i]f s. 21-281 does not apply to the Defendant, then

---

[1] ECF 123 at 17, ¶¶ 114-119 (admitting John Doe #4 moved to encampment around September 2015); ECF 123 at 19-20, ¶¶ 141-44 (admitting John Doe #5 was incarcerated from late 2006 until March 1, 2014, attempted to find housing, then moved to encampment); ECF 123 at 22-23, ¶¶ 181-88 (describing John Doe #6's continual search for housing after January 2015 to the present); ECF 123 at 24-25, ¶¶ 205-213 (admitting John Doe #7 was incarcerated from 2008 until December 2, 2014, and describing his continual search for housing from then to present).

the Defendant is prohibited from living within one thousand (1,000) feet of any school." *Id.* Further, the buffer-zone prohibition is preceded by the qualifying phrase, "As provided in s. 21-281" (*i.e.*, the Ordinance). ECF 124-13 at 137. The plea agreement therefore does not merely state that Doe #7 "shall not live within 2,500 feet of a school." Instead, it ties the requirement directly to the Ordinance. As such, success in this action would not only halt the County's enforcement of the Ordinance against Doe #7, but he would no longer be subject to the provision of his plea agreement requiring him to comply with the Ordinance.

Second, the Ordinance has an obvious impact on Doe #7 independent of the probation condition: if Doe #7 violates Ordinance, he will be criminally prosecuted. *See* ECF 128-16 at 33:21-24. That prosecution would occur separately from any potential prosecution for violating the related probation condition. Prevailing in this lawsuit would indisputably provide Doe #7 redress from the threat of an independent criminal prosecution.

Moreover, even accepting the County's false premise that the Ordinance poses no serious burden until 2026, this length of time does not make the injury any less definite for standing purposes.[2] At least one federal appeals court has found standing even when there was a significantly longer delay of thirteen years. *See Vill. of Bensenville v. F.A.A.*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) ("Nor do we think the municipalities' alleged injury too attenuated or distant to represent a constitutionally-sufficient injury-in-fact, as the FAA asserts, by virtue of the fact that Chicago will not start collecting the passenger facility fee the FAA authorized until 13 years from now."); *accord Mead v. Holder*, 766 F. Supp. 2d 16, 25 (D.D.C. 2011) ("temporal

---

[2] The County has failed to offer any legal support for its apparent position that delayed relief means no standing. Tellingly, the County merely quotes the paradigmatic standing case—*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)—and two Eleventh Circuit cases essentially for the proposition that the standing inquiry exists for courts to consider. *See* ECF 122 at 4-5.

remoteness alone does not automatically defeat standing"). The Ordinance applies to Doe #7 today, and it will apply to him in 2026. He has standing to challenge it today.[3]

For all these reasons, this Court should reject the County's arguments concerning standing for Plaintiff John Doe #7.[4]

### C. The County cannot satisfy the summary-judgment standard with respect to Plaintiffs' Ex Post Facto claims.

Miami-Dade County's prohibition on certain former sexual offenders living within 2,500 feet of a school violates the ex post facto clauses of the federal and Florida constitutions. The protection against retroactive punishment provides "a powerful check on states when they have sought to punish socially disfavored persons without prior notice". *Does #1-5 v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016), *reh'g denied* (Sept. 15, 2016), *cert. denied sub nom. Snyder v. John Does #1-5*, 138 S. Ct. 55, 199 L. Ed. 2d 18 (2017). The ex post facto analysis first asks whether the legislature intended to pass a punitive statute; if it did not, the inquiry shifts to whether the law's punitive effects override the government's civil intent. *Smith v. Doe*, 538 U.S. 84, 92 (2003). On the second prong, the most relevant factors are: (1) whether the act imposes an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether its operation will promote the traditional aims of punishment – retribution and deterrence; (4) whether there is a rational connection to a non-punitive purpose; (5) whether the scheme appears excessive in relation to its non-punitive,

---

[3] In fact, the County itself offers no dispute that success in this case would provide concrete relief to Doe #7—the County appears instead to rely merely on a contention that such relief would have to wait until 2026 to become manifest. Yet that proves Plaintiffs' point. Because the County does not dispute that a favorable decision would ultimately remedy Doe #7's injury.

[4] It bears mentioning that the County's assertion that Doe #7 brought his suit too early directly conflicts with the County's statute-of-limitations argument in the previous section that Doe #7 brought his lawsuit too *late*. *Id.* at 3-4. The County cannot have it both ways.

regulatory purpose. *Smith* 538 U.S. at 97. No single factor is dispositive. *Hudson v. United States*, 522 U.S. 93, 101, 118 S. Ct. 488, 494 (1997) (internal quotation marks omitted). Balancing these factors demonstrates the Ordinance's punitive nature. In any event, the County certainly cannot show that there are no genuine disputes of material fact.

### 1. Punitive Intent

The Second Amended Complaint plainly alleges that the County passed the Ordinance "with the intent to punish." ECF 90 at 19, ¶ 124; *see also id.* ¶ 129. The County mistakenly asserts that Plaintiffs do not dispute this issue. *See* ECF 122 at 5-6. A host of statements by County commissioners during the floor debates on the Ordinance demonstrate that, despite the Ordinance's non-punitive statements of purpose, the commissioners' true intent was to drive covered individuals out of Miami-Dade. *See Doe v. Nebras*ka, 898 F.Supp.2d 1086, 1096-97, 1125-26 (D.Neb. 2012) (relying on statements by legislator who introduced bill limiting registrants' internet access to find punitive intent under ex post facto clause); *see also Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 541-542 (1993) (examining city commissioners' statements during debate in constitutional challenge to zoning ordinance).

During the November 15, 2005 hearing on the Ordinance, Commissioner Carey-Schuler stated "I'd like to see sexual predators disappear, disappear completely . . . I'd like to see them just disappear." ECF 136-18 at 26. Chairman Martinez later suggested that forcing these individuals underground was advantageous because: "then they violate probation and they go back to prison." *Id.* at 58. In response to a concern about where individuals would find housing, Chairman Martinez quipped: "Hopefully Alabama, Georgia, North Carolina and the borders." *Id.* at 49. Addressing how police would enforce the restrictions, Commissioner Sosa proposed using "animal services" instead. *Id.* at 72, because having animal services "track them

down," would "send a message, this is not a place for you . . . ." *Id.* Thus, the County's assertion that increased homelessness was an "unintended effect," of the restriction is simply false. *See* ECF 123 at 14 ¶ 81. The record shows commissioners were well-aware that the Ordinance left "very few areas" for covered individuals to live. ECF 136-18 at 47:19-23. That was the point.

And though the County's Motion emphasizes the Commission's stated intent to protect children, ECF 122 at 5-6, the record shows that commissioners had little concern with whether the law would actually advance this goal. For example, Commissioner Sorenson recognized that there was no evidence that residence restrictions work and that they might make former offenders harder to supervise, but she then noted, "having said that I'll probably vote for whatever comes out of this because, you know, I'm not going to be on the side of the predators and that's how it would be construed." ECF 136-18 at 54; *see also id.* at 63 (Commissioner Seijas: "then I will vote for it because like Commissioner Sorenson said we never want to be on their side, ever, ever again"). Commissioner Carey-Shuler similarly questioned the law's effectiveness given the rarity of sexual offenses committed by strangers and the potential for driving former offenders underground, yet reassured her colleagues the law had her support because "as I said I'd like for them all to disappear." *Id.* at 55-56.

Based on these statements, it is clear that Miami-Dade County Commissioners intended for the residence restriction to punish former sexual offenders.[5]

---

[5] The 2010 amendments to the Ordinance do not alter the analysis. Though the County claims the Ordinance leaves adequate housing for covered individuals, there is no evidence the County made any effort to assess whether this was true. As discussed below, it is not. *See* Section III.C.2, *infra*.

## 2. Affirmative Disability or Restraint

In assessing "affirmative disability or restraint", the Court must "inquire how the effects of the Act are felt by those subject to it." *Smith*, 538 U.S. at 99-100. The County argues that the Ordinance is not "sufficiently harsh," ECF 122 at 9. However, the parties have fundamentally different positions how much reasonably available housing the Ordinance excludes.

Plaintiffs' evidence demonstrates that the Ordinance eliminates most available housing. Dr. Kelly Socia estimates that 90% of potential rental units and 94% of all residential housing units in Miami-Dade County are within the Ordinance's 2,500 foot buffer zone. ECF 136-6 at 18; ECF 136-7 at 17. Using conservative estimates for whether housing is actually available[6] and affordable,[7] Socia concludes that 99.9% of all housing in Miami-Dade County is effectively unavailable for former sexual offenders. ECF 136-6 at 18. Consequently, the Ordinance has dramatically increased homelessness and transience in the county. *See* ECF 136-4 at 8; ECF 136-5 at 16-18.

The degree of the Ordinance's affirmative restraint is bolstered by the County's vain search for housing for homeless former sexual offenders. Beginning in August 2017, the County's Homeless Trust, working with partner agencies, attempted to provide rental assistance to those living at an encampment along NW 71st Street. ECF 137 at 14-15 ¶¶ 234-239. The Homeless Trust's Director of Landlord Recruitment Paul Imbrone looked for housing in the three areas of the County that he deemed most likely to have available housing. ECF 136-10 at

---

[6] ECF 136-6 at 13.

[7] ECF 136-6 at 13. For affordability, Socia applies the federal Housing and Urban Development Office's guidelines for "low" household income rather than "very low" or "extremely low" household income. A low income household would earn $42,300 and, paying 30% of that income toward housing, could afford a monthly payment of $1,058. None of the Does or the individuals who applied for housing assistance from the County earns this level of income. *See* ECF 124-1 at 153-54; ECF 124-4 at 93-95; ECF 124-7 at 116-17; ECF 124-13 at 116-17; ECF 136-17.

25-29.  Imbrone could not find ***any*** housing outside the Ordinance's buffer zone. *Id.*  Robert Berman, an experienced housing navigator from Citrus Health Network with a background in real estate, conducted his own search and also found the Ordinance made it extremely difficult to find housing.  *See generally* ECF 136-8.  Despite extensive efforts on behalf of 120 homeless offenders between August 2017 and July 2018, the Homeless Trust was only able to assist two former sexual offenders.  *Id.* at 2-3; ECF 136-9; ECF 136-11 at 148.

Numerous courts have found less disabling residence restrictions to be a significant restraint.[8]  For example, in *Doe v. Snyder*, 834 F.3d 696 (6th Cir. 2016), the Sixth Circuit struck Michigan's 1,000 foot residence restriction, since many of the plaintiffs had "great difficulty" finding a home. *Id.* at 702.  The court relied on a school-safety-zone map for the city of Grand Rapids that showed that roughly half the parcels in the city of Grand Rapids were within the 1,000 foot buffer zones.  *Id.*

Beginning a mantra it repeats throughout its Motion, the County insists that the Ordinance's grandfather provision mitigates the restraint imposed by the Ordinance.  ECF 122 at 7.  However, because the ex post facto analysis is highly fact-intensive, the mere existence of this grandfather provision does not immunize the County from challenge.  There is instead a

---

[8] E.g., *Hoffman v. Village of Pleasant Hoffman v. Village of Pleasant Prairie*, 249 F. Supp. 3d 950, 958 (E.D. Wisc. 2017) (finding that a residency restriction that excluded 90% of a municipality was a severe restraint); *Evenstad v. City of West St. Paul*, 306 F. Supp. 3d 1086, 1091, 1100 (D. Minn. 2018) (granting preliminary injunction against 1,200 foot residency restriction that excluded 90% of the City); *Mikaloff v. Walsh*, 2007 WL 2572268 (N.D. Ohio 2007) (finding a 1,000 foot residency restriction is an affirmative restraint); *Commonwealth v. Baker*, 295 S.W. 3d 437, 445 (Ky. 2009) ("We find it difficult to imagine that being prohibited from residing within certain areas does not qualify as an affirmative disability or restraint."); *State v. Pollard*, 908 N.E. 2d 1145, 1150 (Ind. 2009) (restraint "neither minor nor indirect" where defendant prohibited from residing in house he owned and would have to incur costs to obtain other housing); *City of Ft. Lauderdale v. Anderson*, 2018 WL 1614204 (Fla. Broward Cty., Mar. 26, 2018) (finding a 1,400 foot residency restriction violates ex post facto clause and is an affirmative restraint because it excludes most affordable rental housing).

genuine factual dispute over the degree to which the grandfather clause mitigates the Ordinance's affirmative disability.

The only evidence the County submits on this point is the County's 10-year old assessment showing that over 600 individuals were once covered by the grandfather provision. ECF 123 at ¶ 77. Plaintiffs' evidence reveals that the grandfather provision has done little to stem the significant increase in homelessness among covered individuals since the 2010 amendments. *See* ECF 136-4 at 8. Part of the reason is that the largest beneficiaries are those who established housing before the 2005 Ordinance. *Id.* The only way they can preserve their grandfathered status is to remain in the exempted location forever. As the County's own Motion makes clear, the grandfather provisions are useless for those who must move from a grandfathered location (like Does #4 and #6) and for those newly released from prison without access to grandfathered addresses (like Does #5 and #7).

Dr. Socia's analysis shows that only 29% of covered individuals with a non-transient address (336 of 1,158) have found housing outside the Ordinance's buffer zone. *See* ECF 136-6 at 19. An equal proportion of covered individuals are transient. *See id.* The reasonable inference is that, without the protection of the grandfather provision, a covered individual is as likely to be homeless as he is to have a compliant address. This already troubling ratio will most likely continue to tilt toward homelessness over time.

The County also asserts there is no affirmative restraint because other factors contribute to Plaintiffs' homelessness. ECF 122 at 8-9. As an initial matter, the County's assertions regarding Does #4 and #6 homelessness are irrelevant because they describe how those Does previously *lost* housing, not why they currently cannot *find* housing. ECF 122 at 8 (Doe #4 homeless after marital separation and loss of roommate; Doe #6 homeless after landlord refused

to renew lease).  The County's suggestion that poverty, rather than the Ordinance, is responsible for Does #5 and #7's homelessness, ECF 122 at 8, is undermined by the fact that the Homeless Trust could not find available housing even for the impoverished who qualified for rental assistance, *e.g.*, ECF 136-9.  Further, Dr. Jill Levenson explains that issues such as poverty have always been a challenge for former sexual offenders seeking housing, but the uniquely high and increasing degree of homelessness among this population in Miami-Dade County started with and results from its residence restriction.  ECF 136-4 at 8-9.

Regardless, Plaintiffs need not show that the Ordinance is the **only** factor causing homelessness.  *Smith* simply requires a showing of "substantial…housing difficulties that would not have otherwise occurred." *Smith*, 538 U.S. at 86. Each of the Plaintiffs testified how the Ordinance creates "great difficulty" in locating housing.  *Snyder*, 834 F.3d at 702.  John Doe #4 stated the Ordinance is "the one thing that's affecting me the most." ECF 124-5 at 12; *see also id.* at 95-96 (responses 6, 8 and 11).  He searches for housing and provides the County's registration office in Doral with three or four invalid addresses per month.  ECF 124-5 at 66-67.  John Doe #5 testified that he found places he can afford but that the housing is off limits because of the Ordinance.  ECF 124-7 at 30; *see also id.* at 118-19 (responses 6, 8, and 11).  John Doe #6 testified about the complicated process he goes through looking for compliant housing and how he must take the addresses to the Doral office for verification. ECF 124-1 at 84-96; *see also id.* at 154-55 (responses 6, 8 and 11).  John Doe #7 testified that he had a friend he could live with near the Palmetto Expressway but for the restrictions.  ECF 124-13 at 48; *see also id.* at 117-18 (responses 6, 8 and 11).

### 3. Historically Regarded as Punishment

There is a genuine issue of material fact as to whether the Ordinance resembles the historical punishments of banishment and probation. The County overemphasizes the relative newness of residence restrictions to argue against this factor. ECF 122 at 9-10. However, the proper inquiry is whether the regulatory scheme *resembles* a historically regarded form of punishment, not whether it is itself a historic form of punishment. *See Doe v. State*, 111 A.3d 1077, 1097 (N.H. 2015) ("[T]his factor inquires only whether the act is *analogous* to a historical punishment, not whether it is an exact replica."). For this reason, the Sixth Circuit in *Snyder* recognized that regardless of lacking direct "ancestors" in American history, a residence restriction resembles banishment if it is sufficiently restrictive. *Snyder* 834 F.3d at 701. *Snyder* consequently concluded that Michigan's residence restriction closely approximated banishment even though it did not result in the complete expulsion of an offender from his or her community, but instead caused former sexual offenders great difficulties in finding housing. *Id.* at 702.

Here, like in *Snyder*, the residence restriction severely limits where Plaintiffs can reside and causes them "great difficulties" in finding housing. But the County's residence restriction goes farther than Michigan's in effectively banishing former sexual offenders. As noted above, *Snyder* emphasized that the Michigan residence restriction effectively banished offenders from Grand Rapids, where close to half of housing parcels were within the 1,000 foot buffer zones. By contrast, Dr. Socia estimates that the Ordinance eliminates nearly 90% of potential rental units and 94% of all residential housing units in Miami-Dade County irrespective of whether those units are reasonably available, and 99.9% of housing when considering availability. ECF 136-6 at 18; ECF 136-7 at 17. *Compare* ECF 136-6 at 25 (Figure 1) *with Snyder* 834 F.3d at 702

(map exclusion zone for City of Grand Rapids). This perhaps explains the County's focus on attempting to place individuals at the encampment outside the County. ECF 136-17 at 89-91.

The extreme degree to which the Ordinance eliminates former sexual offenders from Miami-Dade makes quick work of the County's remaining arguments against banishment. The County asserts that its preemption and repeal of the municipalities' residence restrictions demonstrates that it did not intend to banish former offenders. ECF 122 at 11. As discussed above, Plaintiffs dispute this assertion. Section III.C.1, *supra*. But the question is no longer what the County intended, but what it did, and that was to expel former sexual offenders from at least 90% of the County's homes. The Ordinance's grandfather provisions are similarly unavailing. As Plaintiffs' experiences demonstrate, the provisions only protect the privileged few who are able to return to or remain permanently at the same grandfathered residence. Those who must move face almost certain banishment or homelessness. *E.g.,* ECF 123 at 17 ¶¶ 104-110 (detailing how Doe #4 became homeless when he could no longer afford rent on his grandfathered home after his wife moved out).

The County's argument that the residence restriction does not resemble probation also fails. Probationers by definition "do not enjoy 'the absolute liberty to which every citizen is entitled.'" *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 480 (1972)). Citing *Smith* and *Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018), the County attempts to distinguish the Ordinance from probation by asserting that it only controls where former offenders live. ECF 122 at 10, n.4. But *Smith* did not address this question. It only found that a reporting requirement was not like probation because offenders "[were] free to move where they wish and to live and work as other citizens, with no supervision." 538 U.S. at 101. By contrast, the Ordinance substantially curtails Plaintiffs' liberty to choose where they live. *See*

*Doe v. Dep't of Pub. Safety and Corr. Servs.*, 62 A.3d 123-124, 139-40 (Md. 2013) (concluding that sex offender restrictions "have the same practical effect" as probation or parole) (citing *Doe v. State*, 189 P.3d at 1012 (Alaska 2008) and *Wallace v. State*, 905 N.E.2d 371, 380 (Ind. 2009)). Further, *Vasquez* dealt with a substantially less restrictive residence restriction—only 500 feet— that was not alleged to cause widespread homelessness. *See* 895 F.3d at 518.

### 4. Advances Traditional Aims of Punishment

Though the Ordinance advances all of the aims of punishment—incapacitation, deterrence, and retribution—*see Snyder*, 834 F.3d at 704, its retributive features are most prominent. Specifically, the restriction applies based solely on the crime committed, without regard to an individual's risk of recidivism over time,[9] and "it marks registrants as ones who cannot be fully admitted into the community." *Snyder*, 834 F.3d at 704. The Ordinance also makes no exceptions for the particular vulnerabilities of covered individuals who might be most impacted by housing instability, such as those with mental or physical disabilities. *See* Section III.C.6, *infra* at 20-21. These features strongly support the conclusion that the Ordinance is more concerned with retribution than with regulation.

---

[9] *Doe v. State*, 111 A.3d 1077, 1098 (N.H. 2015) (finding restriction retributive for those affected because it was "based only upon their past action, and not on any individualized assessment of current risk or level of dangerousness"); *Doe v. State*, 189 P.3d at 1013-14 (Alaska 2008) (restrictions for former sexual offenders "based not on a particularized determination of the risk the person poses to society but rather on the criminal statute the person was convicted of violating . . . provide a deterrent and retributive effect that goes beyond any non-punitive purpose and that essentially serves the traditional goals of punishment"); *Starkey v. Oklahoma Dep't of Corr.*, 305 P.3d 1004, 1028 (Okla. 2013) ("In evaluating the . . .factor of retribution and deterrence we find the retroactive extension of SORA's registration based solely upon the individual's prior conviction leads us to weigh this factor in favor of a punitive effect."); *Baker*, 295 S.W.3d at 444 ("When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones.").

The County's only substantive objection is that the Ordinance's aim is to protect children. However, as asserted below, the Ordinance "does so in ways that relate only tenuously to" this end, and therefore the County's stated intent merits little consideration. *Snyder*, 834 F.3d at 704.

## 5. Rational Basis

The County's residency restriction has no rational connection to its stated non-punitive purpose of protecting children. Most significantly, the residence restrictions only dictate where a former offender sleeps at night, when children are not at school, but it does not limit where a former offender goes during the day, when children attend school. ECF 137 at 14-15_¶¶ 242-244. This disconnect is why a number of courts have rejected residence restrictions as irrational.[10] The residence restriction's irrationality is further borne out by the experience of Plaintiffs and other homeless former offenders. They often spend their days at the homes of friends and family members that are within the 2,500 foot buffer zone. *See* ECF 124-5 at 53:1-11; ECF 124-7 at 20:3-17; ECF 124-13 at 58:12-24. But at night, they report to the street corner where they "reside." ECF 124-5 at 70:16-25; ECF 124-7 at 12:19-23; ECF 124-13 at 57: 8-11. This charade does nothing to protect children.[11]

---

[10] *E.g. Snyder* 834 F.3d at 704 ("[T]he record before us provides scant support for the proposition that SORA in fact accomplishes its professed goals."); *In re Taylor*, 343 P.3d 867, 882 (Cal. 2015) (finding county's residence restriction "cannot survive rational basis scrutiny because it has hampered efforts to monitor, supervise, and rehabilitate such parolees in the interests of public safety"); *Baker*, 295 S.W.3d 437, 445-46 (Ky. 2009) (finding residence restriction irrational because "[i]t is difficult to see how public safety is enhanced by a registrant not being allowed to sleep near a school at night, when children are not present, but being allowed to stay there during the day, when children are present"); *see also City of Fort Lauderdale v. Anderson*, Nos. 17-003615MO10A, 13-010799MO10A, 2018 WL 1614204 at *2 (Fla. Cir. Ct. Mar. 26, 2018), ("Because the Ordinance keeps sex offenders from spending the nights near places children gather only during the day, it is not reasonably related to its goal to protect children from sex offenses.").

[11] Compare the residence restriction to the Ordinance's provision creating child safety zones within 300 feet of schools, child care facilities, parks, and school bus stops. *See* Miami-Dade County Ord. 21-285 (3). The provision prohibits a covered individual from loitering or prowling

The Ordinance also does not promote public safety because the County fundamentally misunderstands the risk posed by former sexual offenders. The County premised its Ordinance on the finding that "sexual offenders are extremely likely...to repeat their offenses." Sec. 21-278 (a). The County cites case law to similar effect, including the assertion that "[t]he risk of recidivism posed by sex offenders is frightening and high" from *Smith v. Doe*, 538 U.S. at 103. However, this contention has been thoroughly debunked.[12] Plaintiffs' evidence demonstrates that recidivism rates for former sexual offenders are low relative to other serious offenses. Even accounting for the high percentage of unreported sexual offenses—a phenomenon largely confined to unconvicted offenders and those familiar to their victims, ECF 136-3 at 16-17; ECF 136-5 at 12-13—the longer offenders remain offense-free in the community, the less likely they are to re-offend sexually. Eventually, they are less likely to reoffend than a non-sexual offender is to commit a first sexual offense. ECF 136-3 at 2-3.

### 6. Excessiveness

In remanding this case for further factual development, the Eleventh Circuit recognized a number of Plaintiffs' allegations as relevant to the determination of whether the Ordinance was excessive relative to its purported nonpunitive purpose of promoting public safety. *Doe v. Miami-Dade Cty., Fla.*, 846 F.3d 1180, 1185-86 (11th Cir. 2017). These factors are that the Ordinance 1) applies based solely on the fact of prior conviction, irrespective of an individual's recidivism risk over time; 2) applies for an individual's entire life regardless of circumstances that might warrant an exemption, such as a person no longer having to register under Florida

---

in these zones with the intent to commit a crime while children are present. *See* 21-285. Unlike the residency restriction, this regulation is rationally related to the protection of children.

[12] See generally ECF 136-14; ECF 136-15; *see also,* ECF 136-3 at 3-16; *Snyder*, 834 F.3d at 704 ("The record below gives a thorough accounting of the significant doubt cast by recent empirical studies on the pronouncement in *Smith* that "[t]he risk of recidivism posed by sex offenders is 'frightening and high.'").

law; 3) marks 2,500 feet by straight lines, thus excluding property even if there is no feasible way to reach a school within 2,500 feet; 4) persists despite the absence of any demonstrated, empirical link between residential proximity to schools and recidivism; and 5) undermines public safety by exacerbating transience and homelessness among covered individuals, thereby irreparably damaging these individuals' prospects for successful re-entry and increasing their risk of recidivism. *Id.* As explained below, the record amply supports each of these factors. The County willfully ignores the Eleventh Circuit's clear implication that Plaintiffs' allegations, if proven, are more than "a passionate policy disagreement with Miami-Dade County," ECF 122 at 15; they establish that the County's residence restriction is objectively ***unreasonable***.

The County first asserts that the Ordinance is not excessive because the County determined that the residence restriction properly balances the County's interests in public safety with leaving adequate housing for covered individuals. ECF 122 at 15. But the County's conclusory statements of intent are not evidence and are therefore irrelevant. There is no evidence that the County assessed how much housing would actually be available for covered individuals when it amended the Ordinance in 2010. Further, as discussed in detail above, there is a genuine dispute over how much housing is now reasonably available under the Ordinance. Section III.C.2, *supra*.

The County next cites the Ordinance's "grandfather provision" as mitigating its excessiveness. ECF 122 at 15. Plaintiffs address above why this argument fails. Section III.C.2, *supra* at 11-12.

The County makes a related contention that the Ordinance's focus on schools further mitigates its excessiveness. ECF 122 at 15. Again, the County's conclusory assertion of intent clumsily attempts to mask a critical factual issue of whether the County's residence restriction,

irrespective of its application only to schools, nonetheless unreasonably burdens available housing. The County is not aided by its vague assertion that "a fair amount of [children in the exclusion zone] may walk home unaccompanied by an adult." ECF 122 at 15. There is no evidence quantifying the "fair amount" of children who may (or may not) walk home from school within the excluded zone, nor is there any evidence establishing that the residence restriction lowers sexual abuse risk factors for these children.

Addressing the Ordinance's lifetime application regardless of a covered individual's risk of recidivism over time, the County submits that *Smith* "does not preclude" the County from making categorical and irrevocable judgments about sex offender risk. ECF 122 at 16 (citing *Smith*, 538 U.S. at 103-04). This is true, but beside the point. The Eleventh Circuit, like numerous other courts, expressly determined that these facts weigh in favor of excessiveness.[13] *Doe*, 846 F.3d at 1185. Individual assessments of risk guard against the fact that "while it is intuitive to think that at least some sex offenders—e.g., the stereotypical playground-watching pedophile—should be kept away from schools" the harm posed by other offenders "is doubtless far less than that posed by a serial child molester." *Snyder*, 834 F.3d at 705. The lack of individualization weighs even more heavily in favor of excessiveness because the Ordinance imposes such a severe burden on housing. *Hoffman*, 249 F. Supp. 3d at 959 ("[T]o avoid a[n] [excessive] punitive effect, a statute imposing a particularly harsh disability or restraint must

---

[13] *E.g.*, *Doe v. State*, 189 P.3d 999, 1017 (Alaska 2008) (finding restriction excessive in part because it applied for life without regard to completion of treatment or risk of re-offense); *Baker*, 295 S.W.3d at 446 (citing residency restriction's lack of individualized assessment to support excessiveness); *Wallace v. State*, 905 N.E.2d 371, 384 (Ind. 2009) (finding restriction excessive in part because covered individual could not seek exemption from statute "even on the clearest proof of rehabilitation"); *State v. Letalien*, 985 A.2d 4, 26 (Me. 2009) (finding ex post facto violation where offender registration applied for life); *State v. Williams*, 952 N.E.2d 1108, 1113 (Ohio 2011) (finding ex post facto violation where requirements applied based solely on crime "without regard to . . . future dangerousness").

allow an individualized assessment. An individualized assessment helps to ensure that a statute's particularly harsh disability or restraint is rationally related to a non-punitive purpose.") (quoting *Shaw*, 823 F.3d at 575).

The Ordinance also does not contain any exceptions for individuals in need of long term hospital care, assisted living facilities, or hospice due to severe illness, injury, or other medical conditions. Its unyielding application is especially harsh for individuals like John Doe #5, a 57-year old with Parkinson's disease, right side-weakness from a 2014 stroke, and a number of other medical conditions. ECF 136-1 at 8. Being forced into homelessness has placed and continues to place his health at grave risk. *Id.* Even as his condition inevitably worsens and he loses the ability to control his motor and speech functions, this fact is completely irrelevant under the Ordinance. The Ordinance's failure to account for such individual circumstances—especially those that unequivocally render former offenders harmless to others—supports Plaintiffs' contention that it is objectively unreasonable. *See Snyder*, 834 F.3d at 705 (citing as excessive statute's application to plaintiff with obviously low risk of sexual offense).

The County also contends that its decision to treat covered individuals as a monolith "is reasonable in light of the record." ECF 122 at 16. But the reasonableness of this decision is necessarily a factual question. The County cites Prentky (1997) and other studies essentially focused on the risk presented by diagnosed pedophiles. Plaintiffs' experts explain extensively how shortcomings in these studies prevent generalizing their findings beyond the specific samples examined. ECF 136-3 at 4-16; ECF 136-5 at 6. For instance, the County's reliance on Prentky (1997)'s claim that "child molesters in this sample reoffended as late as 20 years following release" merits little, if any, weight. *See* ECF 122 at 16. Prentky (1997) examined a small sample of extremely high risk child molesters who had been civilly committed at an

institution for exceptionally dangerous offenders. ECF 136-3 at 5. Critically, while the sexual recidivism rate for this sample was 32% at the end of the 25-year study period, 30% of the group had recidivated by year 10, meaning that only 2% of this uniquely dangerous contingent committed a new sexual offense between years 10 through 25 of the study. ECF 136-3 at 6.

Prentky, along with every other study the County cites, is consistent with Plaintiff's evidence that the risk of sexual recidivism is significantly lower than that alleged in the County's legislative findings, *e.g.* ECF 136-2 at 9-10; ECF 136-4 at 12-13; ECF 136-5 at 7-8; that even among high risk groups, the risk of recidivism significantly declines the longer these individuals remain in the community offense free, *e.g.*, ECF 136-2 at 5-6, 9, 12-19; ECF 136-4 at 13-14; ECF 136-5 at 7-8, 21; that only a small fraction of offenders are true pedophiles who present a lifelong risk of recidivism, *e.g.*, ECF 136-2 at 11-12; ECF 136-4 at 6; ECF 136-5 at 10; and that the individuals who do present such a risk may be reliably identified through actuarial and clinical risk assessments, ECF 136-5 at 9-10.

Indeed, the State of Florida already has measures in place to identify, treat, and surveil the most dangerous sexual offenders. Prior to release, all sexual offenders receive a risk assessment to determine if they are "sexually violent predators" who must be civilly committed. ECF 136-2 at 11; ECF 136-5 at 11-12. These assessments are highly reliable, ECF 136-5 at 11-12, and far superior to the County's offense-based system for identifying whose recidivism risk "is doubtless far less than that posed by a serial child molester." *Snyder*, 834 F.3d at 705.

Thus, despite the County's insistence that it has narrowed the Ordinance's application, ECF 122 at 16-17, there is no record evidence demonstrating that Plaintiffs or other individuals who commit a qualifying offense present a sufficiently high lifelong risk of sexual recidivism to warrant the Ordinance's permanent application. Plaintiffs' offenses all occurred before 2005,

and none have committed a new sexual offense since their releases.  There is therefore a material factual dispute over whether the Ordinance is limited to "specifically those who present the greatest danger to children," *id.* at 16.[14]

Finally, though included in the rationality section of the Motion, the County asserts that the Ordinance's effectiveness is irrelevant to the ex post facto determination.  ECF 122 at 14. From this the County concludes that "the Supreme Court's own precedent forecloses any possibility of finding that a policy intended to protect children from sexual abuse" violates the ex post facto clause.  *Id.*  This is simply outrageous.

The Eleventh Circuit clearly instructed that the Ordinance's efficacy relative to its punitive effects—including the extent to which those punitive effects prevent the County from protecting public safety—is critical to evaluating the Ordinance's excessiveness.  *Doe* 846 F.3d at 1186 (11th Cir. 2017); s*ee also Snyder*, 834 F.3d at 705 ("Further, while the statute's efficacy is at best unclear, its negative effects are plain on the law's face. . . . The punitive effects of these blanket restrictions thus far exceed even a generous assessment of their salutary effects.").  Thus, even if this Court concludes that the Ordinance is rational, Plaintiffs have submitted significant evidence establishing that the Ordinance is excessive because its connection to public safety is weak at best, and counterproductive at worst.  *Hoffman*, 249 F.Supp.3d at 959 ("[T]he less rational a restriction's connection to its stated purpose, the more excessive it will be in addressing that purpose.") (citing *Smith*, 538 U.S. at 104–05; *Snyder*, 834 F.3d at 704–05; and *Miller*, 405 F.3d at 721–723).

---

[14] The County's throwaway mention of the fact that there is no generally accepted actuarial tool that measures the risk of recidivism against children does not alter this analysis.  The County does not explain why such a specific metric is necessary, particularly given its extensive efforts to establish that children are the most common victims of sexual abuse, ECF 123 at 3-4 ¶¶ 11-17, and that some offenders who victimize adults "crossover" to assault children, McCleary.

Plaintiffs' evidence also establishes an unimpeached empirical consensus that there is no evidence the County's residence restriction advance public safety, and that the Ordinance in fact *undermines* public safety by making it difficult for covered individuals to establish stable housing. The Ordinance does nothing to regulate where offenders go during the day when children are at school, and it myopically focuses on "stranger danger," the rarest form of sexual victimization. ECF 136-4 at 6; ECF 136-5 at 19-20. On the other hand, the Ordinance makes it unreasonably difficult for covered individuals to secure stable housing, perhaps the most critical component of successful re-entry. ECF 136-4 at 10-11; ECF 136-6 at 5. Once homeless, these individuals become harder to supervise, more likely to abscond, and more likely to re-offend. ECF 136-4 at 6-9; ECF 136-5 at 1-2, 18; ECF 136-7 at 6-7.

As the County's history demonstrates, residence restrictions also force covered individuals into encampments. ECF 137 at 13-14 ¶¶ 221-241. The encampments become breeding grounds for disease and criminal behavior. ECF 136-1 at 2-7; ECF 136-4 at 9-10. The County's problems with offender encampments and escalating homelessness began after it implemented a residence restriction, and it has only worsened over time. ECF 136-5 at 16-17, ECF 137 at 13 ¶ 221.

The County's does not defend the Ordinance's efficacy. To the contrary, Defendant's expert concluded that the County can never credibly claim that its Ordinance reduces sexual recidivism against children. That is because the County has not implemented the Ordinance in a manner that allows for evaluation. ECF 123-11 at 31, 38. Therefore, "[i]t is unlikely that the evidence for any distance rule will ever materialize." *Id.* at 13; *see also id.* at 9 (conceding that residence restrictions have not been shown to reduce recidivism).

The closest the County comes to addressing the Ordinance's efficacy is to cite studies by Walker (2001) and Page (2011). ECF 122 at 13. Read in full, however, both studies contradict the County. Walker (2001) concludes under "Routine Activities Theory" that sex offenders live in these areas to scout potential victims. But its authors expressly warn *against* using residence restrictions because "despite governmental efforts, **there is no evidence that attempts to limit where sex offenders live have been successful**." ECF 123-14 at 17 (emphasis added). Page (2011) found that, while a minority of offenders believed a residence restriction might be effective, the overwhelming majority believed otherwise. ECF 123-15 at 124-26. Surveying the relevant literature, Page (2012) determines that legislation limiting where offenders live "**has not been shown to further reduce already low rates of recidivism**." ECF 123-15 at 119 (emphasis added). The authors note that residence restrictions cause significant housing barriers that thwart re-entry by preventing former offenders from living with supportive networks, which may increase recidivism. ECF 123-15 at 118.

The County's refusal to proffer any concrete, salutary effects weighs heavily in favor of excessiveness. *Snyder*, 834 F.3d at 705 ("Tellingly, nothing the parties have pointed to in the record suggests that the residential restrictions have any beneficial effect on recidivism."). The County's failure is astonishing given its alarmist proclamations about the threat presented by sexual offenders. In addition, the County has long known that a significant proportion of individuals covered by the grandfather provisions are living in the exclusion zone. *See* ECF 123 at ¶ 77. But the County has never assessed whether this group has a higher rate of recidivism, nor has it taken any measures to protect against its purported extreme dangers. To paraphrase the Eastern District of Wisconsin in finding a local residence restriction excessive, "[t]he lack of evidence eliminates the possibility that the [County's] action was rational. . . . The [County] fell

into the same trap as the Michigan legislature [in *Snyder*]. The [County] could have sought objective evidence to support the Ordinance's severe restrictions but chose not to." *Hoffman*, 249 F. Supp. 3d at 960.

## CONCLUSION

The Court should deny the County's Motion for Summary Judgment, ECF 122. There are genuine issues of material fact regarding the amount of housing reasonably available under the Ordinance, the degree to which the Ordinance exacerbates housing instability, and the extent to which the Ordinance advances or undermines its goal of protecting children.

### CERTIFICATE OF SERVICE

I HEREBY certify that I served the foregoing document to all counsel of record via Notice of Electronic Filing generated by CM/ECF Case Management Electronic Case Filing, on this 29th day of August, 2018.

### SERVICE LIST

COUNSEL for Defendant, MIAMI-DADE COUNTY

c/o Michael B. Valdes, Assistant County Attorney

E-mail: mbv@miamidade.gov

Respectfully submitted,


/s/ Jeffrey M. Hearne                    Val Jonas
Jeffrey M. Hearne                        Florida Bar No. 616079
Florida Bar No. 512060                   Weitzner & Jonas, P.A.
Daniel Rowinsky Quintian                 1444 Biscayne Blvd., Suite 207
Florida Bar No. 105525                   Miami, FL 33132
Legal Services of Greater Miami, Inc.    T: 786-254-7930
4343 West Flagler Street, Suite 100
Miami, FL 33134
Telephone/Facsimile: 305-438-2403
jhearne@legalservicesmiami.org
drowinsky@legalservicesmiami.org
*Legal Services only represents John Doe #4, and*
*John Doe #5*

Daniel B. Tilley
Florida Bar No. 102882
Nancy Abudu
Florida Bar No. 111881
ACLU Foundation of Florida
4343 West Flagler Street, Suite 400
Miami, FL 33134
T: 786-363-2714
F: 786-363-1257
dtilley@aclufl.org
nabudu@aclufl.org

Brandon J. Buskey* (ASB2753A50B)
Ezekiel Edwards*
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY  10004
T: 212-284-7364
F: 212-549-2654
bbuskey@aclu.org
eedwards@aclu.org

*Admitted pro hac vice