**United States District Court**
**Southern District of Florida**
**Case No. 14-23933-Civ-Huck/McAliley**

**John Doe #4**, et al.,
    Plaintiffs,

v.

**Miami-Dade County,**
    Defendants.

---

### Miami-Dade County's Proposed Findings of Fact and Conclusions of Law

Pursuant to Local Rule 16.1(L) and this Court's Scheduling Order, D.E. 84, Defendant Miami-Dade County respectfully submits these Proposed Findings of Fact and Conclusions of Law.

### Background and Procedural History

On November 15, 2005, Miami-Dade County enacted Ordinance No. 05-206, which makes it unlawful for an individual convicted as an adult of certain sexual offenses in which the victim or apparent victim is aged 15 years or younger from residing within 2,500 feet of any school.[1] Ex. A at 9. Under this version of the ordinance, the newly-enacted residency restriction only applied in unincorporated Miami-Dade County and in any municipality that did not opt out by adopting a resolution within 90 days providing that the ordinance would not apply in that municipality. *Id*. at 7. In addition, the residency restrictions did not apply to any sexual offender or predator that (1) had established their residence and registered it prior to the effective date of the ordinance; (2) was a minor when he or she committed the sexual offense and was not convicted as an adult; or (3) had established their residence prior to the school being opened. *Id*. at 9-10.

In 2010, the Board of County Commissioners found that the result of Ordinance No. 05-206's opt-out provision was to create "a patchwork of at least 24 separate municipal ordinances, which generally prohibit sexual offenders from living within 2,500 feet of schools, daycares, parks, playgrounds, and sometimes other points such as bus stops and other locations where children congregate." Ex. T at 4-5. As a result, almost all of the municipal ordinances effectively created zones in which sexual offenders were almost completely excluded from available housing in that

---

[1] Under Ordinance No. 05-206, a school is defined in as a "public or private kindergarten, elementary, middle, or secondary (high) school." *See* Ex. A at 8.

municipality and thereby caused the unintended effect of shifting the only available housing for sexual offenders to the unincorporated areas of the County and to those cities that have not yet enacted stricter sexual offender residency ordinances. *Id*. at 5.

To address this unintended consequence, the Board of County Commissioners enacted Ordinance No. 10-01 on January 21, 2010. *Id*. Ordinance No. 10-01 removed Ordinance No. 05-206's opt-out provision and instead made it so that all municipal ordinances concerning sexual offender or predator residency restrictions were preempted. *Id*. at 7. Going forward, the County's residency restriction, which only prohibits sexual offenders and predators from living within 2,500 feet of a school, would be in effect countywide. *Id*. The Board of County Commissioners found that this measure struck "a proper balance between protecting children around the crucial and vulnerable areas of schools while still leaving available residential units in which sexual offenders can find housing." *Id*. at 5. The relevant sections of the Miami-Dade County Code containing the residency restriction and other regulations pertaining to sexual offenders and predators were subsequently re-named "The Lauren Book Child Safety Ordinance." *See* Miami-Dade County Code §§ 21-277 – 21-285.

On October 23, 2014, a group of plaintiffs (John Does #1-3 and the Florida Action Committee, Inc.) filed suit against Miami-Dade County, the Florida Department of Corrections, and Sunny Ukenye for alleged violations of the United States Constitution and the Florida Constitution arising from the Lauren Book Child Safety Ordinance's residency restriction. D.E. 1, 25. All defendants filed motions to dismiss. D.E. 29 & 39. And, after considering the parties' motions, responses, replies, and oral argument, this Court dismissed the plaintiffs' complaint with prejudice. D.E. 60.

Subsequently, the plaintiffs sought relief from judgment under Fed. R. Civ. P. 60(b). D.E. 61. After that motion was denied, D.E. 67, the plaintiffs filed a notice of appeal, D.E. 68.

On appeal, the defendants moved to dismiss plaintiffs' appeal as untimely. *See,* Motion to Dismiss, *Doe v. Miami-Dade County*, No. 15-14336 (11th Cir. Jan. 11, 2016). The Eleventh Circuit granted that motion in part and denied it in part. Specifically, the Eleventh Circuit held that the plaintiffs' appeal was untimely as to the Order Denying Motion for Relief from Judgment, D.E. 67, but timely as to the Order Granting Motion to Dismiss, D.E. 60. *See* Order, *Doe v. Miami-Dade County*, No. 15-14336 (11th Cir. Mar. 4, 2016). Accordingly, the plaintiffs only properly appealed their facial ex post facto challenge.

In a Revised Panel Opinion, the Eleventh Circuit affirmed in part, reversed in part, and remanded this matter for further proceedings consistent with that opinion. In that Opinion, the Eleventh Circuit confined its decision by noting that its role "merely [was] to determine whether the plaintiffs stated a plausible claim, such that they should be permitted to proceed to discovery" and further stating that "[w]hether Doe #1 and Doe #3 ultimately prevail is a determination for a future stage of this litigation."

Following remand, the remaining plaintiffs, Doe #1 and Doe #3, have since voluntarily dismissed themselves from this case, and, in their place, a new set of plaintiffs (John Does #4-7) emerged to raise the same claim. The parties have since conducted discovery, and Miami-Dade County thereafter filed a Motion for Summary Judgment, D.E. 122, that remains pending. At a hearing on September 13, 2018, "it was determined that the Court would aim to resolve the issues raised in the Motion for Summary Judgment at a bench trial." D.E. 145.

## Findings of Fact

Based on the testimony and evidence considered by the Court in connection with the bench trial, the Court finds as follows:

## I. Background Information

**1.** On November 15, 2005, the Miami-Dade County Board of County Commissioners ("County Commission") enacted Ordinance No. 05-206, which created Sections 21-277 through 21-285 of the Miami-Dade County Code. *See* Ex. A.

**2.** Ordinance No. 05-206 made it unlawful for any person who had been convicted as an adult of a violation of Fla. Stat. § 794.011 (sexual battery), § 800.04 (lewd and lascivious acts on/in presence of persons under age 16), § 827.071 (sexual performance by a child) or § 847.0145 (selling or buying of minors for portrayal in sexually explicit conduct), or a similar law of another jurisdiction, in which the victim of the offense was 15 years of age or less, to reside within 2,500 feet of any school. Ex. A at 9.

**3.** In 2010, Miami-Dade County added violations of Fla. Stat. § 847.0135(5) (sexual acts transmitted over computer) to the list of qualifying offenses. Ex. T at 9.

**4.** Miami-Dade County does not impose any residency restriction on sexual offenders or predators whose victims are 16 years of age or older. Ex. A at 9.

**5.** Miami-Dade County's residency restriction imposes no limitations on where offenders

3

can go or where they can work. *See id*. It also does not subject the individual to additional measures of control or supervision. *See id*.

6.    Miami-Dade County only imposes a residency restriction around schools. Ex. A at 9. By contrast, the State of Florida imposes its residency restriction around schools, child care facilities, parks, and playgrounds. Fla. Stat. § 775.215.

7.    Miami-Dade County only imposes its residency restriction on those convicted as adults of five enumerated sexual offenses with minor victims 15 years of age and under. *See* MIAMI-DADE COUNTY CODE § 21-281(a). By contrast, an individual can be designated a "sexual offender" under Florida law based upon a conviction for 1 of 22 different offenses, and, for many of those offenses, the designation occurs regardless of victim age. *See* Fla. Stat. § 943.0435(1)(h).[2]

8.    Under Ordinance No. 05-206, a child molester residing within 2,500 feet of any school did not have to comply with the residency restrictions if he or she (1) had established that residence and registered it prior to the effective date of the ordinance; or (2) was a minor when he or she committed the sexual offense and was not convicted as an adult; or (3) the school was opened after the child molester established the residence. Ex. A at 9-10.

9.    Therefore, when Ordinance No. 05-206 was enacted, no child molester was required to move from their existing registered residence. *Id*. at 9-10. They were simply prohibited from that point onward of establishing a new residence within 2,500 feet of a K-12 school. *Id*.

10.    Pursuant to Ordinance No. 05-206, the 2,500 foot residency restriction around schools was applicable in unincorporated Miami-Dade County; it was also applicable in each municipality in the County unless a municipality, within 90 days after the effective date of the ordinance, adopted a resolution that the County's ordinance would not apply in that municipality. Ex. A at 6-7.

11.    In 2010, the County Commission found that the result of the ordinance's opt-out provision was to create "a patchwork of at least 24 separate municipal ordinances, which generally

---

[2]    To avoid confusion in terminology, those individuals subject to the County's residency restriction will not be referred to by the general term "sexual offender" because that term describes a significantly broader group than those covered under the County's more narrowly-tailored ordinance. Instead, these individuals will be described as "child molesters" given the nature of their offenses and the age of their victims. *Accord* 28 CFR § 549.93 (defining "child molestation" as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years").

prohibit [child molesters] from living within 2,500 of schools, daycares, parks, playgrounds, and sometimes other points such as bus stops and other locations where children congregate." Ex. T at 5.

12.     In fact, "almost all of the municipal ordinances enacted [from 2005-2010] tend[ed] to create zones in which [child molesters] are almost completely excluded from available housing, because nearly all residential units in a developed area are within 2,500 feet of schools, daycares, parks, playgrounds, bus stops, or one of the other points on which the municipal buffer zones are based." *Id*.

13.     Accordingly, "these municipal ordinance have had the unintended effect of shifting the only available housing for [child molesters] to the unincorporated areas of the County and to those cities that have not yet enacted sexual offender residency ordinances." *Id*.

14.     The County Commission noted that "in Broward County, a similar trend [had] created a situation in which a disproportionate number of sexual offenders are concentrated in a few neighborhoods in the unincorporated area, detrimentally impacting living conditions and housing value in those areas, and unreasonably increasing the risk to children in those areas." *Id*.

15.     These findings were incorporated into and served as the basis for a new ordinance enacted by the County Commission in 2010. *Id*. at 6.

16.     On January 21, 2010, the County Commission enacted Ordinance No. 10-01, which amended Ordinance No. 05-206. Ex. T.

17.     In Ordinance No. 10-01, the County Commission recognized that "the goal of protecting children from [child molesters] is of utmost importance in Miami-Dade County" but that "this vital goal cannot be accomplish [sic] by a single law, but instead depends upon a cohesive and functional system of federal, state, and local laws, which must be adjusted and adapted from time to time to address new threats and circumstances as they arise." *Id*. at 4.

18.     Based upon the factual findings described supra at ¶¶ 11-17, the County Commission determined that "the paramount purpose of protecting children would be better served by Miami-Dade County preempting municipal residency restriction ordinances" because "the problem of balancing the interests of people impacted by the residency restrictions has become a regional problem that should be addressed at a regional level by preempting municipal ordinances and thereby limiting the unintended consequence of clustering the [child molesters] in a few, disfavored neighborhoods while still providing protections over and above the protections

provided by State law." *Id*. at 4, 5.

19.    The County Commission found that its residency restriction, "which prohibits [child molesters] from living within 2,500 feet of schools only," "strike[s] a proper balance between protecting children around the crucial and vulnerable areas of schools ***while still leaving available residential units in which [child molesters] can find housing***." *Id*. at 5 (emphasis added).

20.    As a result, Ordinance No. 10-01 removed Ordinance No. 05-206's opt-out provision—codified in MIAMI-DADE COUNTY CODE § 21-279—and instead made it so that "[a]ll municipal ordinances in Miami-Dade County establishing sexual offender or predator residency restrictions are hereby preempted and shall stand repealed." *Id*. at 7.


## II. <u>Miami-Dade County's Intent was Non-Punitive</u>

21.    The legislative intent for Miami-Dade County's residency restriction is expressly provided in Ordinance No. 05-206:

> The intent of this Article is to serve the County's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the County, particularly children, by prohibiting [child molesters] from establishing temporary or permanent residence in certain areas where children are known to regularly congregate, to prohibit renting or leasing certain property to [child molesters] if such property is located where children are known to regularly congregate and to restrict [child molesters'] access to parks and child care facilities.

Ex. A at 6 (codified in MIAMI-DADE COUNTY CODE § 21-278(b)).

22.    This Court finds that this statutory text approved by the County Commission is the best evidence of Miami-Dade County's legislative intent with respect to its residency restriction. *Accord N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017).

23.    This finding is further bolstered by the fact that Ordinance No. 05-206 was approved by a vote of 13-0. *See* Ex. MM at 80:9. Therefore, no statement by an individual county commissioner can more reliably reveal what a majority of the County Commission intended when they voted for the ordinance than this unanimously approved statutory expression of legislative intent. *Accord Bombardier Aerospace Corp. v. United States*, 831 F.3d 268, 277 (5th Cir. 2016).

24.    An intent "to promote, protect and improve the health, safety and welfare of the citizens of the County, particularly children" is unambiguously non-punitive. *Accord Smith v. Doe,* 538 U.S. 84, 93 (2003); *New York v. Ferber*, 458 U.S. 747, 757 (1982).

25.    In Ordinance No. 05-206, the County Commission further expressed the non-punitive

intent of its residency restriction in the ordinance's whereas clauses:

> WHEREAS, the [County Commission] is concerned about convicted [child molesters] who are released and repeat the unlawful acts for which they had originally been convicted; and …
> WHEREAS, Miami-Dade County … has a compelling interest in protecting children from predatory sexual activity; and …
> WHEREAS, the [County Commission] desires to establish a policy regulating where [child molesters] live and limiting their access to children in an effort to protect children of the County from sexual abuse,

*Id*. at 4-5.

**26.**   The County Commission also fully incorporated those additional recitals of legislative intent and findings as part of Ordinance No. 05-206. *Id*. at 5.

**27.**   The residency restriction's non-punitive intent is further evinced by the fact that Ordinance No. 05-206 (a) imposed affirmative obligations on property owners or lessors to confirm that a prospective renter, lessee, or adult resident is not a child molester if the rental property is located within 2,500 feet of a school and (b) provided penalties for property owners and lessors who failed to meet this obligation. *Id*. at 10 (codified in MIAMI-DADE COUNTY CODE § 21-283).

**28.**   If the County Commission had intended to enact these residency restrictions to simply punish child molesters rather than to address public safety concerns, there would have been no need to create a related regulation (with corresponding penalties) that only impacted property owners and lessors.

**29.**   Additionally, while not dispositive, statements provided during the County Commission's debate on Ordinance No. 05-206 are consistent with and support a finding of non-punitive intent.

**30.**   For example, Commissioner Diaz—the prime sponsor of Ordinance No. 05-206—began his remarks by advising his fellow commissioners that the version of the ordinance presented for the County Commission's consideration was an effort "to balance" competing interests and make sure "we don't have a constitutional issue." Ex. MM at 13:23-24. In fact, a prior version of the ordinance would have extended Miami-Dade County's residency restriction to also include any "designated public school bus stop, child care facility, or [ ] park." *See* Ex. II at 3:3 (noting County

Commission's consideration of Item 4F at June 21, 2005 Meeting).[3]

31.    The fact that the County Commission ultimately pared down the types of locations that would be subject to residency restrictions and opted to prioritize schools in an effort to avoid potential constitutional issues with those other locations is consistent with a desire to address public safety not to punish.

32.    Certain statements made by Commissioner Carey-Shuler during the floor debate are similarly instructive.

    **a.**    First, she sought clarification on the effect of the ordinance's grandfather provision because, in her own words, "[t]here might be some ex post facto issues here if the sexual predator already lives in the house [and is forced to relocate]." Ex. MM at 32:25-33:2. Moreover, it was only after she was assured that individuals would be grandfather in and permitted to remain in their residence that she moved on with her discussion. *See id*. at 33:9-20.

    **b.**    Second, she expressed her preference that the County "add money for outreach and education because we have to make all these people aware that this is the law and how we want to enforce the law and what they should do in order to be legal in this matter." *Id*. at 43:9-14.

33.    Taken together, this Court finds that the lack of non-punitive intent in those statements is obvious.

34.    Moreover, this Court finds that the characterization of various commissioners' statements offered by Plaintiffs in their Response to Motion for Summary Judgment, D.E. 138 at 7, relied on taking those statements out of context and was therefore inaccurate. Conversely, the characterization in the County's Reply in Support of Summary Judgment, D.E. 141 at 4, is more reflective of the actual statements provided in the relevant transcript (Ex. MM).

35.    Aside from statutory declarations of intent and statements from individual commissioners, this Court also finds that various aspects of the County's residency restriction are inconsistent with an intent to punish and therefore also evince a non-punitive intent.

    **a.**    First, the County included a grandfather provision, which enabled child molesters

---

[3] A copy of Item 4F is available at:
   http://www.miamidade.gov/govaction/legistarfiles/Matters/Y2005/051767.pdf.

to remain in their existing registered residences.

    **b.** Second, the County exempted child molesters who established their residence prior to a school being built from the residency restriction.

    **c.** Third, the 2010 amendment preempted ***more restrictive*** municipal ordinances in an effort to "strike a proper balance between protecting children around the crucial and vulnerable areas of schools ***while still leaving available residential units in which [child molesters] can find housing***." Ex. T at 5 (emphasis added).

    **d.** Fourth, the County Commission also provided a series of public safety-related concerns and findings as the motivation for its enactment of the 2010 amendment. *Id*. at 4-5.

    **36.** Lastly, this Court need look no further than the ordinance's full title—"The Lauren Book Child Safety Ordinance"—for evidence of a legislative intent to protect children rather than to punish child molesters.

### III.   The Residency Restriction is Not an Affirmative Disability or Restraint

    **37.** The disability or restraint imposed by the County's residency restriction is indisputably less severe than imprisonment.

    **38.** By its very terms, the residency restriction only restricts where a child molester can establish a new residence. Ex. A at 9.

    **39.** Unlike a prisoner, a child molester subject to the County's residency requirement may seek employment, move freely throughout Miami-Dade County, establish a residence at any location not within 2,500 feet of a school, and remain in an existing residence pursuant to the ordinance's grandfather clause. MIAMI-DADE COUNTY CODE §§ 21-281(a) & 21-282(1).

    **40.** This Court finds that the presence of a grandfather clause also mitigates the potential burdens imposed by the County's residency restriction. Unlike other residency restrictions that have been challenged elsewhere,[4] Miami-Dade County's residency restriction does not require that a child molester relocate because a new school opened nearby. *Id*. Instead, once a child molester has found a compliant residence, he or she is free to remain there until either they decide to move

---

[4] *See, e.g.*, *Commonwealth v. Baker*, 295 S.W. 3d 437, 455 (Ky. 2009) and *State v. Pollard*, 908 N.E. 2d 1145 (Ind. 2009) (ordinances provided no grandfather clause and required sexual offenders to relocate from their existing homes).

or factors other than the residency restriction force them to move. *Id*.

41.    The effect of this grandfather clause within Miami-Dade County has also been significant. In August 2008, the Miami-Dade County Sexual Predator and Offender Unit issued a report that estimates that there were approximately 617 offenders and predators who were grandfathered in under this exemption at that time. Ex. S.

42.    In fact, John Doe #4 and #6 were beneficiaries of this very exemption and lived in residential housing pursuant to the grandfather provision for years after the residency restriction was in effect. Ex. XX 41:1-14; Ex. SS at 33:23-34:3, 42:3-10.

43.    From September 21, 2006 to July 23, 2008, John Doe #4 resided at 9551 Fontainebleau Blvd., Miami, FL 33172 with his now-estranged wife. Ex. XX at 41:1-14, 92.

44.    John Doe #4, however, stopped residing at that apartment for reasons that are unrelated to the County's residency restriction. Specifically, John Doe #4 experienced marital difficulties with his wife, and, after she left, John Doe #4 could not keep up with the lease payments on the residence at 9551 Fontainebleau Blvd.; he then proceeded to hold over on that property until he left prior to being formally evicted. Ex. XX at 46:2-13.

45.    If those unrelated events had not occurred, John Doe #4 would have been legally entitled to continue to reside at that address under the grandfather clause.

46.    John Doe #4's subsequent experience is similarly instructive. After being homeless for six months, John Doe #4 was able to obtain compliant housing in Homestead and lived there for approximately 5 years. *Id*. at 48:11-15, 93.

47.    John Doe #4 was able to stay at these residences in Homestead from mid-2010 to approximately September 2015 while sharing rental expenses with his friend and eventually his brother—who is also a child molester subject to the residency restrictions. *Id*. at 48:16-24, 93.

48.    However, around December 2014, the friend that served as John Doe #4's roommate left for Nicaragua leaving himself and his brother to pay rent. *Id*. at 49:1-3. Sometime thereafter, John Doe #4's brother went back to prison for attempting to hold up a bank on SW 8th Street and 19th Avenue. *Id*. at 49:3-20.

49.    It was only at that point that John Doe #4 was unable to pay for rental expenses on his own, eventually stopped paying rent, and ultimately left the residence in Homestead. Id. at 49:12-50:3.

50.    If he would have been able to keep up with the rent, John Doe #4 would have been legally

entitled to continue to reside at that address under the grandfather provision even if a new school was built nearby.

**51.**    As for John Doe #6, he was living at 9064 Collins Avenue in Surfside when Ordinance No. 05-206 was enacted and continued to live there until at least January 2013. Ex. SS at 33:23-34:3, 42:3-10.

**52.**    John Doe #6 was forced to leave his Surfside residence not on account of the County's residency restriction but because the property manager found out that he was a registered sex offender and did not renew his lease. *Id*. at 40:13-25, 42:7-10.

**53.**    John Doe #6 would have been legally entitled to continue to reside at that address under the grandfather provision. *Id*. at 38:18-39:7.

**54.**    Thus, neither John Doe #4 nor John Doe #6 lost compliant housing by virtue of the residency restriction or any circumstances attributable to Miami-Dade County. Instead, both John Doe #4 and #6 were forced to leave their residences when they either (1) became unable to make rent after their spouse or roommates had left or (2) their landlord declined to renew their lease after finding out about their criminal history. *See generally* Ex. SS, XX.

**55.**    As for John Doe #5 and #7, both have likewise failed to demonstrate how their difficulty in obtaining housing would not have otherwise occurred due to their personal financial circumstances.

**56.**    From his release from prison in 2014 to May 2017, John Doe #5 received no income other than food stamps and therefore did not have the means to afford any housing on his own during that time. Ex. ZZ at 3:19-35:13.

**57.**    Similarly, John Doe #7 continues to have no sources of income other than food stamps and, thus, the only source of housing available to him is housing provided to him rent-free by friends, family, the government, or a non-profit organization. Ex. FFF at 37:15-38:10.

**58.**    In fact, John Doe #7 admits that his lack of income is the biggest impediment to his housing search. *Id*. at 47:12-14.

**59.**    John Doe #5 and #7 also missed opportunities to take advantage of the grandfather clause.

    **a.**    John Doe #5 stayed with his niece at a residence in North Miami from 2003 until 2006. Ex. ZZ at 77:3-14.

    **b.**    During that time, however, he had registered his sister's home as his residence for purposes of his sex offender registration requirements. After a visit to his sister's

home by law enforcement revealed that he was not residing at his registered address, John Doe #5 was arrested for failing to maintain an accurate address with the State of Florida as required by the state's sex offender registration requirements. Ex. CCC.

**c.**   John Doe #5 pled guilty to that charge and was sentenced to 8 years in prison. Ex. ZZ at 149-154.

**d.**   John Doe #5 now states that he can live with his sister. *Id.* at 36:20-37:11. However, if John Doe #5 had actually been living with his sister back in 2006 when he was falsely registering that address with law enforcement, he would not have been arrested for a registration violation, would not have spent 8 years in prison, and would have been able to continue to reside at that residence until the present day.

**e.**   As for John Doe #7, he was convicted in June 2009 of qualifying sexual offenses that occurred sometime between 1997 and 2003. At that time, John Doe #7 did not have housing of his own and instead lived with his parents in an apartment in Miami Beach. Ex. FFF at 16:21-25.

**f.**   By the time he was released from prison in December 2014, that apartment was no longer available to him because his parents had passed away while he was in prison and the apartment had been rented out to someone else. *Id.* at 18:9-21.

**g.**   If that apartment had been made available to him or his parents had not passed away while he was in prison, he could have potentially moved back into that apartment upon his release.

**60.**   The evidence shows that Plaintiffs' housing search has been significantly impacted by factors other than the County's residency restriction, such as Plaintiffs' own lack of diligence, limited search area, and misunderstanding of the residence restriction.

**a.**   John Does #5 and 7 have admitted that they have not looked for any available housing in the southern half of the County. Ex. CCC at 51:10-24; FFF at 57:5-7

**b.**   John Doe #6 notes that he was given a map showing areas in Miami-Dade County where there are compliant addresses, but that he has eliminated those areas from consideration because he feels they are too far from his work. Ex. SS at 85:10-12.

**c.**   John Doe #6 also admits that, until his deposition, he was under the mistaken impression that he was required to reside 2,500 feet away from day cares and parks

and had eliminated potential housing options based on this erroneous belief. Ex. SS at 77:20-24. He also admitted that he has eliminated other potential options due to their rental prices, their distance from his work, and their distance from public transportation. *Id*.

    **d.** John Doe #7 also acknowledges that he has been denied housing on multiple occasions by potential landlords due to his criminal history and notes that finding landlords who are willing to rent to sexual offenders is a problem shared by all offenders. Ex. CCC at 42:15-19, 43:3-10, 47:7-11.

**61.**    Notwithstanding these self-imposed restrictions, John Doe #5 and #7 were able to find available, compliant housing but those opportunities fell through for reasons outside of Miami-Dade County's control.

    **a.** John Doe #5 had found an available residence outside the 2,500 foot buffer zone that he was going to share with another offender; however, the house was rented out before they could act on it. Ex. ZZ at 49:24-50:8.

    **b.** John Doe #7 was also provided with a potential address by his probation officer, but he could not act upon it because he did not have any money for rent. Ex. FFF at 44:90-45:14.

    **c.** John Doe #7 also worked to find housing with other offenders, and they have found valid addresses where the rent was too high for them. Id. at 47:2-6.

**62.**    Taken together, these facts show that Plaintiffs cannot establish by the clearest proof that their difficulty in obtaining housing would not have otherwise occurred. Consequently, the Court finds that Plaintiffs failed to carry their burden of showing that the residency restriction operates as an affirmative restraint or disability.

**63.**    Instead, this Court finds that the housing difficulties experienced by Plaintiffs and similarly situated child molesters are more likely attributable to a variety of factors including but not limited to: (a) failure to follow-up with Homeless Trust staff; (b) exhibiting complacency for one's existing situation; (c) general housing difficulties and larger homeless populations among convicted felons; (d) a general shortage of affordable housing in Miami-Dade County at-large; (e) landlords refusing to rent to registered sex offenders; (f) registered sex offenders often not having stable employment; and (g) federal prohibitions on the offering of public housing to registered sex

offenders. *See generally* Ex. 11.

64.    As to the amount of housing in Miami-Dade County that lies outside the 2,500 buffer zone, this Court credits the testimony of Joshua Brashears and finds that there are approximately 124,694 residential units in Miami-Dade County that lie outside the school buffer zone . Ex. U.

65.    This Court further finds that 124,694 residential units provide a large enough pool of compliant housing so as to make its effects non-punitive.

66.    According to 2010 Census Data for Miami-Dade County, the estimated 124,694 residential units in Miami-Dade County that lie outside the 2,500 foot buffer zone described in MIAMI-DADE COUNTY CODE § 21-121(b) exceeds the number of total residential units in every city except the City of Miami, which has 183,994 residential units. Ex. V at 3-4. Moreover, according to that same census data, there are more residential units in Miami-Dade County that lie outside the 2,500 foot buffer zone described in Miami-Dade County Code § 21-121(b) than there are housing units in Coral Gables, Hialeah, and Homestead, ***combined***. *Id*. at 3-4.

67.    Further evidence of the availability of housing for those subject to the residency restriction is shown in the collective observations of the officers at the County's Sexual Predator and Offender Unit, which the Court credits, who have seen "registered sexual offenders that were previously registered as transient [and] have subsequently been able to find compliant housing." Ex. 12 at 92-95; Ex. TT at 39:22-41:6; Ex. III at 30:1-14.

68.    This Court finds that the housing analysis submitted by Plaintiffs' expert, Dr. Kelly Socia, is not persuasive.

69.    First, Dr. Socia's analysis eliminates otherwise compliant residential properties based upon a variety of factors that are not part of the County's ordinance. More specifically, Dr. Socia's analysis considered factors such as whether property was residential-rental in nature, whether it was affordable under HUD low-income guidelines, and whether it was currently available for rent.

70.    However, the residency restriction has no prohibition on home ownership, it says nothing about housing costs, and its applicability is not tied to the ebbs and flows of the real estate market.

71.    Second, by including these additional factors, Dr. Socia has artificially constrained the estimated number of available properties and exaggerated the impact of the residency restriction.

72.    Consider the following:

        a.    Dr. Socia contends that "99.9% of all housing in Miami-Dade County is effectively

unavailable for former sexual offenders." D.E. 138 at 9.

    **b.**   However, his consideration of only rental, affordable, and available units causes the potential universe of available housing to be severely limited before even considering the application of the residency restriction.

    **c.**   For example, Dr. Socia states that, under his analysis, there are approximately 860,696 total housing units in Miami-Dade County and "when considering estimates of affordability and availability ***without considering the*** [***residency restrictions***], there are approximately 9,736 rental units" remaining. Ex. 4 at 17-18 (emphasis in original).

    **d.**   By virtue of simple division,[5] this means that we are looking at a housing pool that represents only 1.13% of all housing in Miami-Dade County ***before*** the residency restrictions are even considered.

    **e.**   Put another way, Dr. Socia's analysis eliminates 98.9% of all housing in Miami-Dade County without even considering the residency restriction.

**73.**   By claiming that housing must meet all of these criteria in order to be a "reasonable housing option," *id*. at 6, and then also finding that only 1% of housing meets this criteria before even considering residency restrictions, Dr. Socia has, if anything, proven the County's point: Plaintiffs cannot demonstrate by the clearest proof that their difficulty in obtaining housing would not have otherwise occurred.

**74.**   Furthermore, this Court agrees with the criticism of Dr. Socia's analysis provided by Miami-Dade County's expert, Dr. Ricard McCleary. *See* Ex. X at 12. Specifically, Dr. Socia's analysis is a result of an unsupported definition of "residential" that then takes averages of both affordable and available units. It is therefore an estimate stacked upon an inference resting upon an assumption. And yet, Dr. Socia claims that his analysis nevertheless allows him to arrive at a set number of available, affordable residential units rather than a range. This Court agrees that these numbers "are difficult to take seriously." *Id*.

## IV.   The Residency Restriction is Not Historically Regarded as Punishment

**75.**   Miami-Dade County first enacted its residency restriction in 2005. Ex. A. At that time, residency restrictions were "relatively new and somewhat unique", *Miller*, 405 F.3d at 720, and

---

[5]  $9,736 \div 860,696 = 0.0113$ (or 1.13%).

Miami-Dade County was "part of essentially the first wave of these laws going into effect." Ex. Y at 62:1-4.

**76.** The County's residency restriction does not resemble banishment because it provides no comparable degree of expulsion from the community.

    **a.** By its very terms, the County's residency restriction provides no limitation on where child molesters may travel or work within Miami-Dade County. Ex. A at 10.

    **b.** Even with respect to residences, child molesters are free to live where they choose as long as it is not within 2,500 feet of a school. *Id*.

**77.** This Court additionally finds that any attempt to analogize the County's residency restriction to banishment is further undone by the grandfather provision and the County's preemption in 2010.

    **a.** Under the grandfather provision, every child molester that committed their sexual offenses prior to the ordinance's enactment was permitted to remain in their existing residence. *Id*. at 9. And any child molester who establishes a compliant residence prior to a school being opened nearby is also exempt from the residency restriction. *Id*. at 10.

    **b.** By definition, this provision has the effect of keeping individuals in their current residences in Miami-Dade County—the very opposite of what is intended by banishment.[6]

    **c.** Similarly, the legislative findings made by the County Commission when enacting Ordinance No. 10-01 demonstrate that the County's intent was contrary to any desire to effectively banish sexual offenders from the community.

    **d.** In Ordinance No. 10-01, the County recognized that allowing a patchwork of 24 different municipal ordinances to govern residency restrictions in municipalities tended to leave child molesters "almost completely excluded from available housing" in those municipalities. Ex. T at 5.

    **e.** As a result, the Board of County Commissioner opted to preempt and repeal all

---

[6] The Court also notes that this provision was not insignificant. In 2008, it was estimated based upon data provided by the Florida Department of Law Enforcement that there were approximately 617 offenders and predators who were grandfathered in under this exemption at that time. Ex. S at 3.

relevant municipal ordinances and have the County's 2,500 foot restriction from only schools apply countywide in order to "strike a proper balance between protecting children around the crucial and vulnerable areas of schools while still leaving available residential units in which [child molesters] can find housing." *Id*. at 5.

**78.**   Under these facts, this Court finds that it defies credulity to suggest that the County chose to repeal more restrictive residency restrictions and create more housing availability for child molesters in an effort to effectively banish them.

**79.**   For similar reasons, this Court finds that the County's residency restriction does not impose the same level of control and supervision that would be analogous with probation.

**80.**   This Court also finds that the County's residency restriction bears a far closer relation to other state and local laws that are purely non-punitive in nature.

    **a.**   For example, both Florida law and the Miami-Dade County Code require that certain establishments maintain a sufficient distance from schools.

    **b.**   Fla. Stat. § 847.0134 provides that certain adult entertainment venues may not be located within 2,500 feet of a public or private elementary, middle, or secondary school.

    **c.**   MIAMI-DADE COUNTY CODE § 33-150 provides that, unless approved as a special exemption, "no premises shall be used for the sale of alcoholic beverages to be consumed on or off premises where the structure or place of business intended for such use is located less than [2,500] feet from a church or public school."

    **d.**   And MIAMI-DADE COUNTY CODE § 33-259.1(d) provides that unless approved as a special exception, no adult bookstore, adult theater, adult entertainment club, adult video store, massage establishment, adult modeling establishment, and encounter studio shall be permitted "within one thousand (1,000) feet of a private school …, public school, church, public park, public library, day care center or nursery for children."

## V.  The Residency Restriction Does Not Serve a Traditional Aim of Punishment

**81.**   This Court finds that Miami-Dade County made the purpose of its residency restriction clear: "[T]he [County Commission] desires to establish a policy regulating where [child molesters]

live and limiting their access to children in an effort to protect children of the County from sexual abuse." Ex. A at 5.

**82.**   In short, the County Commission hopes this policy will prevent future crime. Therefore, while the residency restriction has a clear deterrent and remedial purpose, it is not retributive.

**83.**   Once again, this Court finds that the lack of a retributive purpose is evinced by the grandfather provision because (a) no child molester was not required to move from their existing residence and (b) a child molester is able to establish a residence without fear of having to move in the future due to the placement of a nearby school.

**84.**   This Court also notes that the County Commission's selection of only "schools" as the relevant location is telling. The County Commission does not control the establishment of new schools; that responsibility lies in the hands of the Miami-Dade County School Board. Thus, the County Commission selected a type of location (schools) that it would have no control over and excluded from consideration other types of locations (such as parks) where it would have control to potentially add locations for no reason other than to expand the buffer zone.

## VI.   The Residency Restriction Has a Rational Connection to a Non-Punitive Purposes

**85.**   The County Commission provides the rational connection to its public safety goal within the whereas clauses of Ordinance No. 05-206. Ex. A at 4-5.

    **a.**   In Ordinance No. 05-206, the County Commission notes that it has a compelling interest in protecting children from predatory sexual activity.

    **b.**   The County Commission then finds that prohibiting child molesters from living with 2,500 feet of schools … will reduce the amount of incidental contact child molesters have with children.

    **c.**   And the County Commission finally states that reducing the amount of incidental contact will decrease the opportunity for child molesters to commit new sexual offenses against children.

**86.**   This Court agrees with the Eight Circuit and other courts that have held that it is a matter of "common sense" that limiting the frequency of contact between child molesters and areas where children are located is likely to reduce the risk of an offense.

**87.**   This Court also finds that Miami-Dade County has offered considerable and persuasive

evidence to support this common sense understanding.

**88.** First, the evidence offered by Miami-Dade County explains all too well why governments have a compelling interest in protecting children from predatory sexual abuse:

    **a.** For example, a 1997 report released by the U.S. Department of Justice's Bureau of Justice Statistics titled *Sex Offenses and Offenders: An Analysis of Data on Rape and Sexual Assault* ("Greenfield (1997)") states that its findings "reinforce[] a striking observation in recent studies about crimes involving rape and sexual assault: In a high percentage of cases, the victims are children." Ex. B at 4.

    **b.** According to the data compiled in Greenfield (1997), "violent sexual offenders with single victims reported that two-thirds of their victims had been under the age of 18" and "the median age of the victims of imprisoned sexual assaulters was less than 13 years old." Ex. B at 24.

    **c.** A 2000 study from the U.S. Department of Justice's Bureau of Justice Statistics titled *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics* ("Snyder (2000)") provides similar results. Ex. C.

    **d.** Snyder (2000) found that "over two-thirds (67%) of all victims of sexual assault reported to law enforcement agencies were juveniles" and, specifically, "33% of all victims of sexual assault reported to law enforcement were ages 12 through 17 and 34% were under 12." *Id*. at 7.

    **e.** Snyder (2000) also reported the following findings with respect to the propensity of children to be victims of sexual offenses:

        **i.** "The single age with the greatest proportion of sexual assault victims reported to law enforcement was age 14." *Id*.

        **ii.** "There were more victims in each individual age group between 3 and 17 than in any individual age group over age 17 (any adult age group) and more victims age 2 than in any age group above age 40." *Id*.

        **iii.** "[O]ne of every seven victims of sexual assault (or 14% of all victims) reported to law enforcement were under age 6." *Id*.

        **iv.** "The risk of being the victim of forcible rape increased dramatically from age 10 to age 14, where it peaked. By age 20, the risk had dropped to less

than half the peak 14-year-old rate, and dropped to a 10th of the 14-year-old peak by age 40." *Id.*

    **v.** The peak ages for risk of being a victim of forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling are all 15-years-old or younger. *Id.*

   **f.** That same study further substantiates the County's justifiable concern that the scope of harm to children cannot be measured by police reports alone. Specifically, Snyder (2000) also reported that, in general, the assault of juvenile victims only resulted in arrest 29% of the time. And, for further breakdown by age group, "[a]n offender was arrested in just 19% of the sexual assaults of children under age 6, compared to 33% of victims ages 6 through 11, and 32% of victims ages 12 through 17." D.E. 123-3 at 16.

**89.** In order to place these figures into local context, this Court credits the testimony presented by Lauren Book to the County Commission during the floor debate on Ordinance No. 10-01 at the County Commission's Jan 21, 2010 meeting:

> As of last year, the Miami-Dade County public school system, you have 167,973 female students. If we look at the statistics, one in three girls who will be abused by the time that they are 18, that would mean that we would have 55,991 girls abused before they graduate high school, before they get a chance to be adults. There are also 177,177 male students and if we look at the statistics for boys which is 1 in 6, which we know is a low number, that would give us 29,529 male students being abused before they are 18-years-old. So, of the 345,150 students in our school system in Miami-Dade County; 85,520 children will be abused before they graduate high school. And those are the children who tell. Those are only the children who tell.

Ex. QQ at 11:23-12:13.

**90.** Second, the record evidence further supports Miami-Dade County's finding that "[m]ost sexual offenders commit many offenses, have many more victims than are ever reported, and are prosecuted for only a fraction of their crimes." Ex. A.

   **a.** Results from the National Crime Victimization Survey (NCVS) indicate that the offenses of rape/sexual assault are the least likely crimes to be reported to the police. For example, NCVS's 2016 Crime Victimization report found that only 22.9% of rape/sexual assaults were reported to police. Ex. D at 7. *Accord* Ex. W. at 220:9 (acknowledging that other research studies have found that the rate of

underreporting of sexual offenses is as high as 79 percent).

   **b.**   According to a report issued by the Department of Justice's National Institute of Justice titled *Youth Victimization: Prevalence and Implications*, the underreporting of sexual assault is potentially even greater among children as that report found that only 13 percent of sexual assault cases of victims aged 12-17 were reported to police and 86 percent of those cases went unreported to any authorities, including police, child protective services, or school authorities. *See* Ex. E at 4.

**91.**   This Court also gives considerable weight to the findings in the study from March 1987 by Gene Abel and other colleagues titled *Self-Reported Sex Crimes of Nonincarcerated Paraphiliacs* ("Abel (1987)"), Ex. F, because it relied on data beyond arrest records to assess the scope of the underreporting problem in sexual offense cases.

**92.**   This Court makes this determination because it agrees that "[i]ncarcerated sex offenders are likely to conceal the true scope and nature of their deviant interests and activities for fear of jeopardizing their hope of parole" and, therefore, "data collected from incarcerated offenders can be expected to represent ***minimum*** rates of deviant behavior." *Id.* at 4 (emphasis added).

**93.**   Thus, this Court finds—based on the findings in Abel (1987) and other studies provided by Miami-Dade County—that arrest records do not provide a reliable indication of the true scope of sexual assault. *See generally* Ex. F. *See also Kennedy v. Louisiana*, 554 U.S. 407, 444 (2008), (recognizing that "[u]nderreporting is a common problem with respect to child sexual abuse" and citing two corresponding studies).

**94.**   Third, this Court also finds that, contrary to Plaintiffs' contention, the County has presented credible evidence that the rate of recidivism among sexual offenders, generally, and child molesters, specifically, is high and presents long-term public safety concerns of the highest order:

   **a.**   Greenfield (1997), for example, noted that "[r]eleased rapists were found to be 10.5 times as likely as non-rapists to be re-arrested for rape, and those who had served time for sexual assault were 7.5 times as likely as those convicted of other crimes to be rearrested for a new sexual assault." Ex. B at 33.

   **b.**   According to a study published by the Bureau of Justice Statistics titled *Recidivism of Prisoners Released in 1983* ("Beck (1990)"), "the relative likelihood of re-arrest for a similar crime was highest among prisoners released for rape, sexual assault,

homicide, or fraud and lowest among those released for public-order or drug offenses." Ex. G. at 6.

c.  Similarly, a 1997 study by Robert Prentky and colleagues titled *Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis* ("Prentky (1997)") examined recidivism of a sample of rapists and child molesters over a 25-year period and found that, with respect to child molesters, "[i]t is significant—and should be underscored—that, 10 years after discharge, there was a substantial re-offense rate (i.e., at Year 10, the recidivism rate for new sexual charges was 30 percent, and by Year 25, it had increased to *52 percent*). Ex. H at 21-22.

d.  Prentky (1997) goes on to state that "[c]ontrary to conventional wisdom, most re-offenses do not occur within the first several years after release; child molesters in this sample reoffended as late as 20 years following release." *Id*. at 22.

e.  A May 2001 article from the Center for Sex Offender Management titled *Recidivism of Sex Offenders* ("Bynum (2001)") reaches a similar conclusion. Ex. J. Bynum (2001) "found that the number of subsequent sex offenders revealed through unofficial sources was 2.4 times higher than the number that was recorded in official reports."

95.  This Court also finds that the County's concerns relating to the recidivism of child molesters are eminently justifiable in light of the findings in a 2004 study titled *Lifetime sex offender recidivism: A 25-year follow-up study* ("Langevin 2004)"). Ex. K. Specifically, Langevin (2004) found that "[a] substantial increase in recidivism rates was noted when undetected crimes were included. A total of 88.3% of offenders would have been considered sex offence recidivists if they had been caught." *Id*. at 17. Most disturbingly, "[t]he child sexual abusers and exhibitionists showed highest rates of recidivism, and almost all reoffended if undetected crimes were included." *Id*. at 18.

96.  Additionally, Langevin (2004) found that "[t]he average span of time for known criminal history in [their] study was almost two decades, with over 44% of criminal careers lasting 20 or more years." Consequently, this Court finds that these studies "suggest[] that sexual offending behavior remains a significant problem throughout the sex offenders' adult lives." *Id*. at 20.

97.  Notably, these concerns are not reserved for criminologists and public officials; they are also supported by the experience of the federal judiciary itself, which has expressed similar

concerns regarding the alarming incidence of recidivism among convicted child sexual predators. In 2003, the U.S. Congress enacted the PROTECT Act, which amended 18 U.S.C. § 3583 to provide federal judges with discretion to extend the term of post-release supervision of sex offenders up to a maximum of life when, "[u]nder current law, the maximum period of post-release supervision in Federal cases was generally five years even for the most serious crimes." H.R. CONF. REP. 108-66 at 49 (2003). This change came in response "to the long-standing concerns of ***Federal judges*** and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the ***perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison***." *Id.* at 49-50 (emphasis added).

**98.** During a committee meeting on August 17, 2015, the County Commissioners on that committee were presented with testimony from Ron Book whereby excerpts from the Eighth Circuit's decision in *Doe v. Miller* were read into the record and three research studies on recidivism were presented for the committee's consideration. Ex. KK at 12-15. One of those studies was Bynum (2001), Ex. J; another was from the State of Washington, Ex. BB.

**99.** Fourth, this Court finds that the County has also presented credible and persuasive evidence establishing a rational connection between its selected policy (residency restrictions) and its policy goal (child safety) that is supported by both theory and data.

    **a.** For example, a 2001 study by Jeffrey Walker and colleagues titled *The Geographic Link Between Sex Offenders and Potential Victims: A Routine Activities Approach* ("Walker (2001)") found evidence of a "relationship between where [sex] offenders live and where children congregate." Ex. L at 1.

    **b.** Walker (2001) also offers a theoretical basis for the County's policy choice.

    **c.** For example, Walker (2001) surveys relevant literature on the behavioral patterns of child molesters and notes that a "way sex offenders might gain access to a child is by searching for neighborhoods with children. Goldstein (1987, p. 98) insists that many pedophilic activities are premeditated. Goldstein conducted part of his research by examining publications used by pedophiles. In these publications, he found several articles and other material suggesting that offenders target places such as arcades, ***schools***, and playgrounds. Offenders have also been known to use particular activities to entice children. For example, a perpetrator might approach

23

children at bus stops, ***schools***, and playgrounds and perform magic tricks. After gaining their trust, the offender may trick them into performing sex acts (Goldstein, p. 106)." *Id.* at 3 (emphasis added).

d. Walker (2001) further states "Lanning (1992, p. 18) describes sex offenders as frequently associating with young people. The sex offender may hang around ***schoolyards***, arcades, shopping centers, or anywhere else that children are present." *Id*. at 3 (emphasis added). And "Kelley, Brant, and Waterman (1993) argue that sexual abuse can occur in any setting where children can be found and that sexual abuse perpetrators purposely work to know the locations of concentrations of children." *Id*. at 4.

e. Walker (2001) also discussed the Routine Activities Theory, a theory of criminology that posits "criminals often position themselves to naturally come into contact with potential victims: 'Just as lions look for deer near their watering hole, criminal offenders disproportionably find victims in certain settings.'" *Id*. at 5.

f. Aside from the theoretical support, Walker (2001) also provides empirical support for the County's residency restriction. It found that 48% of all child sex offenders in their dataset lived within buffer zones [around] day cares, school, and parks, and, by comparison, only 26% of non-child sex offenders lived in these buffer zones. *Id*. at 12.

g. This Court agrees that (a) "[t]his lends support to the argument that child sex offenders are choosing to live in areas where there are concentrations of potential victims" and (b) "[p]art of the variation in the residency patterns of child sex offenders, though, is no doubt attributable to them putting themselves in close proximity to potential targets, perhaps in hopes that their routine activities will overlap with the routine activities of potential victims." *Id*. at 13.

h. In fact, one of Plaintiffs' own experts, Dr. Jill Levenson, cites to a study in her expert report that actually supports this position. In a 2010 study co-authored by Dr. Levenson herself, the researchers attempted to "compare the residential proximity of sexual recidivists and non-recidivists relative to schools and daycares in Florida." Ex. 4 at 4. And, while Dr. Levenson notes that this study found no correlation between recidivism and proximity to both schools and daycares, she

omits the fact that this study also found that "recidivists live slightly closer to schools." Ex. X at 38.

i.   The rational basis for the County's policy is further supported by a study by Amy Page and other colleagues titled *North Carolina Sexual Offender Legislation: Policy Placebo?* ("Page (2012)"), which provided the results from a survey regarding residency restrictions that was administered to a nonrandom sample of 231 adult sexual offenders. Ex. M.

j.   Among the offenders sampled in Page (2012), 28.1% of offenders admitted that they themselves were more able to manage risk factors because they cannot live near a school/day care, 31.6% admitted that residence restrictions were effective in limiting their access to children, 22.2% thought that residence restrictions helped prevent them from reoffending, and 35.9% thought that residence restrictions help protect children from sexual offenders. *Id.* at 10.

k.   While these survey results do not represent the majority opinion among child molesters, this Court nevertheless finds the results to be significant. Considering the devasting and potentially lifetime damage that even one new incident of sexual abuse can cause its victim, this Court finds that a policy measure that even a plurality or minority of child molesters believes can help prevent them from reoffending is certainly rationally connected to public safety.

l.   For that same reason, this Court also credits the opinion by Dr. Richard McCleary that "although the danger to children posed by strangers in public places may be lower than popularly believed, it is not so low that it can be ignored." Ex. X at 37 (citing study that found 25% of all sexual assaults on children are committed by strangers and 23% occur in a public area).

m.   This Court also finds that Plaintiffs' contention regarding the rational basis for the residency restriction is undone by the admission of John Doe #6 that one of the techniques that he has learned in sex offender treatment is not putting himself in situations where he can get urges towards children. Ex. SS at 112:21-24. This includes "stay[ing] away from I guess, schools. Like if I walk by a school the only purpose I'm going to walk by a school is to walk by a school to get to where I'm trying to go. I'm not going to let my mind wander, 'Oh, Geez I wonder what's going

on in this school.'" *Id.* at 113:10-17. If child molesters must take concerted effort to not let their mind wander when walking around schools, both the County and this Court are free to question whether the community should take the risk of increasing the frequency of those impulse checks by allowing child molesters to live closer to schools. Certainly, it is rational to limit the potential for incidental contact between child molesters and children and thereby create additional barriers to the incidence of child molestation beyond the child molester's own faculties for impulse control.

   **n.**  Lastly, during the floor debate on Ordinance No. 05-206, Major Buchholz from the Miami-Dade County Sex Crimes Unit provided the following testimony for the County Commission:

> [S]exual offenders are preferential offenders, and they covet, and they stalk, and they look for victims. And anything that we can do to minimize that opportunity, they're opportunists. And what we're trying to do is to minimize the opportunity for them to attack. … Even though it's a small number but I think it's a huge impact on our community when one of these children are abducted and raped, and/or murdered.

   Ex. MM at 60:23-61:9.

**100.**  Fifth, this Court finds that Miami-Dade County also presented credible and persuasive evidence demonstrating a rational connection between the residency restriction's distance (2,500 feet) and the goal of enhancing child safety.

   **a.**  This Court first notes that the creation of a buffer zone around locations where children congregate is not unique to residency restrictions.

   **b.**  Prior to the County's enactment of the residency restriction under Ordinance 05-206, other laws at the county, state, and federal level had created buffer zones in and around schools. *See* Fla. Stat. § 847.0134 (providing that certain adult entertainment venues may not be located within 2,500 feet of a public or private elementary, middle, or secondary school); Miami-Dade County Code § 33-150 (providing that, unless approved as a special exemption, "no premises shall be used for the sale of alcoholic beverages to be consumed on or off premises where the structure or place of business intended for such use is located less than [2,500] feet from a church or public school"); 21 U.S.C. § 860 (stating that any person who

distributes, possesses with intent to distribute, or manufactures a controlled substance within 1,000 feet of a public or private elementary, vocational, or secondary school is subject to twice the maximum punishment otherwise authorized).

c.   Under Fla. Stat. § 1006.21, district school boards are tasked with providing transportation for each public school student in kindergarten through grade 12 "whose homes are more than a reasonable walking distance, as defined by the State Board of Education, from the nearest appropriate school." (emphasis added).

d.   In Fla. Admin. Code Ann. r. 6A-3.001, the State Board of Education has defined a "reasonable walking distance" as "any distance not more than two (2) miles between the home and the school or one-and-one-half (1 ½) miles between the home and the assigned bus stop."

e.   These distances have been incorporated into the Routing Guidelines for Miami-Dade County Public Schools and, as a result, "school bus transportation will not be provided for students living within two miles of the school they are assigned to attend." Ex. N at 4-6. Thus, Miami-Dade County Public Schools does not provide bus transportation for students living within 2,500 feet of a school.

f.   Additionally, Miami-Dade County—through a partnership between Miami-Dade County Public Schools, the Florida Department of Transportation, and the Transportation Planning Organization— participates in Safe Routes to School, a federal program funded by the Federal Highway Administration that provides grants for the construction of infrastructure improvements to make it safer and easier for children in grades K-8 to walk or bicycle to and from school. *See, e.g.*, Ex. O at 1-2.

g.   According to the Transportation Planning Organization's 2014 Report, "improvements closer to a school generally have a greater benefit than improvements further away. Therefore, the primary focus for [Safe Routes to School] improvements is the street network within 0.5 miles [or approximately 2,500 feet] of a school." Ex. Q at 5.

h.   The Transportation Planning Organization's infrastructure plans for 2015 and 2017 reflect a similar focus on the area within 0.5 miles (or 2,640 feet) from the identified

schools. *See also* Ex. P at 10-48 (noting the percentage of students living within 0.5 miles of each school and providing maps with a 0.5 mile buffer around the school); Ex. R at 10-60 (same).

**i.** Accordingly, the evidence demonstrates that (a) minor children are significantly more likely to be walking without an adult within 2,500 feet of a school and (b) Miami-Dade County is making a concerted effort to enhance the walkability of areas within approximately 2,500 feet of a school in order to encourage more students living in that area to walk to school.

**j.** Given that policy choice, this Court finds it is reasonable for Miami-Dade County to want to enhance public safety by restricting child molesters from residing within those very areas so as to reduce the frequency of incidental contact between child molesters and children that are walking to or from school.

## VII.   <u>The Residency Restriction is Not Excessive in Relation to its Public Safety Goal</u>

**101.** The Court finds that the County's residency restriction is not excessive in relation to its public safety goal of protecting children.

**102.** First, the residency restriction is only applicable to individuals convicted as adults of specific enumerated sexual offenses where the victim or apparent victim was 15 years of age or younger. Ex. A. This Court finds that this denotes an intent on the part of Miami-Dade County to impose these restrictions on a group of individuals no larger than necessary to address the specific public safety concerns it has.

**103.** This Court further finds that it is reasonable for Miami-Dade County to conclude that convicted child molesters pose a sufficient risk to child safety that a non-punitive safety regulation is needed. As Plaintiffs' own expert concedes, "The second rule of psychology is the best predictor of future behavior is past behavior." Ex. W at 268:23-25.

**104.** Second, Miami-Dade County's residency restriction provides a grandfather provision to help mitigate any excessive effects by not obligating child molesters to relocate once they have established a compliant residence. Additionally, the County Commission has already amended the residency restriction once to preempt more restrictive measures undertaken at the municipal level in an effort to increase the quantity of available housing. This Court finds that these actions denote an intent by Miami-Dade County to enact reasonable regulation and make adjustments

accordingly. Such actions are not consistent with a finding that Miami-Dade County was deliberately unreasonable and acted excessively when making the policy decisions that it made.

**105.** Third, the residency restriction also limits itself exclusively to schools despite the fact that the State of Florida and even many prior municipalities within Miami-Dade County imposed similar restrictions around additional locations such as day care centers, parks, school bus stops, and other areas where children generally congregate. Miami-Dade County's policy decision to focus its public safety concerns on a vulnerable location where large amounts of children congregate, a fair amount of whom may walk to or from school unaccompanied by an adult, is reasonable.

**106.** Fourth, the fact that the residency restriction applies for life does not, on its own, mandate a finding of excessiveness. There is credible evidence to support such a restriction:

    **a.** Prentky (1997), for example, found that "[c]ontrary to conventional wisdom, most reoffenses do not occur within the first several years after release; child molesters in this sample reoffended as late as 20 years following release," Ex. H at 22.

    **b.** The findings in Langevin (2004) "suggest[] that sexual offending behavior remains a significant problem throughout the sex offenders' adult lives." Ex. K at 20.

    **c.** The US Congress even enacted amendments to sentencing laws following concerns by Federal judges and prosecutors that the criminal conduct "for the perpetrators of child sexual abuse … may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison." H.R. CONF. REP. 108-66 at 49-50 (2003)

    **d.** And Plaintiffs' own expert, Dr. Levenson, acknowledges that "pedophilia is a disorder that can persist for life." Ex. Y at 40:10-15.

**107.** This Court is also unconvinced that Plaintiffs have established by the clearest proof that the individualized risk assessments suggested by their expert witnesses are sufficiently reliable to override the dictate in *Smith* that legislative policymakers are empowered to impose "regulatory burdens on individuals convicted of crimes without any corresponding risk assessment." 538 U.S. at 104.

**108.** As a preliminary matter, the stated intent of Miami-Dade County's residency restriction is to promote child safety. Yet, Plaintiffs' own expert witness acknowledges that "[t]here is no risk assessment tool in common usage or that has come to any sort of prominence in the relevant

academic literature that is specifically designed to measure recidivism risk for sex offenses against children." Ex. W at 265:19-267:6.

**109.** In fact, Plaintiffs' expert concedes that his preferred risk assessment tool, the Static99, only provides "a moderate ability to predict recidivism," agreed that "recidivism rates are difficult to estimate with certainty," and acknowledged that there is no jurisdiction that relies exclusively on the Static-99 to make risk assessment determinations rather it is simply "one tool in the box." Ex. W at 176:10-17; 206:18-20; 221:25-222:10.

**110.** This Court also finds that there are noteworthy reliability concerns with such instruments. For example, in a study designed to assess how well practitioners in the field could assign the correct risk score to a series of test cases, the practitioners only assigned the correct risk score 48.3% of the time and the practitioners were off by 2 points or more 32% of the time. *Id*. at 170:3-174:15. And, even when the practitioners assign the correct risk score, the risk assessment is still never completely accurate at predicting recidivism. *Id*. at 174:16-21.

**111.** Moreover, this Court finds the expert testimony of Dr. Richard McCleary to be more persuasive regarding the limits and corresponding risks associated with relying upon risk assessment scores to make public safety decisions for released child molesters.

**112.** As noted by Dr. McCleary, the empirical literature does not support a credible, reliable estimate of the recidivism rate for registered sex offenders. Ex. X at 12. In support, Dr. McCleary notes that recidivism estimates for sex offenders "can range from as low as zero … to as high as 75 percent." *Id*. at 13. This Court agrees that "the absence of reliable recidivism estimates makes it difficult—if not impossible—to estimate the correlates of recidivism." *Id*. *See also id*. at 19-21.

**113.** This Court is also persuaded by Dr. McCleary's opinion that "proposals by Plaintiffs' experts to base [residency restrictions] on clinical risk assessment ignores the relative costs of false-positive and false-negative errors." *Id*. at 34. By way of example:

> [S]uppose that a convicted child molester applies for a sensitive position that would allow access to children. If a clinician determines that the RSO has a low risk of recidivism and recommends that the RSO be "given a chance," the *cost* of a false-negative error is the sexual victimization of a child. The *cost* of a false-positive error is a lost employment opportunity for the RSO. The *costs* of the false-negative and false-positive errors are radically different in that hypothetical. Given the different relative costs of false-positive and false-negative errors, a responsible public safety agency would err justifiably on the side of caution.

*Id*. at 34.

**114.** While it is not this Court's role to decide whether the legislature has made the best choice possible to address the problem it seeks to remedy, this Court does find that Miami-Dade County has presented credible evidence to undermine Plaintiffs' contention that "there is no evidence that residency restrictions have any impact on recidivism or public safety, or that an individual's residential proximity to a school is a salient risk factor in sexual offending."

    **a.** In Walker (2001), for example, child molesters were found to live within the proximity of day cares, schools, and parks, more often than sex offenders with adult victims and "[p]art of the variation in the residency patterns of [child molesters] … is no doubt attributable to them putting themselves in close proximity to potential targets, perhaps in hopes that their routine activities will overlap with the routine activities of potential victims." Ex. L at 12.

    **b.** Page (2012) also offers survey results from child molesters and those results show that 28.1% admitted that they were more able to manage risk factors because they cannot live near a school/day care, 31.6% admitted that residence restrictions were effective in limiting their access to children, 22.2% thought that residence restrictions helped prevent them from reoffending, and 35.9% thought that residence restrictions help protect children from sexual offenders. *Id*. at 10. Considering the benefit to society from the additional avoidance of a single sexual assault on a child, these numbers are considerable.

    **c.** In fact, a study co-authored by one of Plaintiffs' own experts found that "recidivists live slightly closer to schools." Ex. X at 38.

    **d.** Additionally, there was testimony presented at the various hearings before the County Commission on Ordinance No. 05-206 and 10-01 that offered evidence of the effectiveness of the residency restriction:

        **i.** First, Major Buchholz from the Miami-Dade County Sex Crimes Unit testified that "sexual offenders are preferential offenders, and they covet, and they stalk, and they look for victims. And anything that we can do to minimize that opportunity, they're opportunists. And what we're trying to do is to minimize the opportunity for them to attack. … Even though it's a small number but I think it's a huge impact on our community when one of these children are abducted and raped, and/or murdered." Ex. MM at 60:23-

61:9.

    ii.   Second, during the committee consideration of Ordinance No. 10-01, Commissioner Diaz noted that the Miami-Dade Police Department had advised him to keep the 2,500 feet because "it's working." Ex. OO at 34:4-7, 35:1-5.

    iii.   Third, Ron Book testified when Ordinance No. 10-01 came up for a final vote and noted for the County Commission that "since you adopted your ordinance in 2005, absconding is down, registration compliance is up, and crimes against children are down." Ex. QQ at 8:5-8.

    iv.   Fourth, James Loftus, Director of the Miami-Dade Police Department, also testified when Ordinance No. 10-01 came up for a final vote and stated that "[A]s a police department, we are absolutely behind it." Id. at 15:4-5.

**115.** This Court, however, also credits the opinion of Dr. Richard McCleary that "[t]he inherent difficulty of studying residence restrictions makes it unlikely … that there will ever be a definitive answer to the effectiveness question [and] [l]acking hard scientific evidence, a legislature must fall back on common sense." Ex. X at 40.

**116.** Notably, the difficulty in studying this issue was not lost on the County Commission. During the final vote on Ordinance No. 05-206, Commissioner Sorenson requested "a report of this month's detailing, what activities have occurred, what enforcement actions have been taken and what's changed as a result of this ordinance in six months." Ex. MM at 78:21-25. And, in response, Chairman Martinez stated the following:

> But let me tell you, we have laws for everything. We have laws for something as simple as running a red light. People still do it and people die. But it keeps thousands of people from not doing it. So, you're not going to get that in your stats. You're not going to get what it deterred, you're not going to get the child who maybe did not get raped or killed or anything at all, you're not going to get it. Because you never know the effect of deterrence. Commissioner Moss loves having a police car in the neighborhood, same as other people. … You don't have the stats on maybe what burglaries did not occur in that neighborhood because that's there. So, don't just hang everything on whatever report you're going to get because it's not going to be a true report, because you're not going to know what you deterred. You're not going to know, you never will.

Id. at 79:8-80:1.

**117.** Considering the devastating and potentially lifetime damage that even one new incident of sexual abuse can cause its victim, this Court agrees.

**Conclusions of Law**

**118.** All that remains in this matter is one pair of related claims: a facial challenge under the ex post facto clause of the U.S. and Florida Constitutions.

**119.** As explained by the Supreme Court, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See also City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 790 ("[O]ur tradition has been to discourage facial challenges, and rather, to entertain constitutional attacks on local laws only as they are applied to litigants.").

**120.** The Supreme Court in *Smith v. Doe* outlined the framework for analyzing such claims:

> We must first ascertain whether the legislature meant the statute to establish 'civil' proceedings. If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'

538 U.S. 84, 92-96 (2003) (internal quotations and citations omitted).

## I. <u>Miami-Dade County's Intent was Non-Punitive</u>

**121.** The first step in evaluating an ex post facto challenge under *Smith* is to determine whether the law at issue was intended to be a civil regulation or a criminal penalty. *See id*.

**122.** "Whether a statutory scheme is civil or criminal is first of all a question of statutory construction " and, therefore, [w]e consider the statute's text and its structure to determine the legislative objective." *Id*. at 92-93. *See also Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (holding that "[n]othing on the face of the statute suggests that the legislature sought to create anything other than a civil ... scheme designed to protect the public from harm") (emphasis added).

**123.** Because the focus of the analysis should be on the statutory text itself, "considerable deference must be accorded to the intent as the legislature has stated it." *Smith*, 538 U.S. at 93.

**124.** Turning to the text, this Court finds that the legislative intent for the County's residency restriction is expressly provided in the original 2005 ordinance:

> The intent of this Article is to serve the County's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the County, particularly children, by prohibiting [child molesters] from establishing temporary or permanent residence in certain areas where children are known to regularly congregate, to prohibit renting or leasing certain property to [child molesters] if

such property is located where children are known to regularly congregate and to restrict [child molesters'] access to parks and child care facilities.

*See* Ex. A at 6 (codified in MIAMI-DADE COUNTY CODE § 21-278(b)).

**125.** As the Supreme Court held in *Smith*, "where a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment." *Smith,* 538 U.S. at 93-94 (quoting *Flemming v. Nestor,* 363 U.S. 603, 616 (1960) (internal marks omitted).

**126.** Moreover, that non-punitive intent was re-affirmed and enhanced with additional public safety considerations when the County Commission amended the ordinance in 2010. *See* Ex. T at 4-6.

**127.** With such a clear intent evident from the face of the legislation, this Court is convinced that Miami-Dade County intended to enact a non-punitive, civil regulation when it adopted its residency restriction. *Accord Smith*, 538 U.S. at 93 (holding that "an imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate non-punitive governmental objective and has been historically so regarded.") (internal quotation omitted).

**128.** Furthermore, this Court is unpersuaded by Plaintiffs' reliance on isolated statements by certain County Commissioners during the debate on Ordinance No. 05-206 to override the express legislative intent provided in an unanimously-approved ordinance.

**129.** As a general matter, "statements by individual legislators do not reliably reveal what a majority of [the legislature] intended when they voted for the statute." *Bombardier Aerospace Corp. v. United States*, 831 F.3d 268, 277 (5th Cir. 2016). *See Metropolitan Dade County v. Blumenthal*, 675 So.2d 598, 604 (Fla. 3d DCA 1995) ("The circuit court's first legal error was in deciding to review the remarks of an individual commissioner, rather than reviewing the written Resolution passed by the Commission. It is axiomatic that the County Commission speaks through its written Resolution."); *City of Miami Beach v. Schauer*, 104 So. 2d 129, 131 (Fla. 3d DCA 1958).

**130.** But Plaintiffs reliance on these statements is further misplaced because (1) the cited testimony was taken largely out of context as explained in D.E. 141 at 3-4 and (2) Ordinance No. 05-206 was approved unanimously thereby negating the relevance of any single Commissioner's private intent.

131. This Court finds that Plaintiffs' argument is "a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017).

132. Instead, this Court holds that "what [the legislature] ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *Id*. at 942.

133. Accordingly, this Court finds that the County Commission did not intend to punish, it intended to "promote, protect, and improve the health, safety and welfare of the citizens of the County, particularly children… ." MIAMI-DADE COUNTY CODE 21-278(b).

## II. Background on *Smith* Factors

134. Because this Court has found that the County Commission intended for the residency restriction to be civil in nature, it must now decide whether the ordinance is "so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Smith*, 538 U.S. at 92.

135. In making that determination, the Supreme Court in *Smith* articulated five factors to consider: (1) whether the civil regulation involves an affirmative disability or restraint; (2) whether the civil regulation has historically been regarded as a punishment; (3) whether the civil regulation's operation will promote the traditional aims of punishment—retribution and deterrence; (4) whether the civil regulation has a rational connection to an alternative, nonpunitive purpose; and (5) whether the civil regulation appears excessive in relation to the alternative purpose assigned. *Id*. at 97 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)).

136. Although Plaintiffs have also asserted a state-based ex post facto challenge, the Florida Supreme Court has expressly adopted this same multi-factor balancing test for analyzing ex post facto claims under the Florida Constitution, *see Lescher v. Fla. Dep't of Highway Safety and Motor Vehicles*, 985 So.2d 1078, 1081-83 (Fla. 2008). *See also Westerheide v. State*, 83 1 So. 2d 93, 104 (Fla. 2002) (noting that "the Florida [ex post facto clause is] almost identical in wording to that of the federal constitution," and "this Court has not construed [the ex post facto provision] in a manner different from its federal counterpart."

137. Additionally, in the Revised Panel Opinion that prompted the remand of this action, the Eleventh Circuit also held that "[w]e evaluate both the federal and state ex post facto challenges under *Smith*." *Doe v. Miami-Dade County*, 846 F.3d 1180, 1183 n.2 (11th Cir. 2017).

**138.**  Thus, this Court will rely on the same analysis to explain why judgment should be entered in Miami-Dade County's favor on both remaining claims.

**139.**  When analyzing these factors, the Supreme Court has directed that "*only the clearest proof* will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (emphasis added) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) and *Hudson v. United States*, 522 U.S. 93, 100 (1997)). *See also United States v. W.B.H.*, 664 F.3d 848, 855 (2011) ("We take the [Supreme] Court at its word: some evidence will not do; substantial evidence will not do; and a preponderance of the evidence will not do. '[O]nly the clearest proof' will do.").

**140.**  It is under this framework that many federal courts, including the Seventh, Eighth, and Tenth Circuit, have upheld statutes that imposed residency restrictions on sexual offenders similar to those imposed by Miami-Dade County's ordinance against an ex post facto challenge. *See Vasquez v. Foxx,* ___ F.3d ___, 2018 WL 3372403 (7th Cir. July 11, 2018)*; Doe v. Miller*, 405 F.3d 700, 718-23 (8th Cir. 2005); *Weems v. Little Rock Police Dept.*, 453 F.3d 1010 (8th Cir. 2006); *Shaw v. Patton*, 823 F.3d 556 (10th Cir. 2016). *See also Wallace v. New York*, 40 F. Supp. 3d 278 (E.D.N.Y. 2014); *McGuire v. Strange*, 83 F. Supp. 3d 1231 (M.D. Ala. 2015). And, for the same reasons expressed in the persuasive analysis in those decisions, this Court finds that Miami-Dade County's residency restriction is a civil remedy rather than an ex post facto criminal penalty.

## III.  The Residency Restriction Has a Rational Connection[7] to a Non-Punitive Purposes

**141.**  Though the *Smith* factors are "neither exhaustive nor dispositive," the Supreme Court noted that the "nonpunitive purpose" consideration is "a most significant factor in our determination." 538 U.S. at 102 (citations, punctuation omitted).

**142.**  Here, the County's residency restriction has an indisputable non-punitive purpose of protecting children by diminishing the risk that they will be victims of repeat sexual offenses. In fact, in *Ferber*, 458 U.S. at 757, the U.S. Supreme Court recognized this purpose as "a government objective of surpassing importance."

---

[7]  Contrary to Plaintiffs' contention in the Pre-Trial Stipulation, the rational basis test is the same under both the U.S. and Florida Constitutions. *See Silvio Membrano and Fla. Ass'n of Vendors, Inc. v. City of Hialeah*, 188 So.3d 13 (3d DCA 2016).

**143.** This Court recognizes that the importance of that public safety concern cannot be understated. "Long-term studies show that sexual abuse is 'grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or human society can tolerate." *Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) (Alito, J., dissenting) (quoting C. Bagley & K. King, *Child Sexual Abuse: The Search for Healing* 2 (1990)).

**144.** In addition to these justified concerns for child safety, Miami-Dade County is equally entitled to have well-founded fears about the particular risk presented by child molesters. *See McKune v. Lile,* 536 U.S. 24, 33 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *Smith*, 538 U.S. at 103 (noting "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class," and that "[t]he risk of recidivism posed by sex offenders is frightening and high.") (quotation marks omitted). *See supra* at ¶ 88-98.

**145.** Given both the concern for child safety and the fear of offender risk, it is certainly rational for Miami-Dade County to decide that (1) prohibiting child molesters from living within 2,500 feet of schools will reduce the incidental contact that child molesters have with children and (2) reducing the amount of incidental contact will decrease the opportunity for child molesters to commit new sexual offenses against children. *See Weems*, 453 F.3d at 1015 ("[W]e believe that a residency restriction designed to reduce proximity between the most dangerous offenders and locations frequented by children is within the range of rational policy options available to a [local government] charged with protecting the health and welfare of its citizens"); *Doe v. Baker*, No. 1:05-cv-2265, 2006 WL 905368 at *5 (N.D. Ga. Apr. 5, 2006) ("Prohibiting a sex offender from living near a school or daycare is certainly an appropriate step in achieving the ultimate goal of protecting children."); *Shaw*, 823 F.3d at 574 ("[R]esidency restrictions are rationally designed to reduce sex offenders' temptations and opportunities to re-offend.").

**146.** This Court also finds that the rational connection between policy and purpose is further strengthened by the record evidence noted in the Findings of Fact. *See supra* ¶¶ 85-100.

**147.** For example, Walker (2001) found evidentiary support for "the argument that [child molesters] are choosing to live in areas where there are concentrations of potential victims" and "[p]art of the variation in the residency patterns of [child molesters] … is no doubt attributable to them putting themselves in close proximity to potential targets, perhaps in hopes that their routine activities will overlap with the routine activities of potential victims." *Id*. at ¶ 91.

**148.**   Additionally, survey data from Page (2011) revealed that, among a sample of adult sexual offenders, 28.1% admitted that they were more able to manage risk factors because they cannot live near a school/day care, 31.6% admitted that residence restrictions were effective in limiting their access to children, 22.2% thought that residence restrictions helped prevent them from reoffending, and 35.9% thought that residence restrictions help protect children from sexual offenders. *Id*.

**149.**   And John Doe #6 also stated that one of the techniques that he has learned in sex offender treatment is to not put himself in situations where he can get urges towards children and this includes staying away from schools. Ex. SS at 113:10-17 (JOHN DOE #6: "Like if I walk by a school the only purpose I'm going to walk by a school is to walk by a school to get to where I'm trying to go. I'm not going to let my mind wander, 'Oh, Geez I wonder what's going on in this school.").

**150.**   This Court also holds that there is a rational connection between the selected distance of 2,500 feet and the purpose of child safety.

   **a.**   First, 2,500 feet is less than the distance that the State Board of Education has determined constitutes a reasonable walking distance from a school and, therefore, Miami-Dade County Public Schools does not provide bus transportation for students living within that distance of a school. *See supra* at ¶ 100.

   **b.**   Second, when Miami-Dade County is planning infrastructure improvements to make it safer and easier for children to walk or bicycle to and from school, its primary focus is on the area within 0.5 miles (or approximately 2,500 feet) from the school because it reasons that the highest concentration of students who walk or bicycle to school will come from that distance. *Id*.

   **c.**   Third, state and local laws had already prohibited certain venues from being located within a 2,500 of a school. *See* Fla. Stat. 847.0134; MIAMI-DADE COUNTY CODE § 33-150.

**151.**  Plaintiffs, however, argue that the residency restriction does not achieve its stated purpose because "the residency restrictions only dictate where a former offender sleeps at night, when children are not at school, but it does not limit where a former offender goes during the day

when children attend school." D.E. 138 at 16.[8] This argument concerns the residency restriction's effectiveness, not its rational connections to a nonpunitive purpose, and the Supreme Court made clear that "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the non-punitive aim it seeks to advance." *Smith*, 538 U.S. at 103.

152.   Similarly, Plaintiffs allege that "the efficacy of the Ordinance's residency restrictions is particularly suspect." D.E. 90 at ¶ 109. However, under the framework of limited review established in *Smith*, it is not this Court's role to evaluate the efficacy of a law enacted by the elected political representatives of Miami-Dade County.

153.   Rather, this Court will follow *Smith* and limit its inquiry to simply deciding whether the ordinance's non-punitive purpose is "a sham or mere pretext." 538 U.S. at 103 (quoting *Hendricks*, 521 U.S. at 371 (Kennedy, J., concurring)). That hurdle is one that Miami-Dade County's residency restriction easily clears. *See supra* at ¶ 85-100. *Accord Smith*, 538 U.S. at 93 (holding that "an imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate non-punitive governmental objective and have been historically so regarded."); *Ferber*, 458 U.S. at 757.

154.   Consequently, this Court finds that this factor weighs in favor of Miami-Dade County.

## IV. The Residency Restriction is Not Excessive in Relation to its Public Safety Goal

155.   "The excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem is seeks to remedy." *Smith*, 538 U.S. at 105. Instead, "the question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id*. (emphasis added).

156.   Based upon both precedent and the factual record, Miami-Dade County's policy is clearly reasonable.

---

[8] Other courts have rejected similar arguments. *See, e.g., McGuire v. Strange*, 83 F.Supp.3d 1231, 1265 (M.D. Ala. 2015) (finding that "the restrictions limit the potential for an offender to be alone in an area that could conceal criminal conduct. Living alone … could rationally be considered by the Legislature as providing the potential for periods of unnoticed activity.). In addition, given John Doe #6's statement that he tries not to put himself in situations where he can get urges toward children and that this includes "staying away from … schools" so as to not "let [his] mind wander," Ex. SS at 113:10-17, this Court finds that it would be rational for the County to ask: How much easier is it to let your "mind wander" if you happen to reside within close proximity of a school?

**157.** First, the legislative findings in Ordinance No. 01-01 explicitly state that the County Commission preempted the more restrictive municipal ordinances to "balance[e] the interests of people impacted by the residency restriction ordinances … while still providing protections over and above the protection provided by State law." Ex. T. And, in that vein, the County Commission determined that the County's restriction "which prohibits [child molesters] from living within 2,500 feet of schools only," "strikes the proper balance between protecting children around the crucial and vulnerable area of schools while still leaving available residential housing units in which [child molesters] can find housing." *Id*. That evinces a clear desire to implement reasonable regulation and is hardly the type of action that a local government intending to act excessively would take.

**158.** Second, the County included a grandfather provision in its residency restrictions thereby making it "less disabling than other state laws that have required offenders to relocate if they live in an area that has been compliant but became non-compliant because of an intervening opening of a nearby school, playground, park, or child care center." *Shaw*, 823 F.3d at 570 (citing to other state laws imposing stricter residency restrictions). *See also Wallace*, 40 F. Supp. 3d at 326 (noting that a "grandfather clause" mitigated "any excessiveness relating to the lifetime application of these restrictions"). And, by only limiting its residency restrictions to schools, Miami-Dade County focused its concern on a vulnerable location where large amounts of children congregate, a fair amount of whom may walk home unaccompanied by an adult.

**159.** Third, Plaintiffs take issue with the fact that the County's "residency restriction applies for life, without regard to an individual's risk of recidivism over time." D.E. 90 at ¶ 79. As an initial matter, however, *Smith* explicitly held that "[t]he Ex Post Facto Clause does not preclude a State from making categorical judgments that convictions of specified crimes should entail particular regulatory consequences." 538 U.S. at 103-04 (noting that the Supreme Court "has upheld against ex post facto challenges laws imposing regulatory burdens on individuals convicting of crimes without any corresponding risk assessment"). And, even more specifically as to sexual offenders, *Smith* held that "the [government's] determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause." *Id*.

**160.** But, even if those holdings were not dispositive, the County's policy decision is reasonable in light of the record. Prentky (1997), for example, found that "[c]ontrary to

conventional wisdom, most reoffenses do not occur within the first several years after release; child molesters in this sample reoffended as late as 20 years following release." Ex. H at 22. *See also* Ex. K at 20  (findings "suggest[] that sexual offending behavior remains a significant problem throughout the sex offenders' adult lives"); H.R. CONF. REP. 108-66 at 49-50 (2003) (noting concern by Federal judges and prosecutors that the criminal conduct "for the perpetrators of child sexual abuse … may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison"); Ex. Y at 40:10-15 (recognizing that pedophilia is a disorder that can persist for life).

**161.**   Given this evidence, it is reasonable for Miami-Dade County to have concerns about the potential lifetime recidivism risk that child molesters pose to young children.

**162.**   Moreover, Plaintiffs' emphasis on individualized risk ignores the narrow tailoring done by Miami-Dade County on the front end to have its residency restriction only apply to individuals who committed certain sexual offenses against certain victims—specifically those who present the greatest danger to children.

**163.**   Unlike residency restrictions in other jurisdiction, Miami-Dade County does not subject every registered sexual offender to a residency restriction. *See, e.g., Wallace*, 40 F.Supp.3d at 326 (citing cases upholding residency restrictions that applied to any sexual offender). Instead, Miami-Dade County only applies its residency restriction to an individual convicted of one of five enumerated sexual offenses where the victim was a minor aged 15 or younger. *See* MIAMI-DADE COUNTY CODE § 21-281(a).

**164.**   If the intent of Miami-Dade County's residency restriction is to protect children from being victims of sexual abuse—and this Court finds that it is—then this narrow category of individuals subject to the restriction is clearly reasonable. *See* Ex. W at 268:23-25 ("The second rule of psychology is the best predictor of future behavior is past behavior"); *Smith*, 538 U.S. at 103 ("[A government] could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism"); *Wallace*, 40 F. Supp. 3d at 32l (noting that a conviction of a sexual offenses in which the victim was a minor "demonstrates that the offender is capable of harming children and, thus, poses precisely the threat that these restrictions seek to neutralize"). *See also id.* at 326 (citing cases upholding residency restrictions that did not include any individualized determination of risk and that, in many cases, applied to any offender).

**165.**  Furthermore, Miami-Dade County's reliance on a prior conviction for a sexual offense against a minor victim aged 15 years or younger is even more reasonable in light of the fact that Dr. Harris, Plaintiffs' own expert witness, acknowledges that "[t]here is no risk assessment tool in common usage or that has come to any sort of prominence in the relevant academic literature that is specifically designed to measure recidivism risk for sex offenses against children." Ex. W at 265:19-267:6.

**166.**  Similarly, the predictive limitations and reliability concerns regarding risk assessment tools like the Static-99 discussed *supra* at ¶¶ 109-110, render Miami-Dade County's "determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness" reasonable, *Smith*, 538 U.S. at 103.

**167.**  In the absence of an assessment tool that can offer more than a "moderate" ability to predict recidivism, Miami-Dade County is entitled to err on the side of caution, particularly in light of the striking phenomenon of under-reporting in sexual assault cases.

**168.**  This Court finds that the County's residency restriction is reasonable in light of its stated intent of promoting child safety and, therefore, this factor weighs in favor of Miami-Dade County.

## V.  <u>The Residency Restriction is Not an Affirmative Disability or Restraint</u>

**169.**  When analyzing whether the County's ordinance is an affirmative disability or restraint, courts are "to inquire how the effects of the Act are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Smith*, 538 U.S. at 99-100.

**170.**  The disability or restraint imposed by the Book Ordinance is indisputably less severe than imprisonment, which the Supreme Court has called "the paradigmatic affirmative disability or restraint." *Id*.

**171.**  Unlike a prisoner, a convicted sex offender subject to the Book Ordinance's residency requirement may seek employment, move freely throughout Miami-Dade County, establish a residence at any location not within 2,500 feet of a school, and remain in an existing residence pursuant to the ordinance's "grandfather clause." MIAMI-DADE COUNTY CODE §§ 21-281(a) & 21-282(1). *See also Wallace*, 40 F. Supp. 3d at 317 ("Although sex offenders to whom these restrictions apply may be less free than the average person to live or even travel where they want, these restrictions are not the equivalent of imprisonment, and the offenders are not akin to prisoners, without any freedom of movement.").

**172.** Instead, the residency restriction only imposes a restriction on where a registered sexual offender or predator can establish a *new* residence. Ex. A at 9. Under the grandfather provision, all child molesters were entitled to remain at their existing residence when the ordinance went into effect. *See id*. And all child molesters who establish a new compliant residence after the ordinance's enactment are also permitted to stay at that residence even if a new school is built nearby. *See id*. at 10.

**173.** By virtue of this grandfather provision, this Court finds that Miami-Dade County's residency restrictions are also "less disabling than other state laws that have required offenders to relocate if they live in an area that has been compliant but became non-compliant because of an intervening opening of a nearby school, playground, park, or child care center."[9] *Shaw*, 823 F.3d at 570 (citing to other state laws imposing stricter residency restrictions).

**174.** In fact, the relevant Findings of Fact chronicle how John Doe #4 and #6 were beneficiaries of this very exemption and lived in residential housing pursuant to the grandfather provision for many years after the ordinance was in effect. *See supra* at ¶¶ 42-60.

**175.** This history, coupled with the fact that there were approximately 617 offenders and predators who were grandfathered in under this exemption in August 2008, Ex. S, leads this Court to find that the residency restriction as felt by those subject to it is not so disabling that its effects are punitive.

**176.** Although Plaintiffs have alleged that the residency restriction "has directly caused [their] homelessness by severely restricting [their] housing options," D.E. 90 at ¶¶ 36, 47, 56, 67, this Court is unpersuaded that the record evidence can show by the clearest proof that Plaintiffs' claimed housing disadvantages "would not have otherwise occurred." *Smith*, 538 U.S. at 100.

**177.** This Court relies on its factual findings in supra at ¶¶ 42-63 to hold that Plaintiffs have not met their burden of establishing that this restriction directly caused their homelessness. *See Wallace*, 40 F. Supp. 3d at 327 (finding "no support for Plaintiffs' allegation that these restrictions directly caused forced or *de facto* homelessness among the County's registered sex offenders").

---

[9] In addition to not requiring child molesters to relocate, the Miami-Dade County residency restriction only applies to schools and does not extend, as in other local ordinances or state laws, to playgrounds, parks, child care centers, bus stops or other locations where children congregate. *See* Ex. Y at 38:12-39:4.

**178.** Instead, Plaintiffs' homelessness, by their own admission, was primarily caused by other factors such as loss of roommates, a lack of income, marital separation, landlords unwilling to renew leases, lack of diligence, mandates from probation officers, and imposing limitations on housing beyond those provided for in the ordinance. *See supra* at ¶¶ 42-63.

**179.** Additionally, with respect to this factor, Plaintiffs devoted considerable attention in their Response to the Motion for Summary Judgment, D.E. 138, to the Sixth Circuit's holding in *Doe v. Snyder*, 834 F.3d 696 (6th Cir. 2016). However, *Snyder* contains some critical distinguishing points that bear mention: (1) the plaintiffs in *Snyder* challenged a comprehensive scheme of Michigan sex offender laws for which the residency restriction was but one component; this case presents an isolated challenge to the County's residency restriction; (2) the challenged laws in *Snyder* included similar distance restrictions on where sex offenders could work or loiter; no such restrictions were imposed here; (3) an individual could be subject to the restrictions in *Snyder* for non-sexual offenses[10]; the County has limited its qualifying offenses to only five sexual offenses; and (4) the plaintiffs in Snyder asserted an as-applied challenge; Plaintiffs here have asserted a facial challenge, which is subject to a higher burden of proof. *See generally id.* at 697-706.

**180.** Lastly, this Court notes two factors that weigh against a finding of affirmative disability or restraint.

   **a.** First, Miami-Dade County is larger than the states of Rhode Island and Delaware, and contains extensive urban, suburban, and rural neighborhoods. D.E. 60 at 12. Yet, Plaintiffs' testimony establishes that their housing search has not expanded to the full reaches of the County. But, even with a smaller total area, John Does #5 and #7 admit that they have been able to locate compliant housing that fell through for reasons other than the residency restriction.

   **b.** Second, this Court credited the estimate provided by Joshua Brashears that there are approximately 124,694 residential units in Miami-Dade County that lie outside the 2,500 foot buffer zone. That number vastly exceeds the total number of registered sexual offenders in Miami-Dade County.

**181.** In light of these facts, this Court holds that this factor weighs in Miami-Dade County's favor.

---

[10]  For example, the Sixth Circuit expressly noted that "Doe # 1 … is on the registry because of a nonsexual kidnapping offense arising out of a 1990 robbery of a McDonald's." *Id.* at 702.

44

## VI.   The Residency Restriction Has Not Been Historically Regarded as Punishment

**182.**   When analyzing this factor, the Supreme Court has instructed that "[a] historical survey can be useful because a State that decides to punish an individual is likely to select a means deemed punitive in our tradition, so that the public will recognize it as such." *Smith*, 538 U.S. at 97.

**183.**   In this case, Miami-Dade County first enacted its residency restriction in 2005. Ex. A. At that time, residency restrictions were "relatively new and somewhat unique", *Miller*, 405 F.3d at 720, and Miami-Dade County was "part of essentially the first wave of these laws going into effect." Ex. Y at 62:1-4.

**184.**   As recognized by the Supreme Court, the fact that residency restrictions, generally, were "of fairly recent origin" at the time of the Ordinance No. 05-206's enactment "suggests that the [ordinance] was not meant as a punitive measure or, at least it did not involve a traditional means of punishing." *Smith*, 538 U.S. at 97.

**185.**   Notwithstanding this fact, Plaintiffs have previously contended that the County's residency restriction is akin "to the historical criminal punishment of banishment and probation." D.E. 60 at 13. This historical analogy, however, is simply erroneous based upon the plain language of the ordinance and the factual record.

**186.**   Banishment, under historic common law, "entailed the inability to ever return to the place from which an individual had been banished." *Miller*, 405 F.3d at 719; *Shaw*, 823 F.3d at 565 ("The common feature of banishment, throughout the ages, has been the complete expulsion of an offender from a community.").

**187.**   The County's residency restriction, on the other hand, provides no comparable degree of expulsion from the community. By its very terms, the County's residency restriction provides no limitation on where child molesters may travel or work within Miami-Dade County. Ex. A at 10.

**188.**   And, even with respect to residences, child molesters are free to live where they choose as long as it is not within 2,500 feet of a school. *Accord Vasquez*, 895 F.3d at 521 ("The Illinois residency statute merely keeps child sex offenders from living in very close proximity to places where children are likely to congregate; it does not force them to leave their communities."); *Miller*, 405 F.3d at 719 ("Unlike banishment, [Iowa's residency restriction] restricts only where offenders may reside.'); *Wallace*, 40 F. Supp. 3d at 316-17 (citations omitted) (holding that New York's residency restrictions "cannot be equated to the historic punishment of banishment,"

because they "do not have the effect of either putting the affected individuals on display for ridicule or 'running them out of town'").

**189.**  Moreover, Plaintiffs' banishment analogy is even further undone by the grandfather provision in the Ordinance and the County's preemption in 2010.

**190.**  Under the grandfather provision, every child molester that committed their sexual offenses prior to the ordinance's enactment was permitted to remain in their existing residence. Ex A at 9. And any child molester who establishes a compliant residence prior to a school being opened nearby is also exempt from the residency restriction. *Id*. at 10. By definition, this provision has the effect of keeping individuals in their current residences in Miami-Dade County—the very opposite of what is intended by banishment.

**191.**  Similarly, the legislative findings made by the County Commission when enacting Ordinance No. 10-01 demonstrate that the County's intent was contrary to any desire to effectively banish sexual offenders from the community. In Ordinance No. 10-01, the County recognized that allowing a patchwork of 24 different municipal ordinances to govern residency restrictions in municipalities tended to leave sexual offenders "almost completely excluded from available housing" in those municipalities.

**192.**  As a result, the County Commission opted to preempt and repeal all relevant municipal ordinances and have the County's 2,500 foot restriction from only schools apply countywide in order to "strike a proper balance between protecting children around the crucial and vulnerable areas of schools *while still leaving available residential units in which sexual offenders can find housing*." Ex. T at 5 (emphasis added).

**193.**  When analyzing this factor, this Court finds that the County's stated intent is a relevant and critical factor because *Smith* counsels that a government "that decides to punish an individual is likely to select a means deemed punitive in our tradition, so that the public will recognize it as such." 538 U.S. at 97.

**194.**  As a result, this Court finds that it defies credulity to suggest that the County chose to repeal more restrictive residency restrictions and create more housing availability for child molesters in an effort to effectively banish them.

**195.**  A similar logic extends to the ordinance's grandfather clause: how would child molesters and the public alike recognize that a provision allowing child molesters to stay in their established residences was intended to serve as banishment?

**196.** Plaintiffs' claim that the residency restriction resembles probation is similarly unpersuasive. The residency restriction imposes no limitations on where offenders can go or where they can work. It also does not subject the offender to broad control, mandatory conditions, supervision, or threat of revocation. It only prevents them from living within close proximity of schools. *See Smith*, 538 U.S. at 101 (noting that a registration and notification scheme was not similar to probation because offenders were "free…to live and work as other citizens, with no supervision."); *Vasquez*, 895 F.3d at 521 ("Although the Illinois residency restrictions limit where sex offenders may live, the statute does not control any other aspect of their lives and thus does not resemble the comprehensive control of probation and supervised release.").

**197.** While the County's residency restriction does not resemble a historical form of punishment, this Court finds that it does bear a far closer relation to other previously discussed federal, state, and local laws that are purely non-punitive in nature. *See supra* at ¶ 100.

**198.** Consequently, this Court holds that the County's residency restriction does not resemble the historical use of banishment or probation, and, as a result, this factor also weighs in the County's favor.

## VII.  The Residency Restriction Does Not Serve a Traditional Aim of Punishment

**199.** When analyzing whether the civil regulation promotes the traditional aims of punishment, "the [Supreme] Court strictly limited the scope of this inquiry, asking only whether the law is retributive." *Vasquez*, 895 F.3d at 522 (citing to *Smith*, 538 U.S. at 102).

**200.** The reason for this limitation is that the other traditional aim of punishment—deterrence—"is not unique to punishment, for any civil regulation likely has some deterrent effect." *Shaw*, 823 F.3d at 570. *Smith*, 538 U.S. at 102 ("Any number of governmental programs might deter crime without imposing punishment.").

**201.** Here, the County's residency restriction has a clear aim to promote deterrence of future crimes against children. However, "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' … would severely undermine the Government's ability to engage in effective regulation. *Hudson*, 522 U.S. at 105. *Accord Miller*, 405 F.3d at 720 (holding that Iowa's residency restriction "could have a deterrent effect, but we do not agree that the deterrent effect provides a strong inference that the restriction is punishment").

202.  Because the County's intent is to "regulat[e] where [child molesters] live and limit[] their access to children in an effort to protect children of the County from sexual abuse," Ex. A at 5, the residency restriction is remedial and not retributive. *See Artway v. Att'y Gen. of State of New Jersey*, 81 F.3d 1235, 1255 (3d Cir. 1996) ("Retribution is vengeance for its own sake. It does not seek to affect future conduct or solve any problem except realizing 'justice.' … Remedial measures, on the other hand, seek to solve a problem, for instance by removing the likely perpetrators of future corruption instead of threatening them….").

203.  Accordingly, this Court finds that this factor weighs in Miami-Dade County's favor. *Accord Vasquez*, 895 F.3d at 522 (finding that "the residency restrictions are so clearly *not* retributive" because "the obvious aim of the statute is to protect children from the danger of recidivism by convicted child sex offenders") (emphasis in original).

## Conclusion

In this case, Plaintiffs have asserted a facial ex post facto challenge to Miami-Dade County's residency restriction. In order to prevail, they must show by **the clearest proof** that **no set of circumstances** exists under which the residency restriction would be valid. For the foregoing reasons, this Court finds that Plaintiffs have not met that heightened burden. Accordingly, judgment is entered in favor of Miami-Dade County.

Dated: October 15, 2018             Respectfully submitted,

                                    ABIGAIL PRICE-WILLIAMS
                                    Miami Dade County Attorney
                                    Stephen P. Clark Center
                                    111 N.W. 1st Street, Suite 2810
                                    Miami, Florida 33128

                                    By: /s/ *Michael B. Valdes*
                                    Michael B. Valdes, Assistant County Attorney
                                    Florida Bar No. 93129
                                    Phone: (305) 375-5151
                                    Fax:    (305) 375-5634
                                    E-Mail: mbv@miamidade.gov

**Certificate of Service**

**I hereby certify** that a true and correct copy of the foregoing was served on October 15, 2018

on all counsel or parties of record in the manner indicated on the Service List below.

*/s/ Michael B. Valdes*

Assistant County Attorney

**Service List**

| Counsel for Plaintiffs | Counsel for Miami-Dade County |
|---|---|
| Daniel B. Tilley and Nancy Abudu<br>ACLUE Foundation of Florida<br>4500 Biscayne Boulevard, Suite 340<br>Miami, FL 33137<br>Telephone: (786) 363-2714<br>Fax: (786) 363-1257<br>E-mail: dtilley@aclufl.org;<br>nabudu@aclufl.org | Michael B. Valdes, Oren Rosenthal, and Bernard Pastor<br>Assistant County Attorney<br>Miami-Dade County Attorney's Office<br>111 N.W. 1st Street, Suite 2810<br>Miami, Florida 33128<br>Telephone: (305) 375-5151<br>Fax: (305) 375-5634<br>Email: mbv@miamidade.gov;<br>orosent@miamidade.gov;<br>pastor@miamidade.gov |
| Brandon J. Buskey and Ezekiel Edwards<br>American Civil Liberties Union Foundation<br>Criminal Law Reform Project<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Telephone: (212) 284-7364<br>Fax: (212) 549-2654<br>E-mail: bbuskey@aclu.org;<br>eedwards@aclu.org | *No service necessary* |
| Jeffrey M. Hearne and Daniel R. Quintian<br>Legal Services of Greater Miami, Inc.<br>4343 W. Flagler Street, Suite 100<br>Miami, Florida 33134<br>Telephone: (305) 576-0080<br>Fax: (305) 573-5800<br>Email: jhearne@legalservicesmiami.org;<br>drowinsky@legalservicesmiami.org | |
| Valerie Jonas<br>Weitzner & Jonas, P.A.<br>1444 Biscayne Blvd., Suite 207<br>Miami, FL 33132<br>E-mail: valeriejonas77@gmail.com<br>*Electronic Service* | |