# ELIMINATE RESIDENCY RESTRICTIONS FOR SEX OFFENDERS

JEFFERY T. WALKER
University of Arkansas, Little Rock

Sometimes legislation is passed based on the support of research or the results of successful programming. More often, however, legislation is passed based on the demands of a constituency group or public outcry. Perhaps the clearest instances of legislation being passed in response to public outcry are laws involving sex offenders. The initial passage of many sex offender laws was in response to high-profile sexual attacks on children. To calm and reassure the public and to mourn the lost children, many of these laws were passed quickly without fully understanding the consequences (Fein, 1995; Freeman-Longo, 1996). Research has determined that many provisions of these laws do little to control reoffending and that many create unintended consequences that may do more harm than good. This article addresses a particular type of sex offender law: residency restrictions. It examines the research that shows problems with residency restrictions. It discusses efforts to repeal sex offender residency restrictions and the rationale behind doing so. It ends with a call to modify residency restriction laws and to create more effective ways of controlling sexual reoffending.

## SEX OFFENDER RESTRICTION LAWS AND RESEARCH

Although California has had provisions for registering sex offenders since the 1950s, the nationwide trend to register, restrict, and attempt to control the movement and actions of sex offenders began to take shape in the early 1990s. In response to the abduction and murder of an 11-year-old Minnesota boy, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act (1994) was included as a provision in the Violent Crime Control and Law Enforcement Act of 1994. This act required all states to create a registration system for sex offenders. Megan's Law was passed in 1996 as an amendment to the Jacob Wetterling Act to require public notification of the presence of sex offenders. This law was passed in response to the kidnapping and murder of Megan Kanka by a person twice convicted of sexual assault and who was living with two other sex offenders across the street from the Kanka family. Passage of Megan's Law, along with other requirements of the Jacob Wetterling Act, prompted all 50 states to pass laws requiring registration and notification of sex offenders (Beckman, 1998). Soon, laws began to move beyond registration and notification into other measures meant to control



R

the behavior of sex offenders. These restrictions included where sex offenders could live.

A forerunner of sex offender residency restrictions was the implementation of drug-free zones in the 1970s and 1980s. In 1970, Congress enacted a "school zone" law that increased penalties for drug offenses that were committed in areas surrounding schools and other public locations. By the mid-1980s, state governments began to follow suit. These laws were extended in the 1990s to include weapons possession or other offenses in areas surrounding schools. By 2000, all 50 states had passed laws creating drug-free and gun-free zones surrounding schools.

The first residency restrictions for sex offenders were passed by the Alabama legislature in 1996. The law provided, among other things, that "unless otherwise exempted by law, no adult criminal sex offender shall establish a residence or any other living accommodation or accept employment within 2,000 feet of the property on which any school or child care facility is located" (Alabama Code 15-20-26). By 2005, 14 states had adopted similar laws and many others were considering adopting residency restrictions for sex offenders (Levenson and Cotter, 2005). Some states increased the area of restriction to 2000 feet, and others added prohibited zones, such as playgrounds, parks, and bus stops.

Early research concerning the efficacy of sex offender laws showed limited support. Walker et al. (2001) found 48% of registered sex offenders with child victims lived within 1000 feet of day cares, parks, and schools, whereas only 26% of registered sex offenders with adult victims lived in the same zones. Although this study did not address recidivism, it argued that, based on the principles of Routine Activities Theory, child sex offenders may be placing themselves in a position to have access to potential targets. The Walker study was supported by Maghelal and Olivares (2005) who found over 55% of all sex offenders in one county in Texas lived within 1000 feet of a school. A 2000 Iowa study of the influence of sex offender registration on recidivism found a slight decrease in violations after the registry was established. That study examined a 4-year follow-up period for a group of sex offenders subject to registration and a group of sex offenders who preceded registration. Only 3% of the registry sample reoffended during the follow-up period, whereas 3.5% of the preregistry sample reoffended.

As more data became available about residency restrictions, research increasingly found little or no influence on recidivism and found increased negative consequences of these laws. A 2005 study in Colorado found that child sex offenders who recidivated while under parole supervision were scattered throughout the study area and did not live closer to child-concentrated areas than those who did not recidivate (Colorado Department

of Public Safety, 2004). Not only did a 2003 Minnesota study find no relationship between proximity to schools or parks and recidivism, but also interviews with sex offenders revealed that they were more likely to travel to other neighborhoods to find potential victims because of a reduced chance of being recognized (Minnesota Department of Correction, 2003).

Negative consequences were also found concerning residency restrictions, including clustering of sex offenders (one hotel in Iowa had 23 sex offenders as residents because it was one of the few places they could live), homelessness, transience of sex offenders (decreasing the ability of authorities to determine their whereabouts) (Levenson and Cotter, 2005), as well as vigilantism against sex offenders (Edwards and Hensley, 2001). These consequences were because of the limited areas in which sex offenders could legally reside. Zandbergen and Hart (2006) found that residency restrictions around schools and day cares left only 64% of Orange County, Florida available for sex offenders to live. Including bus stops in the restricted zones left less than 5% of the county for sex offenders to live. Beyond the negative consequences on sex offenders, Linden and Rockoff (2006) found that housing prices in areas immediately adjacent to where sex offenders lived dropped by an average of $5,500 after the offenders moved into the area.

By 2005, some researchers, policy-making organizations, and governmental agencies began to question the efficacy of sex offender residency restrictions. In perhaps the strongest statement concerning this issue, the Iowa County Attorneys Association began a campaign to repeal sex offender residency restrictions (Iowa County Attorneys Association, 2006). Similarly, the Colorado Sex Offender Management Board spoke out against residency restrictions. Even the director of the Jacob Wetterling Foundation indicated that residency restrictions were ineffective. She stated that residency restrictions are often “feel good quick fixes” that do not make the best use of community resources and create a false sense of security. In 2007, the Kansas Sex Offender Policy Board brought together a nationwide group of researchers to address the value of residency restrictions for sex offenders in Kansas. The outcome of that meeting was a decision to advise the Kansas legislature to forego implementing residency restrictions and to consider other means to protect the community from sexual predators. Some suggestions from that meeting are addressed below as a current state of thinking about residency restrictions for sex offenders.

## POLICY IMPLICATIONS

Although conflicting research exists about the efficacy of registration and notification as a means of reducing sex offender recidivism, the totality of the evidence at this point indicates that residency restrictions are not effective. The findings of residency restriction research and the testimony of those individuals tasked with carrying out sex offender laws indicate that residency restrictions should be eliminated and replaced with more effective means of reducing sex offender recidivism.

A fundamental problem in reducing offender recidivism is that conflicting research exists. Early research on child sex offenders (primarily psychological studies) indicated that they could not be cured and that, as an extension, they would be likely to reoffend. Later research, however, found different results. In a meta-analysis of sex offender recidivism studies, Hanson and Bussiere (1998) found that recidivism rates varied widely, but the average across all studies was only 13.4%. This finding lead Hanson and Bussiere (1998) to conclude that "the present findings contradict the popular view that sexual offenders inevitably re-offend. Only a minority of the total sample . . . committed a new sexual offense." Other studies also found that the recidivism rate for sex offenders is less than that for other types of offenders (see, for example, Hanson et al., 1995; Langan and Levin, 2002).

An additional complication of efforts to reduce recidivism is that most sex offenses are not the sensationalized type where a child is kidnapped, sexually assaulted, and murdered by a stranger. Two studies (Greenfeld, 1997; National Institute of Justice, 2006) found that most sex offenses occur in the home and/or are committed by people who have legitimate access to the children. Residency restrictions would not influence this type of victimization.

In a study showing the difficulty in addressing sex offender recidivism, Walker and Ervin-McLarty (2000) found that a sharp division exists between "chronic offenders" and other sex offenders. In that study, 73% of the offenders were first-time sex offenders. Additionally, offenders with fewer than seven sex offenses did not exhibit a pattern of sex offenses, and most did not commit a sex offense as their first offense. These offenders seemed to commit sex offenses as a part of a general pattern of criminal behavior. For offenders with more than seven sex offenses, most had a sex offense as their first offense, and over 70% of all offenses committed by this group were sex offenses. Also, many sex crimes against children were noted in these offenders. Harris et al. (2002) also found conflicting results based on the type of offender. In this study, incest cases involving fathers and daughters resulted in a very small rate of recidivism, whereas male offenders sexually abusing boys were much more likely to reoffend.

What may be taken from research on sex offenders is that they are not a homogeneous group, as previously thought. Some sex offenders are more likely to recidivate. Instead of targeting this group of child sex offenders, most laws attempt to create a panacea for all sex offenders. It would be more viable to target specific offenders who are most likely to be affected: typically those offenders with child victims (especially boys) and those for whom a psychological assessment indicates a high risk for reoffending.

To properly supervise, monitor, or control sex offenders, it is perhaps more important to control their access to children rather than to control where they live. Current residency restrictions easily could create a situation where a person would be prevented from living in an adult-only apartment complex because it is located close to a day care center but be allowed to live in a different apartment complex with many children. Instead of applying broad restrictions on residence, logically it is more important to restrict sex offender access to children. Following the original intent of drug-free zones, it would seem to be more effective to make safe zones from which the highest-risk offenders are prohibited entry (such as playgrounds, schools, and day cares) rather than to restrict where they live. This action also should conserve resources because the community only would have to monitor and supervise known locations rather than attempt to monitor and supervise a group of people who do not always wish for their whereabouts or activities to be known.

In addition to providing protection for potential victims, the policies that are implemented should be the ones most likely to be effective, given a limited amount of resources. These policies should involve treatment and supervision for the group of people most likely to reoffend. Current laws and policies are strong on restriction and weak on contact with and supervision of sex offenders. Sex offender laws typically provide no resources to implement them. The legislature passes the laws and looks tough on crime, but the burden is on sex offenders to register and to stay out of restricted areas. Unless resources are provided to the police and to probation/parole officers, often nothing in sex offender laws provides supervision or monitoring for the offenders. True supervision and a more realistic possibility of public safety more likely could be achieved through proper classification and psychological assessment of offenders (limiting offenders subject to supervision to those at greatest risk to reoffend), continued monitoring and treatment, and closer supervision by probation/parole officers.

As with most crimes, the answer to reducing recidivism is both nebulous and controversial. It is difficult to know what policies are most likely to be effective, and it is even less likely that resources exist to allow the policies to be implemented at a level of individuality sufficient to cover such a

diverse array of people as sex offenders. Conflicting evidence exists concerning the potential for registration and notification to reduce recidivism in sex offenders. Most researchers and many policy makers agree, however, that residency restrictions for sex offenders are not effective and create negative consequences. States that have not enacted such legislation should not consider doing so, and states that have enacted such legislation should consider repealing it.

## REFERENCES

Beckman, Marlene
1998 Panel Introduction. National Conference on Sex Offender Registries. Washington, D.C.: Bureau of Justice Statistics.

Colorado Department of Public Safety
2004 Report on Safety Issues Raised by Living Arrangements for and Location of Sex Offenders in the Community. Denver, Colo.: Sex Offender Management Board.

Edwards, William and Christopher Hensley
2001 Contextualizing sex offender management legislation and policy: Evaluating the problem of latent consequences in community notification laws. International Journal of Offender Therapy and Comparative Criminology 45:83.

Fein, Bruce
1995 Community self-defense laws are constitutionally sound. ABA Journal 81:38.

Freeman-Longo, Robert E.
1996 Feel good legislation: Prevention or calamity. Child Abuse & Neglect 20:95.

Greenfeld, Lawrence A.
1997 Sex Offenses and Offenders: An Analysis of Data on Rape and Sexual Assault. Washington, D.C.: Bureau of Justice Statistics.

Hanson, R. Karl and Monique T. Bussiere
1998 Predicting relapse: A meta analysis of sexual offender recidivism studies. Journal of Consulting and Clinical Psychology 60:348.

Hanson, R. Karl, Heather Scott, and Richard A. Steffy
1995 A comparison of child molesters and nonsexual criminals: Risk predictors and long-term recidivism. Journal of Research in Crime and Delinquency 32:325.

Harris, Anthony R., Stephen H. Thomas, Gene A. Fisher, and David J. Hirsch
2002 Murder and medicine: The lethality of criminal assault, 1960-1999. Homicide Studies 6:128.

Iowa County Attorneys Association
2006 Statement on Sex Offender Residency Restrictions in Iowa. Available online: http://www.iowa-icaa.com/ICAA_STATEMENTS/Sex_Offender_Residency_Statement_Feb_14_2006_for_website.pdf.

Jacob Wetterling Crimes Against Children & Sexually Violent Offender Registration Act
1994 U.S. Code. Vol. 42, Section 14071.

Langan, Patrick A. and David J. Levin
2002 Recidivism of Prisoners Released in 1994. Washington, D.C.: Bureau of Justice Statistics.

Levenson, Jill. S. and Leo P. Cotter
2005 The impact of sex offender residence restrictions: 1,000 feet from danger or one step from absurd? International Journal of Offender Therapy and Comparative Criminology 49:168.

Linden, Leigh L. and Jonah E. Rockoff
2006 There goes the neighborhood? Estimates of the impact of crime risk on property values from Megan's laws. Social Science Research Network. Available online: http://ssrn.com/abstract=903178.

Maghelal, Praveen and Miriam Olivares
2005 Critical Risk Zones: Violators of Megan's Law. 2005 ESRI User Conference Proceedings, Technical Papers. Unpublished manuscript.

Minnesota Department of Correction
2003 Level Three Sex Offenders Residential Placement Issues. St. Paul, Minn.: Minnesota Department of Correction.

National Institute of Justice
2006 Extent, Nature, and Consequences of Rape Victimization. Findings from the National Violence Against Women Survey. Washington, D.C.: Department of Justice.

Walker, Jeffery T. and Gwen Ervin-McLarty
2000 Sex Offenders in Arkansas. Little Rock, Ark.: Arkansas Crime Information Center.

Walker, Jeffery T., James W. Golden, and Amy VanHouten
2001 The geographic link between sex offenders and potential victims: A routine activities approach. Justice Research and Policy 3:15.

Zandbergen, Paul A. and Timothy C. Hart
2006 Reducing housing options for convicted sex offenders: Investigating the impact of residency restriction laws using GIS. Justice Research and Policy 8:122.

Jeffery T. Walker is a Professor of Criminal Justice and Criminology in the Department of Criminal Justice at the University of Arkansas, Little Rock. Dr. Walker also holds joint appointments with the University of Arkansas, Fayetteville, and the University of Arkansas Medical School. Dr. Walker has written 6 books, over 30 journal articles and book chapters, and 17 technical reports, and he has delivered over 70 professional papers and presentations. He has obtained over $9 million in grants from the U.S. Department of Justice, National Institute of Drug Abuse, and others. His areas of interest are social/environmental factors of crime and the study of nonlinear dynamics as they relate to crime. He is the Immediate Past President of the Academy of Criminal Justice Sciences. Editorial experience includes service as Editor of the *Journal of Criminal Justice Education*, Editor-in-Chief of *Journal of Critical Criminology*, and Editor of *ACJS Today*. Previous publications include articles in the *Journal of Quantitative*

*Criminology*, *Journal of Criminal Justice Education*, and *Journal of Gang Research* and the books *Leading Cases in Law Enforcement* (6th ed.), *Statistics in Criminal Justice and Criminology: Analysis and Interpretation* (2nd ed.), and *Myths in Crime and Justice*.