## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:14-cv-23933-PCH

JOHN DOE #4, JOHN DOE #5,
JOHN DOE #6, and JOHN DOE #7,

      Plaintiffs,

v.

MIAMI-DADE COUNTY, FLORIDA,

      Defendant.

_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, John Does #4–7, homeless registered sex offenders, brought this action against Miami-Dade County ("the County").[1] They assert that a Miami-Dade County ordinance, prohibiting them from residing within 2,500 feet of a school, on its face, violates the ex post facto clauses of the United States and Florida Constitutions. The County raises the statute of limitations as an affirmative defense. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one claim arises under the United States Constitution.

This matter is before the Court for ruling following a bench trial held October 22–26, 2018. The Court heard the testimony of 20 witnesses, reviewed the exhibits admitted into evidence, considered the parties' Joint Pre-Trial Stipulation, Proposed Findings of Fact and Conclusions of Law, amended Proposed Findings of Fact and Conclusions of Law, supplemental briefing, and other pertinent portions of the record. Having considered the evidence and being otherwise duly advised, the Court finds as follows.

---

[1] The Court uses the terms "homeless" and "transient" interchangeably. When sex offenders register their address with law enforcement, they are considered "transient" if they do not have a permanent address.

## I.   BACKGROUND AND PROCEDURAL HISTORY

On November 15, 2005, the County enacted Ordinance No. 05-206 (the "Ordinance"). The Ordinance prohibits an individual convicted as an adult of certain sexual offenses[2] in which the victim is 15 years or younger from residing within 2,500 feet of a school. A school is defined as a "public or private kindergarten, elementary, middle, or secondary (high) school." The stated goal of the Ordinance is "to promote, protect and improve the health, safety and welfare of the citizens of the County, particularly children[.]"

The Ordinance applies retroactively to sexual offenders convicted of covered crimes, even if the crime were committed before the County enacted the Ordinance in 2005. However, the Ordinance contains a "grandfather clause," which provides that the residency restriction does not apply to sexual offenders who: (1) established their residence prior to the enactment of the Ordinance; or (2) established their residence prior to a school opening within 2,500 feet of the residence. Under the Ordinance, anyone who violates the County's residency restriction shall be punished by a fine not to exceed $1,000 or imprisonment in the County jail for not more than 364 days or by both fine and imprisonment.

Originally the Ordinance gave municipalities the option to opt-out of the County's residency restriction and enact their own residency restrictions. By 2010, 24 municipalities in Miami-Dade County enacted ordinances that were more restrictive, prohibiting sex offenders from living within 2,500 feet of various points including schools, daycares, parks, playgrounds, bus stops, and other places where children may congregate. These municipal ordinances effectively reduced and shifted the available compliant housing for sexual offenders to the

---

[2] The sexual offenses covered by the Ordinance include violations of Fla. Stat. § 794.011 (sexual battery); § 800.04 (lewd and lascivious acts on/in presence of persons under age 16); § 827.071 (sexual performance by a child) or § 847.0145 (selling or buying of minors for portrayal in sexually explicit conduct). In 2010, Miami-Dade County added violations of Fla. Stat. § 847.0135(5) (sexual acts transmitted over computer) to the qualifying offenses.

unincorporated areas of the County and to cities that had not yet enacted sexual offender residency restrictions. On January 21, 2010, the County enacted Ordinance No. 10-01, which amended the Ordinance to preempt all of the more restrictive municipal ordinances, applying the County's residency restriction countywide. The Board of County Commissioners found that this measure struck "a proper balance between protecting children around the crucial and vulnerable areas of schools while still leaving available residential units in which sexual offenders can find housing."

On October 23, 2014, former plaintiffs, John Does #1, 2, and 3, and the Florida Action Committee, Inc., filed the initial Complaint, alleging multiple constitutional challenges to the Ordinance. The Complaint was amended on December 20, 2014. On April 3, 2015, this Court dismissed the Amended Complaint for failure to state a cause of action. Plaintiffs appealed. The Eleventh Circuit affirmed in part and reversed in part the ex post facto claim, holding that Does #1 and 3 alleged plausible ex post facto claims. *Doe v. Miami-Dade Cty., Fla.*, 846 F.3d 1180, 1182 (11th Cir. 2017).

On October 5, 2017, Doe #3, along with four new plaintiffs (Does #4–7), filed the Second Amended Complaint, alleging only two counts against the County: facial ex post facto violations under the United States Constitution (Count I) and Florida Constitution (Count II). Subsequently Doe #3 withdrew from the suit, which proceeded as to Does #4–7. The Court denied the County's Motion for Summary Judgment and held a bench trial on October 22–26, 2018.

At the trial, the parties submitted documentary evidence and called numerous witnesses to testify, including expert witnesses. Plaintiffs testified about the Ordinance's impact on their ability to find housing. Plaintiffs called witnesses from the Miami-Dade County Homeless Trust

(the "Homeless Trust") and Citrus Health Network, including Manuel Sarria, Rosa Noriega, Robert Berman, and Paul Imbrone, who testified about their efforts to find compliant housing for registered sex offenders. Raul Fernandez of the Florida Department of Corrections testified about an encampment that developed near NW 71st Street and NW 36th Avenue (the "71st Street Encampment"), which was comprised predominantly of homeless registered sex offenders. Dr. Samir Elmir from the Florida Department of Health testified about the 71st Street Encampment constituting a "sanitary nuisance." Dr. Pedro Greer, an internal medicine physician, testified about the effects of homelessness on health. Dr. Kelly Socia, a criminologist, testified about the number of housing units available outside the residency restricted areas (sometimes referred to as "buffer zones"). Dr. Jill Levenson, a professor of social work, and Dr. Andrew Harris, a psychologist, testified about recidivism rates of sex offenders. Lieutenant Luis Poveda of the Miami-Dade County Police Department, Victoria Mallette of the Homeless Trust, and Ronald Book, Chair of the Homeless Trust Board of Directors, testified for both parties. The County presented Sergeant Rodger Irvine, of the Miami-Dade County Sexual Predator Enforcement Team, who testified about sex offender registration procedures. Dr. Richard McCleary, a criminologist, testified about recidivism rates for sex offenders. Josh Brashears of the Miami-Dade Information Technology Department testified about the number of housing units available outside the buffer zones.

## II.   ISSUES PRESENTED

The parties have stipulated that the issues before the Court are:

1) Whether the County enacted the residency restriction with punitive intent? If the County did not enact the restriction with punitive intent, whether Plaintiffs established by the

"clearest proof" that the punitive effect of the residency restriction overrides the County's legitimate intent to enact a nonpunitive, civil measure?

2) Whether Plaintiffs' claims are barred by the statute of limitations?

## III.   FINDINGS OF FACT

The Court finds the following determinations to be important for analyzing the applicability of the statute of limitations and the merits of Plaintiffs' ex post facto claims: the circumstances of each Plaintiff; the recidivism rate for sex offenders; the effectiveness of the residency restriction; the availability of housing outside of the buffer zones created by the Ordinance; the number of homeless registered sex offenders subject to the Ordinance; and causes of homelessness in Miami-Dade County. In evaluating the evidence presented, the Court is cognizant that if the Ordinance was not enacted with punitive intent, Plaintiffs must establish by the "clearest proof" that the residency restriction's punitive effect overrides the County's civil intent. That is, the Court does not evaluate whether the residency restriction is the optimal way to reduce recidivism by sex offenders against children. Instead, it determines whether Plaintiffs have established by the "clearest proof" that the restriction is punitive.

### A. The Plaintiffs

Plaintiffs are four homeless individuals who were convicted of qualifying sexual offenses that occurred before the Ordinance was enacted in 2005. The pertinent circumstances of each Plaintiff are summarized as follows.

#### 1.  Doe #4

On January 5, 1994, Doe #4 was convicted of lewd and lascivious assault on a minor under the age of 16. He was sentenced to probation for a period of three years. A year later, Doe #4 was found to have violated his probation by failing to submit reports for five months, by

failing to make monthly payments to the State, and by changing his residence without first procuring the consent of his probation officer. As a result of these probation violations, Doe #4 had his probation revoked and was sentenced to prison for a term of four-and-a-half years.

In July 2006, Doe #4 was arrested for failing to register the address where he was residing. From 2006 to 2008, Doe #4 lived in a residence with his wife that was grandfathered under the Ordinance. However, when he and his wife separated, he no longer could afford the lease payments and became homeless. In mid-2010, Doe #4 received housing assistance from the Homeless Trust and was placed in a residence in Homestead with two roommates: his brother, who is also a registered sex offender, and a friend. Doe #4 resided in that home for five years. However, after his brother went back to prison and his roommate moved out, Doe #4 could not afford the rent on his own. In July 2015, he moved to the 71st Street Encampment and remained there until it was closed in May 2018. Doe #4 still does not have a permanent residence.

Doe #4 suffers from schizophrenia and depression. The Social Security Administration declared him disabled in 2009, and he receives Supplemental Security Income of $750 per month, plus $194 per month in food stamps. He is retired and has no other source of income.

2. Doe #5

Doe #5 was convicted in 1994 of nine counts of related sexual offenses: (a) lewd and lascivious assault on a child; and (b) attempted sexual battery on a minor. The victim was 10 years old. He was incarcerated for probation violations from November 1996 until February 2001 and from November 2002 until September 2003.

After his release, Doe #5 was not registering his address with the Miami-Dade Police Department nor communicating with his probation officer as required by probation, so his location was unknown to authorities. Doe #5's last known address was his sister's home;

however, law enforcement's visit to his sister's home revealed that he was not residing at her address. In 2006, he was arrested on a probation warrant and charged with violating state registration requirements for former sexual offenders. After pleading guilty to the registration violation, he was sentenced to eight years in prison, and was incarcerated until March 2014. Upon his release, his probation officer directed him to go to the 71st Street Encampment. He has been transient ever since.

Doe #5 has Parkinson's disease and suffers from significant tremors. He is unemployed. From the time of his release from prison in 2014 until May 2017, his only source of income was food stamps. His current sole source of income is $750 per month in disability benefits. He found one available residence outside the buffer zones that he was going to share with another offender. However, the residence was rented before they could act on it. He has limited his search for available housing to the northern half of Miami-Dade County.

### 3.   Doe #6

In September 2004, Doe #6 pled guilty to one charge of lewd and lascivious molestation of a child less than 12 years of age. He lived in a grandfathered residence in Surfside until around January 2013, when the property manager found out that Doe #6 is a sexual offender and did not renew his lease. After moving out, Doe #6 resided with different friends, but he was advised that these addresses did not comply with the residency restriction when he registered them with the Miami-Dade County Sexual Offender and Predator Unit. He eventually moved to the 71st Street Encampment.

Doe #6 is employed in the culinary field and earns about $30,000 per year. He testified that in attempt to find housing, he walks through neighborhoods that are close to his work or easily accessible by public transportation. He limited his search to residential units that are at

7

least 2,500 feet away from schools, daycare centers, and parks. Although the Ordinance only applies to schools, Doe #6 was, until trial, under a mistaken belief that the Ordinance also applied to daycares and parks.[3] Doe #6 testified that he has not looked for housing in the southern part of the County because it is too far from his work.

    4.   Doe #7

      On June 2, 2009, Doe #7 pled guilty to three pre-2005 sexual offenses of sexual battery and lewd and lascivious molestation on a child between the age of 12–16, and lewd and lascivious molestation on a child under the age of 12. In his plea agreement, Doe #7 acknowledged that he would be subject to the residency restriction in the Ordinance. He was sentenced to eight years in prison and was released in December 2014. Upon his release, Doe #7 stayed at hotels or motels until relocating to the 71st Street Encampment. When the encampment closed, he moved to a new encampment.

      Prior to Doe #7's incarceration, he lived with his parents in an apartment in Miami Beach. By the time he was released from prison in December 2014, the apartment was no longer available to him because his parents had passed away while he was in prison and the apartment had been rented out to someone else. If that apartment had still been available, he could have potentially moved back in after his release.

      In addition, Doe #7's probation officer gave him an address to an apartment that was compliant with the Ordinance. Doe #7 testified that he planned to rent the apartment with a roommate; however, he did not rent it because it was too far from the Special Victims Bureau,

---

[3] While the State of Florida has a residency restriction (Fla. Stat. § 775.215) that prohibits a person convicted of certain sexual offenses from living within 1,000 feet of a school, child care facility, park, or playground, it does not apply to anyone whose qualifying sexual offense occurred prior to the enactment of the statute in October 2004. Thus, the Florida state residency restriction does not apply to Plaintiffs, since their offenses occurred prior to its enactment.

where Doe #7 is required to report in person once a month.[4] Doe #7 further testified about the concern that if the potential roommate were to stop contributing to the rent, Doe #7 would not be able to afford the lease payments on his own. Doe #7 acknowledged that he has been denied housing by potential landlords due to his criminal history.

Doe #7 is in his 70's, uses a wheelchair for mobility, and has an anxiety disorder. His only source of income is food stamps.

**B. Recidivism**

The Ordinance's residency restriction aims to prevent certain sex offenders from reoffending by prohibiting them from living within close proximity to schools. Plaintiffs contend that the Ordinance is ineffective at achieving this goal because there is no evidence that the residency restriction reduces recidivism. The Court finds that Plaintiffs have not established the rate of recidivism for sex offenders, nor have they proven that the Ordinance is ineffective.

1. Rate of Recidivism for Sex Offenders

The recidivism rate for registered sex offenders is subject to much inconclusive debate. For instance, one of Plaintiffs' experts, Dr. Levenson, testified that dozens of studies across North America show that sexual recidivism rates average 5 to 15 percent depending on the sample size and length of follow-up period. Another of Plaintiffs' experts, Dr. Harris, testified that a study found that after 15 years of living in the community, 73 percent of sexual offenders had not been charged with or convicted of another sexual offense—meaning that at least 27 percent had recidivated. The County's expert, Dr. McCleary, testified that the empirical literature does not support any credible, reliable estimate of the recidivism rate for registered sex

---

[4] However, Lieutenant Poveda testified that while transient offenders are required to register once a month, if they find a permanent residence, they only have to register once every three months or once every six months, depending on the nature of their conviction. He also testified that Miami-Dade County offers transportation services to disabled individuals that can be used to get to the registration office.

offenders. As support, Dr. McCleary notes that studies have estimated recidivism rates from as low as zero to as high as 75 percent. The Court finds Dr. McCleary's testimony to be the most objective, persuasive, and informative on this point.

As Dr. McCleary explained, one of the reasons for the disparate recidivism estimates is that studies use different definitions of recidivism, so they are not comparing apples to apples. For example, some studies limit recidivism to "sex offense recidivism," meaning they only count subsequent offenses that are sexual in nature, whereas others use "general recidivism," meaning they include any subsequent crime. More importantly, Drs. Levenson and Harris defined recidivism as a new arrest, conviction, or return to prison after being arrested and sanctioned for a prior offense. Thus, their studies do not take into account subsequent offenses that are not officially reported. Dr. McCleary testified that most sexual victimizations are not reported or recorded either because the victims choose not to report the incident, or because police choose not to record the victimization as a crime incident. In either event, the data on which the various studies rely substantially underestimate the true sexual victimization rate. Criminologists call the difference between the known and true rates the "dark figure." [5] Dr. McCleary noted that "[a]ll of the evidence suggests that the non-reporting rate for sexual crimes is much larger than the non-reporting rates for other crime."

For example, according to the National Crime Victimization survey, 70 percent of sexual victimizations of adult women are unreported. Similarly, Dr. Levenson testified that according to Bureau of Justice Statistics in 2016, only 42 percent of all violent crimes and 23 percent of rapes or sexual assaults were reported to police. Dr. Harris also acknowledged that studies have found that 79 percent of sex offenses go unreported to law enforcement. In fact, one study found that

---

[5] *See, e.g.*, Albert D. Biderman & Albert J. Reiss, Jr., *On Exploring the "Dark Figure" of Crime*, THE ANNALS OF THE AMERICAN ACAD. OF POL. & SOC. SCI., 1967, at 1–15.

"[a] total of 88.3% of offenders would have been considered sex offense recidivists if they had been caught," and that "[t]he child sexual abusers and exhibitionists showed highest rates of recidivism, and almost all reoffended if undetected crimes were included."[6]

The Court finds that the rate of unreported sex crimes involving victims under 16 years old may be even higher than for older victims. Moreover, studies show that children under 16 years old are most likely to be the victims of sexual offenses. For example, a 2000 study from the U.S. Department of Justice's Bureau of Justice Statistics found that "[t]he single age with the greatest proportion of sexual assault victims reported to law enforcement was age 14."[7] The same study found that the risk of being the victim of forcible rape increased dramatically from age 10 to age 14, where it peaked. By age 20, the risk had dropped to less than half the peak 14-year-old rate. And, according to a report issued by the Department of Justice's National Institute of Justice, 86 percent of sexual assaults with victims aged 12–17 went unreported to any authorities, including police, child protective services, or school officials.[8] This is consistent with Dr. Levenson's testimony that child sex abuse reporting to police is often delayed. Based on the high number of sex crimes against children that go unreported, the Court finds that the actual reoffense rate is higher than suggested by the recidivism studies proffered by Plaintiffs.

Drs. Harris and Levenson both criticized the Ordinance for treating all offenders as a single category, rather than individually, because not all offenders are equally likely to reoffend. Dr. Harris testified to the rather unremarkable propositions that one-time sexual offenders are significantly less likely to reoffend sexually than those with more than one previous sexual conviction and offenders over the age of 50 are less likely to reoffend than younger offenders.

---

[6] *See* Ron Langevin et al., *Lifetime Sexual Offender Recidivism: A 25-Year Follow-Up Study*, 46 CANADIAN J. OF CRIMINOLOGY & CRIM. JUST. 531, 547–48 (2004).

[7] *See* Howard N. Snyder, *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics*, BUREAU OF JUST. STATISTICS, July 2000, at 2, 8.

[8] DEAN G. KILPATRICK ET AL., U.S. DEP'T OF JUST. NAT'L INST. OF JUST., YOUTH VICTIMIZATION: PREVALENCE AND IMPLICATIONS 6 (2003).

He also testified that the longer offenders are offense-free in the community, the less likely they are to reoffend. However, the study on which Dr. Harris relies states: "The extent to which the recidivism rates of child molesters decreases with age is unknown."[9] The County presented studies that show many reoffenses do not occur within the first several years after release, and that some child molesters may reoffend as late as 20 years following release.[10] Dr. Levenson testified that only a small subgroup of offenders are "serial predators and pedophilic offenders" who pose a high risk of reoffending. However, she also acknowledged that for those offenders who do have pedophilia disorder, the DSM-V—the principal authority within the psychological community for diagnosing psychological disorders—states that "pedophilia per se appears to be a lifelong condition."

Both Drs. Levenson and Harris assert that the better practice for identifying potential recidivists is to conduct individualized assessments, such as using the Static-99R test,[11] to distinguish between higher and lower-risk sex offenders. However, Plaintiffs have not proven that these methods are reliable indicators of recidivism. Dr. McCleary testified that even the best instruments for assessing risks, such as the Static-99R, only have a "moderate" degree of accuracy, which is inadequate for judicial and public safety decisions. Even Dr. Harris admitted that one study showed that practitioners using such instruments assigned individuals the correct risk score only 48.3 percent of the time.

---

[9] *See* R. Karl Hanson, *Recidivism and Age: Follow-Up Data From Sexual Offenders*, 17 J. OF INTERPERSONAL VIOLENCE 1046, 1047 (2002).

[10] *See* ROBERT PRENTKY ET AL., DEP'T OF JUST., CHILD SEXUAL MOLESTATION: RESEARCH ISSUES, 13–14 (1997). One study in this report examined recidivism of a sample of rapists and sexual offenders over a 25-year period and found that 10 years after discharge, the recidivism rate for new sexual charges was 30 percent, and 25 years after discharge, it had increased to 52 percent.

[11] Dr. Harris explained that the Static-99 is a 10-item actuarial scale developed in 1999 that assesses the recidivism risk of adult male sexual offenders. The 10 items cover factors such as the nature of the offense, the offender's demographics, and criminal history. The Static-99 results in a score that can range from 0 to 12. Depending on their score, offenders are classified as having low, moderate-low, moderate-high, or high risk of reoffending. More recently, researchers have begun using the Static-99R, which is identical to the Static-99 except it takes into account the age of the offender at the time he was released from custody.

It is meaningful that while the experts disagreed as to the extent of the risk, they all acknowledged that sexual recidivism is an existential danger. Accordingly, the Court finds that Plaintiffs have not established a reliable rate of recidivism among sex offenders, but the County has a sufficient basis to determine that the risk to children 15 years old and younger is substantial.

2.   Effectiveness of Residency Restrictions in Reducing Recidivism

Plaintiffs also have not proven that the residency restriction is ineffective. In fact, Plaintiffs' expert Dr. Socia testified that studies show that after the imposition of residency restrictions, reoffense rates went down, although not in a statistically significant way. Moreover, Dr. McCleary explained that to evaluate a residency restriction at the level of statistical significance, the sample size must be sufficiently large. He said that virtually all of the samples in the policy literature on residency restrictions (including those relied on by Dr. Levenson) are too small to detect their true effects. Dr. McCleary also testified that finding a residency restriction has no statistically significant effect does not imply that the law is ineffective.

Dr. Levenson cited studies to support her opinion that residency restrictions are not effective; however, these studies evaluated different laws from different states, with different outcomes. For example Dr. Levenson cited one study that compared recidivism rates for registered sex offenders before and after the enactment of residency restrictions in Missouri and Michigan. Recidivism rates *rose* in Michigan but *fell* in Missouri, which she interpreted to mean that residency restrictions generally do not work. The Court is persuaded by Dr. McCleary's interpretation that this could, and likely does, mean that the particular law in Missouri "worked," but the law in Michigan did not, as residency restriction laws vary widely from state to state and

there may be other factors causing the different results, including differences in the data upon which the analyses were based.

Dr. McCleary testified that since the County's Ordinance is substantively different than virtually all of the laws examined in the studies cited by Dr. Levenson, it is nearly impossible to generalize the results of those studies to Miami-Dade County. Dr. McCleary also explained that there are numerous limitations in Plaintiffs' proffered research on the effectiveness of residency restrictions, including: the small number of studies, small sample sizes, differing laws, short follow-up periods, the use of different recidivism measures (making cross-study comparisons challenging at best), little information about the specific elements of the programs that are found to be successful, the inability to determine whether the preventative strategy being studied is what leads to the result, generizability problems with certain geographic-specific studies, inadequate scientific rigor of some studies that lack comparison groups, and, of significant importance, the underreporting of sex crimes among minor victims. Dr. Levenson acknowledged that one of the reports on which she relied also recognized these limitations in its own evaluation of the effectiveness of residency restrictions.

In addition, Dr. McCleary testified that because the evidence on the effectiveness of a 2,500-foot residency restriction is inconclusive, the choice of a specific means to protect the most vulnerable potential victims, minor children, must rely on practical considerations and common sense. Plaintiffs do not dispute Dr. McCleary's testimony that definitive proof of the residency restriction's effectiveness is likely not possible. The Court agrees, and finds that there are several practical and legitimate reasons for the County's residency restriction. For instance, the County presented a study that found evidence of a "relationship between where [sex]

14

offenders live and where children congregate."[12] One of Plaintiffs' arguments against the residency restriction is that the majority of child victimizations occur in victims' homes, perpetrated by family members or friends. However, as Dr. McCleary testified, a significant proportion of sex offenses against children still occur in public places and are perpetrated by strangers. He testified that a 2008 national study of child victims showed that 25 percent of perpetrators were strangers, and 23 percent of victimizations occurred in a public place. Moreover, it seems intuitive that after a sexual predator is convicted, he will no longer have the same access to children of family members and friends. Thus, a reoffender would, out of necessity, seek victims who are unaware of the potential danger.

It is also noteworthy that some sex offenders agree that residency restrictions are helpful in preventing them from reoffending. The County presented a study in which 28.1 percent of offenders admitted that they were better able to avoid the risk of reoffending because they cannot live near a school or daycare center, 31.6 percent admitted that residency restrictions were effective in limiting their access to children, 22.1 percent thought that residency restrictions helped prevent them from reoffending, and 35.9 percent thought that residency restrictions help protect children from sexual offenders.[13] Although Dr. Socia questioned whether the results of that study could be generalized, it is compelling that Doe #6 testified that he intentionally stays away from schools in order to avoid getting those "urges" again. While Dr. Socia suggested that the respondents in the study had an incentive to overstate the ameliorative effects of residency

---

[12] *See* Jeffrey Walker, et al., *The Geographic Link Between Sex Offenders and Potential Victims: A Routine Activities Approach*, 3 JUST. & RES. POL'Y 15 (2001). Walker surveys relevant literature on the behavioral patterns of sexual offenders and explains that one way sex offenders might gain access to a child is "by searching for neighborhoods with children." *Id.* at 17. He notes that some researchers insist "that many pedophilic activities are premeditated" and that there are "articles and other material suggesting that offenders target places such as arcades, schools, and playgrounds." *Id.* Walker also discussed the "routine activities theory," a theory of criminology that posits "criminals often position themselves to naturally come into contact with potential victims[.]" *Id.* at 19. This theory supports that sex offenders often target schools.

[13] *See* Amy Page et al., *North Carolina Sexual Offender Legislation: Policy Placebo?*, 51 JOURN. OF OFFENDER REHABILITATION 115, 124 (2012).

restrictions, in the Court's view, it seems more reasonable that offenders, who may be adversely impacted, have an incentive to downplay the effectiveness of residential restrictions. Certainly, Doe #6 had no incentive to be dishonest about the effectiveness of the Ordinance. In fact, he would have had an incentive to say the Ordinance is not effective, as he is challenging its constitutionality.

### C. Compliant Housing Available to Offenders

#### 1.   Number of Available Compliant Housing Units in Miami-Dade County

Plaintiffs' expert Dr. Socia opined that after accounting for affordability and availability, there are only 338 housing rental units outside the buffer zones. The Court finds that this number is unreliable and understated. Dr. Socia did not just calculate the number of available housing units under the Ordinance by excluding those within 2,500 feet of a school. He also added three additional criteria, only including housing that is: 1) rental in nature, 2) affordable, *and* 3) currently available for rent. He defined affordability as rental units at or below $1,058 per month based on the federal Housing and Urban Development's ("HUD") affordability guidelines for low income households. Dr. Socia determined availability for rent by using the 2015 American Community Survey Census data five-year estimates. By eliminating housing that is not rental, not affordable under the HUD guidelines, and unavailable, Dr. Socia eliminated 98.869 percent of residential units in Miami-Dade County for reasons other than the residency restriction.[14] The Court finds that Dr. Socia's determination of the number of housing units available is under-inclusive for the following reasons.

First, Dr. Socia did not include any units that were not, in his view, affordable because "it seems unlikely that the 'average' released felon would have the financial resources comparable

---

[14] Dr. Socia estimated that there are 860,696 residential units in Miami-Dade County, and eliminated 850,960 units based on affordability, availability, and whether they were rental properties prior to considering the residency restriction.

to an area's median income." There was no evidence to support his assumption that all or any reliable number of offenders are low income. In fact, evidence in the record refutes this assumption. Lieutenant Poveda testified that he observed some sex offenders who were registered as "transient" driving high-end vehicles, including one driving a Porsche and another driving a Mercedes, and others wearing expensive jewelry. This supports that there may be offenders who can afford housing that costs more than $1,058 per month. For example, even Doe #6, employed in the culinary field, earns about $30,000 per year, and did not suggest that he could not find housing because of low income.

Second, Dr. Socia did not consider non-rental housing because a study found that aside from staying with family and friends, the most likely option for finding housing after release from prison is the private rental market. Yet, for the same reasons set forth above, some offenders may have the means to buy, rather than rent, a home.

Third, by only considering parcels available for rent as potential housing units, Dr. Socia did not take into account that some registered sex offenders may be able to live with friends or family who already own or rent homes outside the buffer zones.[15] And, some offenders may reside in homes that are exempt from the Ordinance under the grandfather clause.

Fourth, Dr. Socia did not consider all types of housing. For instance, his original report excluded government-owned properties and certain types of single family homes. While Dr. Socia's supplemental rebuttal report added these properties, he still excluded other whole categories of potential housing units, such as improved agricultural single-family residences, nursing homes, and motels. These categories were excluded even though, for example, there are numerous residential units in rural, agricultural areas of Miami-Dade County, and those units are

---

[15] The Court is aware that this is, in fact, the case in some instances, based on sex offenders who have appeared before the Court.

far less likely than units in urban areas to be within the buffer zones. Also, according Dr. McCleary's report, re-entering offenders often live in residential motels.

Finally, Dr. Socia's analysis also does not take into consideration that the Ordinance does not prohibit relocating to another county where housing may be more affordable. For example, Mr. Berman, housing navigator for Citrus Health Network, found residences for some sex offenders outside of Miami-Dade County, including in Pahokee, Florida and in St. Petersburg, Florida.[16]

On the other hand, the County's witness, Mr. Brashears, testified that there are approximately 124,694 residential units in Miami-Dade County that lie outside the buffer zones. Mr. Brashears first determined the number of units that are at least 2,500 feet away from a school, and then narrowed the list to only residential properties; however, he did not eliminate housing based on affordability or availability. The Court finds Mr. Brashears' number is substantially over-inclusive and unrealistic because it does not take into account whether the properties are available or exclude units that are already registered as the owner's homestead, suggesting the units are not rentable.

Because Plaintiffs have not carried their burden of proof on this issue, the Court is left to speculate as to the actual number of compliant units available to registered sex offenders. The Court finds that the number of compliant units, which falls somewhere between Dr. Socia's and Mr. Brashears' unreliable estimates, is adequate to meet the housing needs of sexual offenders who would otherwise qualify for compliant housing.[17]

---

[16] As discussed below, Dr. Socia's estimate also seems not credible because the majority of registered sex offenders have found compliant housing. *See infra* at Part III(C)(3).
[17] As discussed further below, there are numerous factors that cause homelessness, irrespective of the Ordinance, that prevent registered sex offenders from qualifying for housing. *See infra* Part III(D).

2.  <u>Number of Transient Registered Sex Offenders Subject to the Ordinance</u>

To put the availability of housing units in meaningful perspective, the Court attempted to ascertain how many transient sex offenders subject to the Ordinance are competing for the available compliant housing. However, the Plaintiffs have not established a reliable number of transient registered sex offenders who are actually covered by the Ordinance. Plaintiffs contend that as of October 11, 2018, there were at least 311 sex offenders subject to the Ordinance who were registered as transient.[18] Obviously, the number of transient registered sex offenders would be even smaller when considering only those who are subject to the Ordinance retroactively. Plaintiffs agree that as of October 11, 2018, there were only about 246 transient registered sex offenders subject to the Ordinance whose crimes occurred before November 15, 2005.[19] This number, of course, will decline as the number of pre-2005 offenders declines.

Even if the number of transient sexual offenders who are subject to the Ordinance could be determined, that number would be greater than the real number of registered sex offenders who are actually homeless. Lieutenant Poveda estimated that only 20 to 25 percent of registered sex offenders who list transient addresses are actually homeless. He explained that his estimate is based on: arrests that his unit made of sex offenders that were registered as transient, but were found to be residing at non-registered permanent addresses; seeing transient registrants who appeared not to be homeless (e.g., they drove high-end vehicles, wore expensive jewelry, were well dressed and well groomed); and visiting locations where transient offenders claim to be residing, but finding that they do not actually reside at the location provided. He further

---

[18] Plaintiffs reported that there were at least 311, and no more than 398, transient registered sex offenders in Miami-Dade County who were subject to the Ordinance as of October 11, 2018. Plaintiffs verified that for 311 of the offenders, the victim was under age 16, so they were subject to the Ordinance. However, for 87 other offenders, Plaintiffs could not determine the exact age of the victim, so it is unclear whether they are subject to the Ordinance.

[19] Plaintiffs contend that there were at least 246, and no more than 262, transient registered sex offenders whose crimes occurred before November 15, 2005 who are subject to the Ordinance. Plaintiffs could only verify that 246 of the sex offenders committed crimes against victims under age 16. Plaintiffs could not verify the age of the victim for an additional 16 sex offenders.

explained that when an offender registers an address, officers are mandated to notify the schools in the area in which a sexual predator has moved. Thus, Lieutenant Poveda opined, based on his experience, that some sex offenders do not register their actual address in order to avoid mandated community notification. Others, who are involved in ongoing criminal activity, do not register their true address to avoid law enforcement.

Doe #5's testimony exemplifies that some offenders register inaccurate addresses. Prior to his re-arrest in 2006, Doe #5's last known address was his sister's home; however, he was actually residing with his niece at a residence in North Miami at that time. Doe #5 admitted that he failed to comply with both the terms of his probation and sex offender registration requirements by not disclosing his actual address to the authorities. Similarly, Doe #4 was arrested in 2006 for failing to provide his residence address to authorities. Plaintiffs also acknowledge that many more people were registered as residing at the NW 71st Street Encampment than ever seemed to be physically present at the encampment. All of this highlights the difficulty of determining the true number of transient registered sex offenders. Nevertheless, based on the evidence, and drawing reasonable inferences from it, the Court finds that the actual number of transient registered sex offenders subject to the Ordinance is much lower than Plaintiffs assert. Accordingly, the Court finds that Plaintiffs have not established that the number of transient registered sex offenders who are subject to the Ordinance is greater than the number of compliant housing units available.

3.   The Majority of Registered Sex Offenders Have Found Housing

Although Plaintiffs have not established the number of compliant housing units available, or the number of transient sex offenders covered by the Ordinance, the Court finds that the majority of registered sex offenders have found compliant housing. Dr. Levenson testified that as

of August 3, 2017, according to public data provided by the Florida Department of Law Enforcement ("FDLE"), 26 percent of all registered sex offenders in Miami-Dade County were considered transient, meaning 74 percent were able to find homes. This is consistent with Plaintiffs' report that as of October 11, 2018, approximately 25 percent of all registered sex offenders in Miami-Dade County were transient, meaning approximately 75 percent found residences.[20] While these statistics establish a reasonably accurate estimate of the number of transient registered sex offenders in Miami-Dade County in total, they do not establish the number of transient registered sex offenders who are subject to the Ordinance.[21] Nevertheless, the Court finds that it is reasonable to extrapolate and infer from these statistics that, though to a degree less than all registered sex offenders, the majority of registered sex offenders in Miami-Dade County who are subject to the Ordinance have found compliant residences. In fact, the Court finds that it is likely that an even greater percentage of offenders have found compliant residences, in light of Lieutenant Poveda's testimony that far more offenders register as transient than actually are homeless. This data strongly suggests that, absent other causes of homelessness irrespective of the Ordinance's residency restriction, there are sufficient housing options to reasonably accommodate all registered sex offenders.

[20] Plaintiffs reported that according to FDLE data, as of October 11, 2018, there were 443 transient registered sex offenders in Miami-Dade County, out of 1,788 registered sex offenders in Miami-Dade County in total.

[21] Plaintiffs did not determine the number of transient registered sex offenders, or the number of registered sex offenders in total (including transient and non-transient), who are subject to the Ordinance because the FDLE data does not indicate whether the victim was under age 16. As noted above, the number of transient registered sex offenders who are subject to the Ordinance is at least 311, because for 311 of the offenders, it was clear that their victim was under the age of 16 based on the specific crime charged. For 87 other offenders, the victim was a minor, but it is unclear whether the victim was under age 16. Because Plaintiffs have not identified the exact number of transient registered sex offenders who are subject to the Ordinance, or the total number of registered sex offenders (both transient and non-transient) who are subject to the Ordinance, the Court cannot determine the percentage of offenders who are subject to the Ordinance who have found compliant residences.

### D.  Other Causes of Homelessness

Even assuming that approximately 25 percent of registered sex offenders in Miami-Dade County are homeless, the Court finds that there are numerous factors contributing to their homelessness irrespective of the Ordinance. Mr. Sarria, Assistant Director of the Homeless Trust, and Mr. Berman both testified that registered sex offenders often have difficulty finding housing because of a number of factors unrelated to the Ordinance which result in homelessness in general. For instance, landlords and housing associations often do background checks and do not accept tenants with criminal histories (especially sex offenses against minors), poor credit scores, financial difficulties, unstable employment, mental illness, or substance abuse problems. Landlords and housing associations often select tenants with income at least three times the amount of rent. Mr. Berman also testified that some potential landlords do not want tenants who are receiving rental assistance from the government.

Mr. Sarria also testified that the primary reasons for homelessness generally in Miami-Dade County are low income and a lack of affordable housing in the County. According to Mr. Sarria, who participated in outreach efforts to help homeless sex offenders at the 71st Street Encampment find housing, the offenders' lack of motivation to find housing is, as with the homeless in general, also a barrier. This is particularly true for those who had previous negative experiences with law enforcement or service providers and are reluctant to accept their assistance.[22] Mr. Sarria also testified that some offenders simply did not want to move to available compliant housing in certain parts of the County that are far from their jobs or families, such as southern and western Miami-Dade County, further eliminating viable housing options. In

---

[22] Mr. Sarria, Mr. Berman, and Mr. Imbrone testified to the lack of cooperation that they observed on the part of sexual offenders whom the County attempted to assist in locating compliant housing. For example, Mr. Berman testified that very few of the sexual offenders that he worked with followed up with him, and as time went by the follow-up rates declined further. Ultimately, he only remained in contact with 2 or 3 of the approximately 70 individuals to whom he had initially reached out in attempt to help them find housing.

fact, Does #5, 6, and 7 admitted at trial that they have not looked for any available housing in the southern half of the County.

In addition, as discussed above, some transient sex offenders who are not subject to the Ordinance still have difficulty finding housing. For example, Mr. Berman testified that he located a residence for one registered sex offender who was not subject to the residency restriction, but that it was just as challenging as finding housing for those who are subject to the Ordinance. It took six attempts before Mr. Berman finally found an apartment for that offender. This suggests that factors unrelated to the Ordinance make it difficult to find housing for all registered sex offenders, not just those subject to the Ordinance.[23]

It is noteworthy that there are various reasons why each Plaintiff in this case is homeless, irrespective of the Ordinance. For instance, three of the four Plaintiffs are unemployed and receive only disability benefits and/or food stamps as income. Doe #4 could not afford the rent for his residence that was grandfathered in after he separated from his wife. He later resided in another compliant residence for five years, but could not afford the rent after his roommates moved out. Doe #5 located a residence that was outside the buffer zones, but it was rented before he acted on it. Doe #6 was required to move out of his home because his property manager learned of his criminal history. He also unnecessarily excluded potential housing options due to a misunderstanding of the scope of the residency restriction. Doe #7, who is disabled, did not rent a compliant apartment because it was too far from the registration office, despite testimony that the County provides transportation to disabled individuals.[24] The Court finds that the housing

---

[23] In fact, some non-sex offenders resided at the NW 71st Street Encampment, for reasons unrelated to the Ordinance.
[24] Interestingly, it appears that the original Does #2 and 3, who dropped out of this case, similarly became homeless for a reason unconnected to the Ordinance: they were evicted from their residences for failing to pay rent.

barriers discussed above, not the Ordinance, constitute the greatest negative impact on sex offenders' ability to find housing, compliant or non-compliant.

## IV.   CONCLUSIONS OF LAW

The Court first addresses the County's threshold statute of limitations affirmative defense, followed by an analysis of the merits of Plaintiffs' ex post facto claims.

### A. Statute of Limitations

Plaintiffs brought this action under 42 U.S.C. § 1983. "Section 1983 claims are subject to a forum state's statute of limitations for personal injury claims." *Hillcrest Prop., LLC v. Pasco Cty.*, 754 F.3d 1279, 1281 (11th Cir. 2014). In Florida, the statute of limitations for a personal injury claim is four years. *See id.* "Generally, 'the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003) (citation omitted); *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F. 3d 1259, 1261 (11th Cir. 2003) (citation omitted).

The County argues that Plaintiffs' claims are barred by the statute of limitations. According to the County, Does #4, 5, and 6's claims accrued in November 2005 when the Ordinance was enacted, because they had already been convicted of a qualifying offense. Thus, it became apparent or should have become apparent that they would be subject to the residency restriction at that time. The County contends that Doe #7's claim accrued in 2009 when he pled guilty to his qualifying offense and acknowledged in his plea agreement that the residency restriction applied to him. Therefore, the County argues, each of their claims lapsed before the initial Complaint was filed on October 23, 2014.

Plaintiffs argue that none of their claims are time barred because they assert a continuing violation of their constitutional rights. Plaintiffs contend that they experience anew the punitive effects of the Ordinance every day it is in effect, every day they are denied the right to live in the 2,500 foot buffer zones, and every 30 days when they must register to confirm that their reported residence complies with the Ordinance.

The Court notes that there is no controlling precedent from the Eleventh Circuit on the continuing violation doctrine in this factual context. While the Eleventh Circuit addressed whether the continuing violation doctrine applied to ex post facto claims in *Brown* and *Lovett*, finding it did not apply, those cases and their progeny involved ex post facto challenges to adverse changes in parole procedures, not to post-release restrictions, such as ongoing restrictions on sex offenders.[25] *See Lovett*, 327 F.3d at 1182; *Brown*, 335 F.3d at 1261–62. As then-district court Judge Carnes aptly pointed out in 1992, whether the continuing violation doctrine applies to violations of constitutional rights "appears to be a close question[.]" *See Abiff v. Slaton*, 806 F. Supp. 993, 996 (N.D. Ga. 1992). To this day, whether the continuing violation doctrine applies to alleged ex post facto violations appears to be a close and perplexing question, with rational decisions going both ways.[26]

In its attempt to resolve whether Plaintiffs' ex post facto challenge to the Ordinance involves an alleged continuing constitutional violation, and without clear precedent from the

---

[25] At least one district court has distinguished ex post facto challenges to parole procedures from challenges to restrictions imposed post-release. *See Doe v. Haslam*, Nos. 3:16-cv-02862, 3:17-cv-00264, 2017 WL 5187117, at *13 (M.D. Tenn. Nov. 9, 2017) ("[I]t is debatable whether Plaintiffs' allegations should be considered under the same rubric applied to claims challenging changes to parole procedures. Those prisoners are still incarcerated pursuant to their original, lawfully imposed sentences and merely challenge the procedures associated with determining their release. The Plaintiffs' challenges involve the imposition of wholly new burdens, unrelated to their initial, lawful sentences").

[26] *Compare Haslam*, 2017 WL 5187117, at *13 (finding continuing violation doctrine applied to ex post facto challenge to sex offender registration act "[b]ecause the infliction of an alleged ex post facto punishment on Plaintiffs is ongoing"), *and Doe v. Gwyn*, No. 3:17-cv-504, 2018 WL 1957788, at *5–6 (E.D. Tenn. Apr. 25, 2018) (same), *with Moore v. Olens*, No. 1:13-cv-0374-AT, 2013 WL 12097640, at *6 (N.D. Ga. Nov. 18, 2013) (finding continuing violation doctrine did *not* apply to ex post facto claim because it arose out of a one-time "decision to impose the punishment" retroactively, "rather than the punishment itself").

Supreme Court or the Eleventh Circuit, the Court finds helpful, and adopts, the continuing violation standard set forth by the Sixth Circuit in *Eidson v. Tennessee Department of Children's Services*, 510 F.3d 631, 635 (6th Cir. 2007). The Sixth Circuit determined that a continuing violation must meet three criteria: "First, the defendant's wrongful conduct must continue after the precipitating event that began the pattern.... Second, injury to the plaintiff must continue to accrue after that event. Finally, further injury to the plaintiff[ ] must have been avoidable if the defendants had at any time ceased their wrongful conduct." *Id.* (citation omitted). This three-prong standard has been persuasively applied by other district courts to ex post facto challenges to sex offender registration laws. *See Doe v. Gwyn*, No. 3:17-cv-504, 2018 WL 1957788, at *5 (E.D. Tenn. Apr. 25, 2018).

Here, each of the *Eidson* criteria is satisfied. The County's alleged wrongful conduct—enforcing the residency restriction—is continuous: the Plaintiffs are excluded from living within the 2,500 foot buffer zones and, because they are transient, required to register their addresses every 30 days. If they reside in a buffer zone or fail to register, they are subject to prosecution. Thus, the Plaintiffs' alleged injuries continue to accrue after enactment of the Ordinance, and after Plaintiffs were first aware, or should have been aware, that they must comply with the Ordinance. And, if the County were to repeal the Ordinance, Plaintiffs would no longer suffer those injuries. *See Doe v. Haslam*, Nos. 3:16-cv-02862, 3:17-cv-00264, 2017 WL 5187117, at *13 (M.D. Tenn. Nov. 9, 2017) (holding the continuing violation doctrine applied to ex post facto challenge to sex offender registration act because "[i]nsofar as the requirements of the Act are, as Plaintiffs allege, a punishment, it is a punishment that is inflicted on Plaintiffs every day and will continue to be inflicted every day in the foreseeable future"); *Gwyn*, 2018 WL 1957788, at *6 (holding continuing violation doctrine applied to ex post facto challenge to sex offender

registration act because plaintiff faces the possibility of criminal prosecution every day if he does not comply with the act); *Wallace v. New York*, 40 F. Supp. 3d 278, 303 (E.D.N.Y. 2014) (holding ex post facto claims challenging the state's current sex offender regime are "continually accruing"). Accordingly, the Court concludes that the continuing violation doctrine applies here and Plaintiffs' claims are not time barred.[27] However, as discussed below, Plaintiffs cannot prevail on the merits of their ex post facto claims.

### B.  Ex Post Facto Challenge

To begin, the parties stipulate that the issue in this facial ex post facto challenge to the Ordinance is properly framed as: whether the County enacted the residency restriction with punitive intent, and if not, whether Plaintiffs established by the "clearest proof" that the punitive effect of the law overrides the County's legitimate intent to enact a nonpunitive, civil measure.

Both the federal and Florida constitutions prohibit the passage of ex post facto laws. *See* U.S. Const. art. I § 9, cl. 3; *id.* art. I, § 10, cl. 1; Fla. Const. art. I, § 10. As the U.S. Supreme Court has explained, to evaluate an ex post facto claim, a court must "ascertain whether the legislature meant the statute to establish 'civil' proceedings.... If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a

---

[27] The Court notes that if the continuing violation doctrine did not apply, Does # 4, 6, and 7's claims would be time barred because it was apparent or should have been apparent that the Ordinance would be retroactively applied to them more than four years before the Complaint was filed on October 23, 2014. The parties stipulated that in July 2006, Doe #4 was arrested for failing to provide the address where he was residing, so it was apparent that he was subject to the residency restriction in July 2006. Although Doe #6 testified that he was not aware of the Ordinance until he moved out of his grandfathered residence in January 2013, he also testified that he initially registered his address in January 2006, and his registration forms show that he reported to a registration officer on January 23, 2006 and October 1, 2009. Sgt. Irvine testified that when offenders register their addresses, it is standard practice for officers to advise them of all applicable residency restrictions. Thus, the Court finds that it should have been apparent to Doe #6 that he was subject to the Ordinance when he registered his address in January 2006. Doe #7 acknowledged that he would be subject to the residency restriction in his plea agreement in June 2009. However, Doe #5's claim would not be time barred, because he was not aware of the residency restriction until his release from prison in March 2014. Although he would have been informed had he registered his address after the Ordinance was enacted, he was not registering his address or communicating with his probation officer as required from 2004–2006, and he was incarcerated from 2006–2014. Thus, the Court would proceed to the merits on Doe #5's claim.

regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the government's] intention' to deem it 'civil.'" *Smith v. Doe*, 538 U.S. 84, 92 (2003) (citations and quotations omitted).[28] Because courts "ordinarily defer to the legislature's stated intent, ... 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (citations and quotations omitted); *see also United States v. W.B.H.*, 664 F.3d 848, 855 (11th Cir. 2011) ("[S]ome evidence will not do; substantial evidence will not do; and a preponderance of the evidence will not do. '[O]nly the clearest proof' will do.") (citing *Smith*, 538 U.S. at 92).

The Court concludes that the County did not enact the Ordinance's residency restriction with punitive intent, and Plaintiffs have not established by the "clearest proof" that the punitive effect of the Ordinance overrides the County's intent to enact a nonpunitive, civil regulation.

1. Punitive Intent

"Whether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.'" *Smith*, 538 U.S. at 92 (citing *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). To determine the legislative objective, courts "consider the statute's text and its structure." *Id.* "A conclusion that the legislature intended to punish would satisfy an *ex post facto* challenge without further inquiry into its effects, so considerable deference must be accorded to the intent as the legislature has stated it." *Id.* at 92–93.

Here, the Miami-Dade County Commission expressed the intent of the Ordinance in the statutory text itself:

> The intent of this Article is to serve the County's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the County,

---

[28] The Court evaluates both the federal and state ex post facto challenges under *Smith*. *See Doe v. Miami-Dade Cty.*, 846 F.3d at 1183 n.2 (citing *Houston v. Williams*, 547 F.3d 1357, 1364 (11th Cir. 2008)).

> particularly children, by prohibiting [sexual offenders] from establishing temporary or permanent residence in certain areas where children are known to regularly congregate…

The County Commission further expressed its intent in the Ordinance's whereas clauses which note: that the Commission is concerned about convicted child molesters who reoffend after incarceration, that the County has a "compelling interest in protecting children from predatory sexual activity," and that the Commission intends to "regulat[e] where [child molesters] live" and limit "their access to children in an effort to protect children of the County from sexual abuse."[29] Protecting children from sex offenders is a legitimate, nonpunitive government objective. *See Smith*, 538 U.S. at 93–94 ("[W]here a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.") (citations and quotations omitted).

The Commission's nonpunitive intent is further demonstrated by the fact that the residency restriction is limited to schools. In limiting the restriction to schools, the Commission rejected extending the restriction to other locations, including bus stops, child care facilities, and parks. As the prime sponsor of the Ordinance Commissioner Jose "Pepe" Diaz explained, the enacted Ordinance was limited to schools "to balance" competing interests. The County's efforts to rationally balance competing interests is also reflected by the Ordinance's grandfather clause, which exempts residences established prior to the enactment of the Ordinance or prior to a new school opening within 2,500 feet, and by the 2010 amendment, which preempted stricter

---

[29] In addition, at the County Commission hearing on the Ordinance, Major Buchholz from the Miami-Dade County Sex Crimes Unit testified in support of the residency restriction, stating that law enforcement is trying to "minimize the opportunity for [sexual offenders] to attack," further reflecting that the goal of the restriction is to protect children.

municipal ordinances, in order to strike "a proper balance between protecting children … while still leaving available residential units."

Plaintiffs contend that statements by several commissioners demonstrate the County's punitive intent in enacting the Ordinance. They also argue that the Ordinance is punitive because Mr. Book, Chair of the Homeless Trust Board of Directors and lobbyist, was the most influential individual behind the residency restriction, and he made vitriolic statements about sexual offenders. However, statements by certain commissioners, particularly when there are contrary statements by other commissioners, do not override the clear expression of intent in the Ordinance itself. *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) (explaining that "floor statements by individual legislators rank among the least illuminating forms of legislative history" because different legislators may offer contradicting accounts); *see id.* at 942 ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."). The commissioners' comments about the proposed Ordinance were both varied and conflicting. Moreover, such comments do not override the text of the Ordinance itself. Likewise, comments by individuals who are not commissioners, such as Mr. Book, do not override the text of the Ordinance. Thus, the Court concludes that the County did not enact the Ordinance with punitive intent.

2. Punitive Effects

To determine whether the punitive effects of the Ordinance outweigh the County's nonpunitive intent, the Court is guided by factors set forth by the Supreme Court, including whether the regulatory scheme: "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*,

538 U.S. at 98. The Court addresses each factor in turn. In considering these factors, the Court notes that it is not determining whether the Ordinance's residency restriction is the optimal means to prevent sex offense recidivism; it merely is determining whether the restriction passes constitutional muster.

### a. Historically Regarded as Punishment

Plaintiffs argue that the residency restriction resembles the historical punishments of banishment and probation. However, the restriction is not akin to banishment because it does not restrict where registered sex offenders may visit or work, and only prohibits them from residing within close proximity to a school. *See, e.g.*, *Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) (rejecting argument that residency restriction is equivalent to banishment because it does not completely expel offenders from the community); *Shaw v. Patton*, 823 F.3d 556, 566–67 (10th Cir. 2016) (same). Nor does the residency restriction resemble probation, because it does not subject the offender to broad control, supervision, or threat of revocation. *See Vasquez v. Foxx*, 895 F.3d 515, 521 (7th Cir. 2018), *petition for cert. filed*, No. 18-386 (U.S. Sept. 21, 2018) ("Although the Illinois residency restrictions limit where sex offenders may live, the statute does not control any other aspect of their lives and thus does not resemble the comprehensive control of probation and supervised release."). Thus, the Court concludes that the residency restriction is not historically regarded as a punishment.

### b. Promotes the Traditional Aims of Punishment

Plaintiffs also assert that the Ordinance advances the traditional aims of punishment: deterrence and retribution. The County responds that the Ordinance's goal of deterring future crimes against children does not render it punitive, and that the residency restriction is remedial, not retributive. The Court agrees with the County. The fact that the residency restriction aims to

deter reoffending does not make it punitive. *See Smith*, 538 U.S. at 101 ("Any number of governmental programs might deter crime without imposing punishment.... To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the Government's ability to engage in effective regulation.") (citations and quotations omitted); *see also Miller*, 405 F.3d at 720 (residency restriction's goal of reducing the likelihood of reoffense did not render it punitive). Because the Ordinance's goal is to prevent sex offenders from reoffending by limiting their access and opportunity, it is remedial, not retributive. *See Vasquez*, 895 F.3d at 522 (finding that "the residency restrictions are so clearly *not* retributive" because "[a]s in *Smith*, the obvious aim of the statute is to protect children from the danger of recidivism by convicted child sex offenders") (emphasis in original). The Court thus concludes that the Ordinance does not promote the traditional aims of punishment.

### c.   *Undue Affirmative Disability or Restraint*

Under the "affirmative disability or restraint" factor, the Court must "inquire how the effects of the Act are felt by those subject to it." *Smith*, 538 U.S. at 99–100. "While restrictive laws are not necessarily punitive, they are more likely to be so." *Miller*, 405 F.3d at 720. "Imprisonment is the 'paradigmatic' affirmative disability or restraint, ... but other restraints, such as probation or occupational debarment, also can impose some restriction on a person's activities." *Id.*

Plaintiffs argue the Ordinance imposes an undue affirmative disability or restraint, citing *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). In *Snyder*, the ordinance prohibited registrants from living, working, or "loitering" within 1,000 feet of a school. *Id.* at 698. This imposed a far greater affirmative restraint or disability than the residency restriction here, as it did not only limit where covered individuals can reside, but also where they may work or

"loiter." *See id.* at 703–04. Here, the residency restriction does not prevent sex offenders from working in or visiting any part of the County; it only limits where they may establish a new residence.

On the other hand, the residency restriction is more disabling than the sex offender registration law at issue in *Smith*, 548 U.S. at 100, as it imposes a direct restraint on Plaintiffs' freedom to select new residences. *See Doe v. Miami-Dade Cty.*, 846 F.3d at 1185. Plaintiffs contend that the Ordinance has led to substantial housing disadvantages for sex offenders that would not have otherwise occurred. While it is true that the Ordinance exacerbates housing difficulties for individuals subject to the residency restriction, the impact of the Ordinance on offenders' ability to find housing is not of the magnitude suggested by Plaintiffs. As described above, most registered sex offenders subject to the Ordinance have found housing. *See supra* at Part III(C)(3). Moreover, the record reflects that there are other more significant causes of homelessness in Miami-Dade County, irrespective of the Ordinance. *See supra* at Part III(D).

Accordingly, the Court concludes that while the Ordinance imposes an affirmative disability or restraint, it is nonpunitive. *See Shaw*, 823 F.3d at 570 (explaining that an ordinance prohibiting sex offenders from living within 2,000 feet of a school, playground, park, or child care center was less harsh than a ban on working in a particular field, which is considered nonpunitive). Nevertheless, this factor directs the Court to the crux of the case, the last two *Smith* factors: whether the law is rationally connected to a nonpunitive purpose, and if so, whether it is excessive in relation to that purpose. *See Miller*, 405 F.3d at 721.

d.   *Rational Connection to a Nonpunitive Purpose*

When evaluating an ex post facto claim, the law's "rational connection to a nonpunitive purpose is a '[m]ost significant' factor in [the court's] determination that the statute's effects are

nonpunitive." *Smith*, 538 U.S. at 102 (citation omitted). "A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* at 103. In other words, the question is whether the Ordinance passes rational basis scrutiny.[30]

In the Ordinance's whereas clauses, the County Commission finds that "prohibiting sexual offenders from living within 2,500 feet of schools … will reduce the amount of incidental contact sexual offenders have with children," and that this will decrease the opportunity for sexual offenders to commit new sex offenses against children. The Court must determine whether there is, in fact, a rational connection between the Ordinance's residency restriction and the County's goal of protecting children from sexual offense recidivism.

Plaintiffs argue that the residency restriction has no rational connection to its stated purpose of protecting children because it only dictates where an offender sleeps, but does not limit where an offender goes during the day. Plaintiffs also argue that the County premised the Ordinance on the erroneous idea that sexual offenders are likely to repeat their offenses, which, Plaintiffs say, has been debunked. Although both sides agree there is recidivism among sexual offenders, they disagree as to the extent. Each points to various studies to support its respective position. In that regard, the County contends that the recidivism rates are much higher than the rates reported in some of Plaintiffs' studies due to substantial, documented underreporting of sex

---

[30] Plaintiffs argue that the standard for rational basis scrutiny under the Florida constitution is more rigorous than the federal standard, citing *Estate of McCall v. United States*, 134 So. 3d 894 (Fla. 2014). In *McCall*, the Florida Supreme Court held that the cap on non-economic damages in medical malpractice claims contained in Section 766.118, Florida Statutes, violated the rational basis test of the equal protection clause of Florida's constitution as applied to wrongful death cases. A majority of justices, however, did not agree on a rationale for the holding. In *Silvio Membreno & Florida Association of Vendors v. City of Hialeah*, 188 So. 3d 13 (Fla. 3d DCA 2016), the Third District Court of Appeal rejected a similar argument that *McCall* changed Florida's rational basis test to one more rigorous than the federal standard. The court explained that the Florida rational basis test is "based on precedent from the United States Supreme Court," and has been applied the same way as the federal test for over 50 years. *Id.* at 20. The court further explained that neither of the plurality opinions in *McCall* expressly indicated intent to overrule Florida cases applying the rational basis test consistently with the federal test. *Id.* at 31. The Court finds *Silvio* persuasive, and concludes that the rational basis test is the same under both the Florida and federal constitutions. The Eleventh Circuit also evaluated the Florida ex post facto challenge under the same standard as the federal challenge in *Doe v. Miami-Dade Cty.*, 846 F.3d at 1183 n.2.

crimes. The County also argues that it is a matter of common sense that limiting the frequency of contact between child molesters and areas where children are located is likely to reduce the risk of a repeat offense, and that credible evidence supports this common sense notion.

The Court agrees with the County that the residency restriction is rationally related to the goal of protecting children. First, the Court concludes that there was enough evidence for the County to reasonably determine that the risk of registered sex offenders reoffending is significant. As discussed above, the estimates of recidivism rates for sex offenders range from zero to 75 percent. *See supra* at Part III(B)(1). Even Plaintiffs' experts do not contend that recidivism does not exist, and as Dr. McCleary testified, most studies underestimate the reoffense rate because of the "dark figure" of sexual victimization. *Id.* Underreporting is an even greater problem for sex offenses involving child victims. *Id.* Just as in *Smith*, the evidence here provides a sufficient basis to find that the risk of recidivism posed by sex offenders is very significant. *See Smith*, 538 U.S. at 103 ("The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.'") (citation omitted).

Second, the Court concludes that the residency restriction is a legitimate means to manage this risk of recidivism. The fact that the residency restriction only limits where an offender sleeps, but not where an offender goes during the day, may mean it is not the optimal solution to the recidivism problem; but if it has some ameliorative effect, that is enough to be "rationally connected" to the County's goal of protecting children. Plaintiffs' experts presented studies relating to other jurisdictions' laws to show that residency restrictions did not reduce recidivism to a statistically significant extent. However, as Dr. McCleary testified, studies that do

not show a statistically significant effect do not mean that the residency restrictions are ineffective. Dr. McClearly explained that there are significant shortcomings in the studies upon which Plaintiffs' experts rely to contend that residency restrictions are not a particularly effective tool in deterring reoffending. These shortcomings include: the small number of studies, small sample sizes, varying residency restrictions in different jurisdictions, short-follow-up periods, the use of different definitions of recidivism, and the underreporting of sex crimes. *See supra* at Part III(B)(2). Thus, Plaintiffs have not established by the "clearest proof" that the County's residency restriction has no rational connection to its goal of protecting children.

In reaching its conclusion, the Court is also mindful that in order to survive a rational basis challenge, the legislative choice "may be based on rational speculation unsupported by evidence or empirical data." *See, e.g., Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993)). In the absence of compelling evidence to the contrary, which evidence is not present here, it is rational for the County to determine that prohibiting registered sex offenders from residing within close proximity to schools will reduce their access to children and, therefore, the opportunity to reoffend.

Although justifying its decision based on "rational speculation" would be legally sufficient to satisfy the "rational connection" factor, the County nevertheless presented credible evidence to support its determination that the residency restriction is likely to help prevent reoffending.[31] As discussed above, this includes a study that found evidence of a relationship between where sex offenders live and where children congregate. *See supra* at Part III(B)(2). In

---

[31] And, even some of the evidence presented by Plaintiffs supports that the residency restriction has a rational connection to protecting children. For instance, as discussed above, Dr. Levenson cited a study that compared recidivism rates for registered sex offenders before and after the enactment of residency restrictions in Missouri and in Michigan. Recidivism rates *rose* in Michigan but *fell* in Missouri. This supports the County's determination that residency restrictions may be effective at decreasing recidivism, as was the Missouri restriction. *See supra* at Part III(B)(2).

addition, at least one study has shown that 20 to 30 percent of registered sex offenders reported that they find residency restrictions helpful in preventing them from reoffending.[32] *Id.* And, notably, Doe #6 acknowledged that avoiding schools helps him prevent getting "urges" towards children.

It is noteworthy that Courts of Appeals and other district courts have found similar residency restrictions to be "rationally designed to reduce sex offenders' temptations and opportunities to reoffend." *See Shaw,* 823 F.3d at 574. For instance, in *Shaw,* the Tenth Circuit explained that residency restrictions "place children out of sight and mind, beyond senses that could stir the perversions of known child sex offenders. At least arguably, a 2,000-foot restriction reduces opportunity, diminishes temptation, and thereby decreases the risk that a proven child sex offender will reoffend." *Id.* (citation omitted). Similarly, in *Miller,* the Eighth Circuit held that an ordinance prohibiting registered sex offenders from residing within 2,000 feet of a school or registered child care facility was a reasonable way to minimize "the risk of repeated sex offenses against minors." 405 F.3d at 721. And, in *Vasquez,* the Seventh Circuit held that a residency restriction prohibiting sex offenders from residing within 500 feet of a playground, school, child care center, child daycare home and group daycare home was rationally related to protecting children. *See* 895 F.3d at 522. The court explained that even if it accepted the plaintiffs' assertion "that sex offenders do not reoffend more than other criminals" as true, "similar recidivism rates across different categories of crime would not establish that the nonpunitive aim of this statute—protecting children—is a sham." *Id.* at 522; *see also Weems v. Little Rock Police Dep't,* 453 F.3d 1010, 1015 (8th Cir. 2006) ("[W]e believe that a residency

---

[32] Although Plaintiffs criticize the County's reliance on studies like these from other jurisdictions to bolster the theoretical basis for the residency restriction, the Court agrees with Dr. McCleary that studies of a law's effectiveness may be "practically significant," even if they do not establish statistical significance. In other words, a lawmaker may find a study useful, even if it does not statistically establish how effective a residency restriction may be. The studies produced by the County show that it had a rational basis for concluding that the residency restriction is a reasonable means to address recidivism.

restriction designed to reduce proximity between the most dangerous offenders and locations frequented by children is within the range of rational policy options available to a [local government] charged with protecting the health and welfare of its citizens"); *Doe v. Baker*, No. 1:05-cv-2265, 2006 WL 905368 at *5 (N.D. Ga. Apr. 5, 2006) ("Prohibiting a sex offender from living near a school or daycare is certainly an appropriate step in achieving the ultimate goal of protecting children."). Here, the evidence at trial, including Doe #6's testimony, supports the reasonableness of the County's strategy to reduce sex offenders' temptations and opportunities through the residency restriction. Therefore, the Court concludes that the Ordinance's residency restriction is rationally connected to the nonpunitive purpose of protecting children from sex offenders.

     *e.   Excessive with Respect to the Nonpunitive Purpose*

"The excessiveness inquiry of [the Supreme Court's] *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105.

As an initial matter, the Ordinance's residency restriction is less restrictive and more limited in scope than some other similar restrictions enacted by local governments.[33] Mr. Book testified that the County's residency restriction was less restrictive than the versions lobbied for and enacted in many other jurisdictions throughout the state of Florida and around the country. For instance, other regulations not only prohibit registered sex offenders from residing within a certain distance of a school, they also prohibit them from living within a certain distance of

---

[33] In determining that Does #1 and 3 pleaded an ex post facto claim, the Eleventh Circuit panel stated: "Accepting the facts alleged in the complaint as true, the County's residency restriction is 'among the strictest in the nation.'" *Doe v. Miami-Dade Cty.*, 846 F.3d at 1185. However, Plaintiffs did not prove this allegation at trial. Instead, the evidence showed that many jurisdictions have stricter residency restrictions.

daycares, parks, bus stops, or places where children congregate. Some of these more restrictive laws have survived constitutional challenges. *See, e.g., Miller*, 405 F.3d at 704 (upholding law that prohibited a person convicted of certain sex offenses involving minors from residing within 2,000 feet of a school or registered child care facility); *Shaw*, 823 F.3d at 559 (upholding law that prohibited certain registered sex offenders from living within 2,000 feet of a school, playground, park, or child care center). Even Plaintiffs' experts, who were familiar with residency restrictions in other jurisdictions, agreed that other laws are often more restrictive by applying to a broader group of offenders (i.e., all offenders regardless of victim age) or to a broader category of prohibited locations.

The County's Ordinance is also less restrictive than some other residency restriction ordinances because of its grandfather clause which exempts residences established prior to the enactment of the Ordinance or the opening of a new school. *See Shaw*, 823 F.3d at 570 (grandfather clause made ordinance "less disabling than other state laws that require sex offenders to relocate if they live in an area that had been compliant but became non-compliant because of an intervening opening of a nearby school, playground, park, or child care center"); *see also Wallace*, 40 F. Supp. 3d at 326 ("[A]ny excessiveness ... is further mitigated by the grandfather clause exempting an offender's prior-established residence."). In *Vasquez*, the Seventh Circuit affirmed the dismissal of plaintiffs' ex post facto claim, even though the plaintiffs were required to move within 30 days after new child daycare homes opened within 500 feet of their residences. 895 F.3d 518–22.

In addition, the County's residency restriction only applies to offenders who were convicted as adults for one of five enumerated sexual offenses, even though an individual can be designated a "sexual offender" under Florida law based upon a conviction for 17 additional

offenses. And, the residency restriction only applies to crimes against the most vulnerable victims: children under 16. Thus, the residency restriction is narrowly tailored to only apply to individuals who committed certain sexual offenses against particularly vulnerable victims—specifically, those who present the greatest danger to children.

Nevertheless, Plaintiffs contend that the residency restriction is excessive because it: (1) applies based solely on the fact of prior conviction, irrespective of the offender's recidivism risk over time; (2) applies to the offender for life; (3) marks 2,500 feet by straight lines, rather than by pedestrian or driving routes; (4) persists despite the absence of any demonstrated empirical link between residential proximity to schools and recidivism; and (5) exacerbates transience and homelessness among offenders subject to the Ordinance, increasing their risk of recidivism. The Court rejects Plaintiffs' contention for the following reasons.

First, even if the Ordinance, applying to all covered sex offenders without an individualized risk assessment, is not the "best choice," that does not make it unreasonably disproportionate to the aim of protecting children. *See Wallace*, 40 F. Supp. 3d at 326. Dr. McCleary testified that individualized risk assessment programs, which Plaintiffs promote, only have a "moderate" degree of accuracy. Dr. Harris acknowledged that a study showed that such programs only assigned individuals the correct risk score 48.3 percent of the time. *See supra* at Part III(B)(1). Legislatures are not required to rely on such fallible measures for policymaking decisions. As the Supreme Court has explained:

> The *Ex Post Facto* Clause does not preclude a State [or municipality] from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences. We have upheld against *ex post facto* challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment... The determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause.

*Smith*, 538 U.S. at 103–04; *see also Miller*, 405 F.3d at 721.

Second, the Ordinance is not excessive even though it applies to the covered offender for life. Although Dr. Harris testified that the longer offenders are offense-free, the less likely they are to reoffend, the County presented evidence that a substantial percentage of sex offenders re-offend over 20 years after release. *See supra* at Part III(B)(1). This, coupled with Dr. McCleary's testimony on the inability to accurately predict the likelihood of reoffending or when reoffending may occur, supports that the County may reasonably determine that the residency restriction should apply for offenders' entire lives. *See Valentine v. Strickland*, No. 5:08-cv-00993-JRA, 2009 WL 9052193, at *5 (N.D. Ohio Aug. 19, 2009) (finding registration requirement and residency restriction that applied to certain sex offenders for life was not excessive because of the risk of recidivism). The Court also notes that in 2003, the U.S. Congress enacted the PROTECT ACT, which amended 18 U.S.C. § 3583 to provide federal judges with discretion to extend the term of post-release supervision of offenders up to a maximum of life when, "[u]nder current law, the maximum period of post-release supervision in Federal cases was generally five years even for the most serious crimes." H.R. CONF. REP. 108-66 at 49 (2003). This change came in response to "the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison." *Id.* at 49–50.

Third, measuring the 2,500 feet restriction by a straight line also does not render the Ordinance excessive. Although Plaintiffs would prefer that the County calculate the 2,500 feet differently, the question is not whether there is a better solution to the recidivism threat; it is whether the Ordinance violates the Plaintiffs' constitutional rights. As Dr. McCleary testified,

because the evidence on the effectiveness of residency restrictions is inconclusive, the choice of a specific means to protect children must rely on practical considerations and common sense. The County selected a 2,500-foot distance based on its determination that minor children are more likely to walk without an adult within 2,500 feet of a school and because the County is making an effort to enhance the walkability of areas within 2,500 feet of a school to encourage more students to walk to school. In fact, Miami-Dade County public schools do not provide bus transportation for students living within 2,500 feet of a school because it is considered a "reasonable walking distance." The County's decision to select a 2,500-foot restriction, measured as the crow flies, is reasonable. *See Miller*, 405 F.3d at 722 (explaining the legislature's decision to select a 2,000-foot restriction was reasonable even though no witness "was able to articulate a precise distance that optimally balanced the benefit of reducing risk to children with the burden of the residency restrictions on sex offenders").[34]

Fourth, Plaintiffs failed to show that the residency restriction does not deter sexual recidivism against children. As discussed above, the Plaintiffs' experts' opinions estimating sexual recidivism rates, based on various studies, are unreliable. This is because, among other reasons, the recidivism data on which their studies are based do not take into account the "dark figure" of sexual victimization. Therefore, the Court concludes that Plaintiffs' experts' opinions based on those studies do not establish by the "clearest proof" that the residency restriction is ineffective.

Plaintiffs contend that the "most significant factor in the analysis of excessiveness" is the County's failure to present any evidence of the residency restriction's benefits, citing *Snyder*,

---

[34] The Court notes that 2,500 feet is also the distance used in other laws that create buffer zones around schools. *See, e.g.,* Fla. Stat. § 847.0134 (providing that certain adult entertainment venues may not be located within 2,500 feet of schools); MIAMI-DADE COUNTY CODE § 33-150 (providing that, unless approved by a special exemption, "no premises shall be used for the sale of alcoholic beverages to be consumed on or off premises" within 2,500 feet of a church or public school).

834 F.3d at 705, and *Hoffman v. Village of Pleasant Prairie*, 249 F. Supp. 3d 951, 960 (E.D. Wis. 2017). Plaintiffs reliance on *Snyder* is misplaced, because in that case, unlike here, "nothing the parties … pointed to in the record suggest[ed] that the residential restrictions ha[d] any beneficial effect on recidivism rates." 834 F.3d at 705. Furthermore, *Snyder* involved an as-applied challenge to a much broader restriction that prohibited certain registrants from living, working, or "loitering" within 1,000 feet of a school. Similarly, in *Hoffman*, the court found that the ordinance was based solely on the Village's "own conjecture about the dangers posed by sex offenders," rather than on studies or evidence. 249 F. Supp. 3d at 960 ("If the Village had even a sliver of factual material to support the stated goals of the Ordinance, the outcome of this claim would likely be different."). Here, in contrast, there is credible evidence that residency restrictions deter the opportunity and "urge" to reoffend, including unrefuted evidence that a significant percentage of sex offenders find residency restrictions helpful in preventing them from reoffending, including Doe #6, who acknowledged that avoiding schools helps him prevent "urges." This evidence is certainly far more than a "sliver," reflecting the ameliorative effect of the residency restriction. *See Miller*, 405 F.3d at 722 (holding residency restriction was not "excessive" even though there was no scientific evidence of its effectiveness because "there was expert testimony that reducing the frequency of contact between sex offenders and children is likely to reduce temptation and opportunity, which in turn is important to reducing the risk of reoffense").

Fifth, Plaintiffs did not establish by the "clearest proof" that the residency restriction places an undue burden on those subject to it or is a significant cause of homelessness. While the County understates the burdens imposed by Ordinance, Plaintiffs overstate them. On balance, the Court concludes Plaintiffs have not proven that there is inadequate housing available to

registered sex offenders as a result of the residency restriction. *See supra* at Part III(C). While there are a limited number of truly homeless offenders, Plaintiffs have not proven that their homelessness is the result of the residency restriction as opposed to other common causes of homelessness among the general population in Miami-Dade County. Tellingly, with regard to each Plaintiff, the record reflects that there are many causes of his homelessness other than the Ordinance, including the reluctance of landlords and housing associations to accept tenants with a criminal history, low income, unemployment, mental illness and/or physical disability. *See supra* at Part III(D). For instance, Doe #6 resided in a compliant residence until his property manager found out about his criminal history and refused to renew his lease; Doe #4 lived in a compliant residence with his wife until they separated, and he could no longer afford the lease payments, and later lived in another compliant home until his roommates moved out and he could no longer afford the rent. *See id.* Some Plaintiffs have also limited their housing searches to certain geographic regions of the County, further eliminating housing options. *Id.* Thus, the evidence shows that the Ordinance is not the cause of each Plaintiff's homelessness. *See Shaw*, 823 F.3d at 574 (rejecting argument that residency restrictions increased homelessness among sex offenders and caused plaintiff's homelessness).[35]

      Plaintiffs also suggest some viable options that the County could have chosen to reduce the risk of sexual recidivism, including registration, notification, mandatory probation,

---

[35] Plaintiffs also criticize the Ordinance for not containing any exceptions for offenders with particular hardships, such as three of the Plaintiffs, who have mental or physical disabilities. The Court notes that there may be instances when such offenders could have a potential "as applied" challenge to the Ordinance, such as Doe #7, who is in a wheelchair. However, no Doe has alleged an "as applied" claim here. The Court notes that it rejected Plaintiffs' Motion to Conform Pleading with the Evidence [ECF No. 168], which sought to add an as-applied claim to the Second Amended Complaint, because it would have prejudiced the County since it was not requested until the last day of the non-jury trial, despite Plaintiffs' repeated representations throughout the extensive pretrial proceedings that they were not asserting an "as applied" challenge [ECF No. 170].

mandatory treatment, and GPS monitoring.[36] But again, the issue here is not whether the County has made the "best choice possible" to address the existential threat of recidivism. *See Smith*, 538 U.S. at 105. For the above reasons, the County's selection of the 2,500-foot residency restriction was reasonable. Accordingly, the Court concludes that the residency restriction is not excessive with respect to its nonpunitive purpose.

### V.       CONCLUSION

For the reasons discussed above, Plaintiffs' claims are not barred by the statute of limitations. However, Plaintiffs have not proven that the Ordinance was enacted with punitive intent or carried their burden of establishing by the "clearest proof" that the punitive effect of the Ordinance overrides the County's legitimate intent to enact a nonpunitive, civil measure. Thus, Plaintiffs cannot prevail on their claim that the Ordinance, on its face, violates the ex post facto clauses of the United States and Florida Constitutions. Final judgment will be entered accordingly.

**DONE and ORDERED** in Chambers, in Miami, Florida, on December 18th, 2018.

Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record

---

[36] While these options may be meritorious, Plaintiffs could raise their suggestions and critiques of the residency restriction to the County Commission. However, here, the Court's role is limited to evaluating the constitutionality of the Ordinance, not whether there is a theoretically better ordinance.